UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

CHRISTOPHER SEAN FRANCIS, acting on behalf
of infant child, K.K.S.F.,

                              Petitioner,

    - against -

SHELLON ROBERTA CULLEY,

                           Respondent.

_____

No. 20 Civ. _____

## VERIFIED PETITION FOR WARRANT IN LIEU OF *HABEAS CORPUS* AND PETITION FOR THE RETURN OF CHILD TO PETITIONER

**The Hague Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980**
**International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.***

### PREAMBLE

1.    Petitioner Christopher Sean Francis ("the Father" or "Petitioner"), by and through his attorneys, Duane Morris LLP, brings this Petition pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Convention"), and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*. ("ICARA"). The Convention became effective in the United States on July 1, 1988. For the convenience of the Court, copies of the Convention and ICARA are attached hereto as Exhibits "A" and "B," respectively.

2.    The objects of the Convention are: (1) to secure the prompt return of children wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States. Convention, Article 1(a), and 1(b).

3.      The Republic of Trinidad and Tobago and the United States are Contracting States to the Hague Convention.  The Convention applies to cases in which one parent wrongfully removes and retains his or her child, who is under the age of sixteen (16) years, from the child's "habitual residence" in breach of the other parent's custodial rights, which were being exercised at the time of the wrongful retention of the child.  Convention, Art. 3.

4.      This case involves Respondent Shellon Roberta Culley ("Respondent"), who wrongfully removed the Child K.K.S.F (the "Child" or "K.K.S.F."), a nine-year-old girl, to and retained her in the United States.

5.      Respondent originally traveled with the Child from Trinidad and Tobago to Guyana for what she falsely claimed was a two-week trip.  Thereafter, Respondent took the Child to the United States, in violation of the Father's custody rights validly exercised at the time of the wrongful removal and retention in the United States.

6.      The Father respectfully requests that this Court schedule an expedited hearing on this matter in order to reach an expedited determination on the Petition and order that the Child be returned to Trinidad and Tobago.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 22 U.S.C. § 9003(a) under the Hague Convention, ICARA, 42 U.S.C. § 11603 and 28 U.S.C. § 1331.

8.      This Court has personal jurisdiction over Respondent because she is physically present within this District.

9.      Venue is proper pursuant to 22 U.S.C. § 9003 and 28 U.S.C. § 1391(b) because, upon information and belief, the Child and Respondent are residing at 2301 Newkirk Avenue, Apt. 3, Brooklyn, New York 11226 in the Eastern District of New York; and because this case

involves the removal and retention of a child under the age of sixteen from her habitual residence of the Republic of Trinidad and Tobago to the United States of America.

## HISTORY OF THE CASE AND STATUS
## OF THE FATHER AND CHILD

10.    In or about 2007, the Father and the Respondent, who is a Guyanese national, began an intimate relationship while both were living in Trinidad and Tobago.

11.    On or about April 20, 2012, the Father and the Respondent were married.

12.    The parties have one child together:  K.K.S.F.  The Child was born in 2010 in Mount Hope in Trinidad and Tobago.  The Child is the subject of this Petition.  (*See* Trinidad and Tobago Birth Certificate, annexed hereto as Exhibit "C.")

13.    The parties lived together from 2007 through April 2019, with the Child and Respondent's son, who is not the biological child of the Father.

14.    The Child is a citizen of Trinidad and Tobago and has always known the country as her home.

15.    Trinidad and Tobago is the Child's habitual residence.  Prior to her unlawful removal and retention by Respondent, the Child had always resided with the Father and Respondent in Trinidad and Tobago.

16.    Before the Child's unlawful removal and retention by Respondent, and since her enrolment in 2012, the Child was attending school at Edinburgh Government Primary School in Chaguanas, Trinidad and Tobago.  (*See* School Certification annexed hereto as Exhibit "D.")

17.    The Father works as an elevator technician in Trinidad and Tobago.

18.    The Father tailored his work schedule in order to provide care for the Child and Respondent's son, J.M., and also to support Respondent's efforts to start a nail technician business in Trinidad and Tobago.

19.     Until Respondent wrongfully removed the Child to the United States after refusing to return the Child to Trinidad and Tobago from Guyana, the Father was consistently involved in the care of the Child throughout her life.

20.     Before Respondent's wrongful removal and retention of the Child, the Father picked up and dropped of the Child from daycare, pre-school and school, helped the Child with her homework, did housework and prepared meals and put the Child to bed during times that Respondent worked late hours in her business as a nail technician.

21.     The Father also took the Child to various social events, such as church, birthday parties, movies, the beach and parks, such as Harry's Water Park.

22.     The Father also provided similar childcare for Respondent's son, J.M.

23.     The Child also has other family in Trinidad and Tobago, including her paternal grandmother, Agnes Francis, and aunts, Helen Francis-Baptiste and Kemba Ifill-Francis.

24.     Prior to Respondent's wrongful removal and retention of the Child, the Father provided primary financial support for the Child.

25.     The Father was responsible for the majority of household expenses while he and Respondent cohabited with the children, including rent for the entire family.

26.     Respondent refused to contribute to rent, but agreed to pay the light bill and also helped with groceries.

27.     The Father provided support and assistance to Respondent in establishing her nail technician business, including helping her to obtain necessary equipment.

28.     Respondent and her son J.M. are both Guyanese citizens and do not have legal immigrant status in Trinidad and Tobago.

29.     During his marriage to Respondent, the Father supported Respondent, a Guyanese national, in her now-abandoned efforts to obtain resident status in Trinidad and Tobago and a student permit for her son, J.M.

30.     The Child is now nine (9) years old.  The Convention applies to cases where a child under the age of sixteen (16) has been removed from his or her habitual residence in breach of the custody rights of a petitioner, which petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

31.     The Father has a right of custody of the Child within the meaning of Articles 3 and 5 of the Convention.

32.     The Father and Respondent have held joint legal custody of the Child from her birth in 2010 to the present.

33.     At the time of Respondent's wrongful removal and retention of the Child, the Father was exercising custody rights within the meaning of Articles 3 and 5 of the Convention, in that he is the father of the Child, was residing with the Child, and has exercised custody rights over the Child since her birth in 2010.

34.     Section 4(1) of Trinidad and Tobago's Family Law (Guardianship of Minors, Domicile and Maintenance) Act, Chapter 46:08, provides as follows:

> In relation to the custody or upbringing of a minor,  . . . , a mother shall have the same rights and authority as the law allows to a father, and the rights and authority of mother and father shall be equal and be exercisable by either without the other.

(A true and correct copy of the pertinent excerpt is annexed hereto as Exhibit "E.")

35.     Part III of Trinidad and Tobago's Matrimonial Proceedings and Property Act, Chap. 45:51, entitled, "Protection and Custody of Children," provides as follows:

> 47. (1) The Court shall not make absolute a decree of divorce or of nullity of marriage, or make a decree of judicial separation, unless the Court, by order, has declared that it is satisfied—

(a) that for the purposes of this section there are no children of the family to whom this section applies; or

(b) that the only children who are or may be children of the family to whom this section applies are the children named in the order and that—

(i) arrangements for the welfare of every child so named have been made and are satisfactory or are the best that can be devised in the circumstances; or

(ii) it is impracticable for the party or parties appearing before the Court to make any such arrangements; or

(c) that there are circumstances making it desirable that the decree should be made absolute or should be made, as the case may be, without delay notwithstanding that there are or may be children of the family to whom this section applies and that the Court is unable to make a declaration in accordance with paragraph *(b)* above.

(A true and correct copy of the pertinent excerpt is annexed hereto as Exhibit "F.")

36.     On or about September 20, 2018, Respondent filed a petition for divorce in the High Court of Justice, Family Division of the Family and Children Court in Trinidad and Tobago (the "Trinidadian Court").

37.     The Father did not wish to divorce from Respondent as he still loved her.

38.     Respondent informed the Father that she had prepared the divorce petition herself.

39.     In her divorce petition, Respondent falsely stated under oath that "[t]he parties to the marriage have lived apart for a continuous period of at least two (2) years immediately preceding the presentation of the petition," which is one of the requirements to obtain a divorce under Trinidadian law.

40.     Instead, the Father and Respondent lived together from 2007 through the filing of the September 20, 2018 divorce petition.

41.     The Father and Respondent continued to live together with the Child and Respondent's son, J.M., after Respondent filed the petition for divorce from the Father.

42.     Respondent was required to identify the Child in her divorce petition under Trinidadian law.

43.     Respondent's divorce petition omitted the existence of the Child.

44.     Instead, Respondent's petition for divorce falsely stated under oath that "there [we]re no children of the family now living."

45.     The divorce petition provided an inaccurate address for the Father, which was not the same address that he and Respondent cohabitated with the Child and Respondent's son, J.M.

46.     On or about September 20, 2018, Respondent asked the Father to sign a consent form to her divorce petition.

47.     Prior to signing the consent form on September 20, 2018, the Father did not read Respondent's divorce petition.

48.     Respondent told the Father that he did not need to appear at the court hearing in connection with her divorce petition.

49.     On or about January 7, 2019, the Father appeared without counsel at the court hearing on Respondent's divorce petition.

50.     On or about January 7, 2019, the Trinidadian Court issued a Decree Nisi in connection with Respondent's divorce petition.   (A true and correct copy of the Decree Nisi is annexed hereto as Exhibit "G.")

51.     As a result of Respondent's failure to inform the Trinidadian Court of the existence of the Child, the issue of custody and access to the Child was not addressed by the Trinidadian Court in its January 7, 2019 Decree Nisi.

52.     Under Trinidadian law, the Decree Nisi did not end the marriage between the Father; rather, the Decree Nisi is a provisional decree that the parties' marriage is considered to have irretrievably broken down.

53.     Under Trinidadian law, after the issuance of the Decree Nisi, Respondent was required to apply for a decree absolute in order to end the marriage.

54.     On or about February 20, 2019, Respondent filed an application for the decree absolute necessary to end the parties' marriage in Trinidad and Tobago.

55.     After Respondent's filing of the divorce petition in September 2018 until April 5, 2019, the Father and Respondent continued to live together with the Child and her brother, J.M.

56.     On or about April 4, 2019, Respondent informed the Father that she would be visiting Guyana for business and intended to take the Child for the Easter Vacation and would return in two weeks.

57.     The Father agreed to permit the Child to accompany Respondent on the two-week trip to Guyana, as Respondent had previously travelled with the Child for vacation and returned to Trinidad and Tobago.

58.     On or about April 5, 2019, the Father returned home from work in order to transport Respondent and Child to the airport for the trip to Guyana when he discovered that they had already left for the airport.

59.     The Father then met Respondent and the Child at the airport, at which time Respondent confirmed that she would return the Child to Trinidad and Tobago in two weeks.

60.     Respondent then travelled to Guyana with the Child.

61.     On or about April 15, 2019, the Father inquired with Respondent as to when she would be returning to Trinidad and Tobago with the Child.

62.     Respondent then informed the Father that she would not be returning to Trinidad and Tobago with the Child.

63.     The Father was later informed by the Child's school in Trinidad and Tobago that Respondent had notified the Child's teacher that they would be leaving Trinidad and Tobago and would not be returning to the school.

64.     Respondent refused to disclose to the Father the address in Guyana where she was keeping the Child.

65.     Respondent also refused to provide the Father with information concerning whether and what school the Child was enrolled in while she was being improperly kept in Guyana.

66.     Since her wrongful removal and retention of the Child, Respondent has restricted and monitored the Father's communications with the Child.

67.     On or about April 25, 2019, Respondent sent the Father a video of the Child, which showed that the Child was hospitalized in Guyana.

68.     Respondent claimed that the Child was hospitalized in Guyana for bumps on her skin that resulted from her eating too many sweets and not drinking enough water.

69.     Respondent refused to inform the Father of the hospital at which the Child was being treated in Guyana.

70.     After consulting with Trinidadian counsel, on or about April 15, 2019, the Father filed an acknowledgment of service with the Trinidadian Court, in which he stated that he no longer consented to the divorce from Respondent due to the discrepancies in her divorce petition concerning the existence of the Child.

71.     On or about May 3, 2019, the Father filed an application with the Trinidadian Court to set aside Respondent's application to make the January 7, 2019 Decree Nisi absolute.

72.     On May 6, 2019, the Trinidadian Court issued an Order that the Decree Nisi issued on January 7, 2019 shall not be made final and absolute until after hearing and determination of the Father's application.  The hearing was set for July 24, 2019.

73.     In May 2019, the Father's family law attorneys in Trinidad and Tobago contacted the Trinidadian Central Authority – Civil Child Abduction Authority to obtain assistance in the return of the Child from Guyana.

74.     By letter dated May 10, 2019, the Father's family law attorneys notified the Trinidadian Central Authority that Respondent was residing in Guyana at a location that she refused to disclose to the Father and had restricted communications between the Father and the Child.  (A true and correct copy of the May 10, 2019 letter is annexed hereto as Exhibit "H.")

75.     On or about May 29, 2019, the Trinidadian authorities referred the Father's family law attorneys to the Guyanese Childcare and Protection Agency, but informed them that, while the Convention was entered into force by Guyana on May 1, 2019, the Convention had yet to be formally entered into force between Trinidad and Tobago and Guyana, and therefore that "formal requests for assistance cannot be facilitated by [the Trinidadian authorities] until same occurs."

76.     In June 2019, the Father was informed by his mother that Respondent had posted on Facebook that she was working as a night nurse at a hospital in the United States.

77.     The Father was also informed by his sister, Helen Francis-Baptiste, that she had been told by her aunt who resides in the United States that she had seen Respondent in the United States.

78.    In July 2019, the Father's Trinidadian counsel learned that Respondent posted on her Instagram page that she was working in the United States as a nail technician at 1756 Flatbush Avenue in Brooklyn, New York.

79.    On or about July 20, 2019, Respondent blocked the Father from her Facebook account and ceased further contact with the Father through Facebook Messenger.

80.    On July 24, 2019, the Trinidadian Court issued its Order in Chambers providing as follows in relevant part:

> THIS COURT ORDERS that pending the determination of the issue of custody, care and control of the minor child of the parties namely, [K.K.S.F.] . . . :
>
> a) Sole interim custody, care and control of the child shall hereby be granted to [the Father]; and
>
> b) [Respondent] shall with immediate effect return the chi[l]d to the jurisdiction of this court in Trinidad and Tobago.

(A true and correct certified copy of the July 24, 2019 Order in Chambers with appropriate redactions is annexed hereto as Exhibit "I.")

81.    Because Respondent had secreted herself and the Child, the Father was unable to provide Trinidadian Court officials with a current address at which to serve the July 24, 2019 Order in Chambers on Respondent.

82.    Respondent has not complied with the July 24, 2019 Order in Chambers, which requires her to return the Child to Trinidad and Tobago.

83.    After learning in July 2019 that Respondent had moved with the Child from Guyana to the United States without his knowledge or consent, the Father's Trinidadian family law attorneys notified the Trinidadian Central Authority – Child Abduction Authority.

84.    On September 11, 2019, the Father submitted his application to the Trinidadian Central Authority – Child Abduction Authority for assistance under the Convention in the return of the Child from the United States.

85.    On or about October 8, 2019, Trinidadian Central Authority – Child Abduction Authority referred the Father's application for return of the Child under the Convention to the United States Department of State.  (A true and correct copy of the October 8, 2019 referral and the Father's Hague Convention application with appropriate redactions is annexed hereto as Exhibit "J.")

86.    The residences of the minor child are as follows:

| DECLARATION ESTABLISHING TRINIDAD AND TOBAGO AS THE HABITUAL RESIDENCE OF THE CHILD | |
|---|---|
| Child's Name | K.K.S.F. |
| Place of Birth | Mt. Hope General Hospital Mt. Hope, Trinidad and Tobago |
| Birth Year | 2010 |
| Gender | Female |
| | |
| Period of Residence | November 2010 through July 2011 |
| Number of Days/Months/Years: | Approximately eight months |
| Purpose | The Child lived with the Father, Respondent and Respondent's son at their joint residence. |
| Address | McDonald Street Curepe, Trinidad and Tobago |
| Person(s) the Child Lived With | The Father, Respondent and Respondent's son. |
| Relationship to the Child | Father, Mother and Brother. |
| | |

| | |
|---|---|
| Period of Residence | July 2011 to 2014 |
| Number of Days/Months/Years: | Approximately three years. |
| Purpose | The Child lived with the Father, Respondent and Respondent's son at their joint residence. |
| Address | # 31 Robin Crescent Edinburgh 500 Chaguanas, Trinidad and Tobago |
| Person(s) the Child Lived With | Petitioner, Respondent and Respondent's son. |
| Relationship to the Child | Father, Mother and Brother. |
| | |
| Period of Residence | 2014 through April 2019 |
| Number of Days/Months/Years: | Approximately five years |
| Purpose | The Child lived with the Father, Respondent and Respondent's son at their joint residence. |
| Address | #103 Robin Crescent, Edinburgh 500, Chaguanas, Trinidad and Tobago |
| Person(s) the Child Lived With | Petitioner, Respondent and Respondent's son. |
| Relationship to the Child | Father, Mother and Brother. |
| | |
| Period of Residence | April 2019 to approximately July 2019 |
| Number of Days/Months/Years: | Approximately three months. |
| Purpose | Respondent's purported business and vacation travel with the Child. |
| Address | Unknown location in Guyana. |
| Person(s) the Child Lived With | Respondent and Respondent's Son. |
| Relationship to the Child | Mother and Brother. |
| | |

| Period of Residence | Approximately July 2019 to Present |
|---|---|
| Number of Days/Months/Years: | Approximately eleven months. |
| Purpose | Wrongful removal and retention by Respondent. |
| Address | 2301 Newkirk Avenue, Apt. 3, Brooklyn, New York 11226 (Unknown at present whether the Child has been kept at other addresses in the United States.) |
| Person(s) the Child Lived With | Respondent and Respondent's son. |
| Relationship to the Child | Mother and Brother. |
| | |

87.     Respondent has refused to provide the Father with the address at which she is wrongfully retaining the Child in the United States.

88.     On July 6, 2020, the Legal Assistance Coordinator with the Bureau of Consular Affairs of the United States Department of State provided Respondent's last known address in the United States to the undersigned counsel of record for the Father.  (A true and correct copy of the July 6, 2020 letter is annexed hereto as Exhibit "K.")

89.     Based on the July 6, 2020 letter from the United States Department of State, the Child has or does reside with Respondent at her last known address, 2301 Newkirk Avenue, Apt. 3, Brooklyn, New York 11226.

90.     Upon information and belief, the Child may also have resided with Respondent at the other addresses in the United States during the period of unlawful removal and retention in the United States.

91.     Respondent has refused to provide the Father with information concerning whether and where the Child has attended school while being wrongfully retained in the United States.

92.     The Father does not know the United States immigration status of the Child during the time that she has been wrongfully retained by Respondent in the United States.

93.     The Father does not know the United States immigration status of Respondent during the time that she has wrongfully retained the Child in the United States.

94.     The Father knows of no other person or institution not a party to this proceeding who has physical custody of the Child or claims to have rights of parental responsibilities or legal custody or physical custody of, or visitation or parenting time with the Child.

95.     Since April 2019, the Father has only been permitted by Respondent to communicate with the Child by telephone call and video chat under the watch and control of Respondent.

96.     During those calls, the Child has told the Father that she wants to return to Trinidad and Tobago to live with him.

97.     Under the July 24, 2019 Order of Chambers, the Father has sole interim custody of the Child and his clearly defined custodial rights have been violated by Respondent's actions. (*See* Ex. I.)

98.     Respondent is violating the Father's parental and custodial rights as defined by the Hague Convention.

## WRONGFUL RETENTION OF THE CHILD BY RESPONDENT

99.     A removal or retention of a child is wrongful under Article 3 of the Hague Convention if: (a) the removal of retention is in breach of *custody rights* attributed to a person, institution, or other body, either jointly or alone, under the law of the state in which the child was *habitually resident* immediately before the removal or retention; and (b) at the time of the

removal or retention, those custody rights were *actually exercised,* or would have been exercised, but for the removal or retention of the child.  *See* Hague Convention, Arts. 3 and 5.

100.    "Custody rights" under the Hague Convention are defined to include "rights relating to the care of the person of the child, and in particular, the right to determine the child's place of residence."  *See* Hague Convention, Art. 5(a).

101.    On or about April 5, 2019, the Child flew to Guyana with Respondent.

102.    The parties agreed that the Child would spend two weeks with Respondent in Guyana and that the Child would be returned to the family's home in Trinidad and Tobago in April 2019.

103.    Respondent never returned the Child to Trinidad and Tobago from Guyana as was agreed between her and the Father.

104.    Rather, Respondent refused to disclose the location of the Child in Guyana and then secreted the Child from Guyana to the United States and Respondent has thus wrongfully retained the Child.

105.    The Child's country of "habitual residence" as defined in Article 3 of the Hague Convention is Trinidad and Tobago, which is where the child habitually resided prior to her visit to Guyana in April 2019 and subsequent wrongful removal to the United States in or about July 2019.

106.    The Father has a right to custody of the Child within the meaning of Articles 3 and 5 of the Hague Convention and the laws of Trinidad and Tobago and pursuant to the July 24, 2019 Order of Chambers granting him sole interim custody of the Child and ordering Respondent to return the Child to Trinidad and Tobago.  (*See* Ex. I.)

107.    On or about September 11, 2019, the Father filed a formal Request for the return of the Child with the Central Authority in Trinidad and Tobago in accordance with the Hague Convention; the Father's request/application was forwarded to the Central Authority of the United States (United States Department of State).  (*See* Ex. J.)

108.    Upon information and belief, the Child is presently being illegally held in custody, confinement or restraint within this Court's jurisdiction at 2301 Newkirk Avenue, Apt. 3, Brooklyn, New York 11226.  (*See* Ex. K.)

## PROVISIONAL REMEDIES

109.    Pending further hearing in this Court, the Father respectfully requests that this Court issue an immediate order prohibiting the removal of the Child from the Eastern District of New York, directly or indirectly.

110.    The Father respectfully requests that this Court issue an order to show cause directing Respondent to show cause why she has not returned the Child to the Father in Trinidad and Tobago and that Respondent be directed to appear at order to show cause hearing with the Child pursuant to ICARA, 22 U.S.C. § 9004(b) and New York's Uniform Child Custody Jurisdiction and Enforcement Act, N.Y. Domestic Relations Law § 77-g(3).

111.    The Father respectfully requests that this Court issue an order to show cause directing Respondent to the United States Marshals Service:  (1) Respondent's passport and all other travel documents and (2) the Child's passport and all other travel documents.

112.    The Father respectfully requests that this Court order Respondent to immediately produce to the Court (1) any tourist visa for the Child and (2) any work visa for Respondent and anyone claiming the Child as a dependent, and (3) produce any application submitted to the

United States Citizenship and Immigration Service ("USCIS") concerning the Child and any documents reflecting action taken by USCIS on any application concerning the Child.

113.    The Father respectfully requests that this Court order Respondent to immediately provide the address at which she is wrongfully retaining the Child in the United States.

114.    The Father respectfully requests that this Court order Respondent to provide the names and addresses of the schools that the Child has attended during the time wrongfully retained here in the United States.

115.    The Father respectfully requests that this Court order Respondent to produce the Child's school and immunization records for the time wrongfully retained here in the United States at the order to show cause hearing.

116.    The Father respectfully requests that the Court schedule an expedited hearing on the Verified Petition for the immediate return of the Child to Trinidad and Tobago, the Child's habitual residence and that Respondent be directed to appear at the expedited hearing with the Child pursuant to ICARA, 22 U.S.C. § 9004(b) and New York's Uniform Child Custody Jurisdiction and Enforcement Act, N.Y. Domestic Relations Law § 77-g(3).

**NOTICE OF HEARING**

117.    Pursuant to 42 U.S.C. § 11603(c), Respondent shall be given notice pursuant to New York's Civil Practice Law and Rules.

**ATTORNEYS' FEES AND COSTS**

118.    The Father will submit a copy of all expenditures to date incurred by him as a result of the wrongful removal of the Child by Respondent.

119.    The Father will amend this list from time to time to include further expenditures required because of this wrongful removal of the Child.

120.    The Father requests that this Court award all costs and fees incurred to date as required by 42 U.S.C. § 11607, reserving jurisdiction over further expenses.

## RELIEF REQUESTED

The Father respectfully requests that pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, and the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.,* this Court:

a.    Schedule an expedited hearing on the Petition and communicate that hearing date and time to Petitioner so that Petitioner may provide notice of these proceedings and the hearing pursuant to ICARA, 42 U.S.C. § 11603(c).

b.    Issue an order to show cause for Respondent to show cause why she has not returned the Child to Petitioner in Trinidad and Tobago.

c.    Issue an immediate order directing Respondent to surrender any and all of Respondent's passports and other travel documents all of the passports and other travel documents of the Child.

d.    Issue an immediate order directing Respondent to surrender to the Court (1) any tourist visa for the Child, (2) any work visa for Respondent and anyone claiming the Child as a dependent, and (3) produce any application submitted to the United States Citizenship and Immigration Service ("USCIS") concerning the Child and any documents reflecting action taken by USCIS on any application concerning the Child.

e.    Issue an immediate order directing Respondent to provide the names and addresses of the schools that the Child has attended during the time wrongfully retained here in the United States.

f.      Issue an immediate order directing Respondent to produce the Child's school and immunization records.

g.      Issue an immediate order pursuant to ICARA, 42 U.S.C. § 11604(a), prohibiting Respondent from removing the Child from the jurisdiction during the pendency of these proceedings, directly or indirectly.

h.      Issue an order following the hearing, directing that the Child shall be returned to her Habitual Residence of Trinidad and Tobago, pursuant to Article 12 of the Convention.

i.      Directing that Respondent shall be given Notice pursuant to New York's Civil Practice Law and Rules, pursuant to ICARA, 42 U.S.C. § 11603(c);

j.      Issue an Order directing Respondent to pay Petitioner for all costs and fees incurred to date by reason of the Child's wrongful removal and retention pursuant to 42 U.S.C. § 11607, reserving jurisdiction over further expenses; and

k.      Granting such other and further relief as this Court may deem appropriate.

Dated: New York, New York
       July 23, 2020

**DUANE MORRIS LLP**

By:  ___s/ Ralph Carter_____
       Kevin J. Fee
       Ralph Carter
1540 Broadway
New York, New York 10036-4086
Tel: (212) 692-1000

Email: kjfee@duanemorris.com
       rcarter@duanemorris.com

*Attorneys for Petitioner*
*Christopher Sean Francis*

**VERIFICATION**.

I, CHRISTOPHER SEAN FRANCIS, solemnly declare and affirm under the penalties of perjury and the laws of the United States of America, that I am the Petitioner in the within action and have read the foregoing Petition and know the contents of the foregoing Petition are true, to the best of my knowledge, except as to those matters alleged upon information and belief.

Executed on July 23, 2020 at Port of Spain, Trinidad and Tobago

_____
Christopher Sean Francis