UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
CHRISTOPHER SEAN FRANCIS, acting on
behalf of infant child, K.K.S.F.,

                             Petitioner,                   **MEMORANDUM & ORDER**
                                                20-CV-3326 (PKC) (SJB)

        - against -

SHELLON ROBERTA CULLEY,

                             Respondent.
---------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Petitioner Christopher Sean Francis ("Petitioner"), a citizen of Trinidad and Tobago, petitions this Court for the return of his now 10-year old daughter to Trinidad and Tobago pursuant to the Convention on the Civil Aspects of International Child Abduction, held at the Hague on October 25, 1980 (the "Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. §§ 9001 *et seq.* ("ICARA"). The child, K.K.,[1] has been retained in the United States by her mother, Respondent Shellon Roberta Culley ("Respondent"), a citizen of Guyana, without Petitioner's consent since April 6, 2019. While Respondent concedes the *prima facie* elements of an ICARA violation, she asserts defenses that could bar K.K.'s return to Trinidad and Tobago. The Court has assessed the evidence presented over the course of a 10-day hearing, during which 16 witnesses testified and more than 100 exhibits were entered into evidence, and has carefully considered the arguments presented by the parties in extensive post-hearing briefs. For the reasons set forth below, the Court denies the petition.

---

[1] The minor child's initials, instead of her full name, will be used to protect her identity. Fed. R. Civ. P. 5.2(a)(3).

# BACKGROUND

### I.   Procedural History

On July 23, 2020, Petitioner commenced these proceedings by filing a verified petition pursuant to the Hague Convention and ICARA and seeking, *inter alia*, an expedited hearing on the petition, an order for Respondent to show cause why she has not returned K.K. to Trinidad and Tobago, and an order, following the expedited hearing, directing K.K.'s return to Trinidad and Tobago.  (*See generally* Verified Petitioner for Warrant in lieu of Habeas Corpus and Petitioner for the Return of Child to Petitioner ("Verified Petition"), Dkt. 1; Proposed Order to Show Cause and Temporary Restraining Order, Dkt. 2.)

On July 24, 2020, the Court issued an Order to Show Cause with Temporary Restraining Order ("TRO"), ordering Respondent, or her attorneys, to appear via video conference for a show cause hearing and expedited hearing, and pending the expedited hearing and merits determination of the Verified Petition, prohibiting Respondent from removing K.K. from the Eastern District of New York and directing Respondent to provide certain information to the Court regarding K.K.'s circumstances in the United States.  (*See generally* July 24, 2020 Order, Dkt. 7; 7/24/2020 Docket Order.)

On August 4, 2020 the Court conducted a show cause hearing, at which Petitioner was represented by counsel of record in this matter, as well as counsel in Trinidad, Desiree Sankar and Kimba Ifill-Francis, and Respondent appeared *pro se*.  (8/4/2020 Minute Entry.)  The Court extended the TRO until the date of the preliminary injunction hearing, scheduled for August 12, 2020.  (*Id.*)  On August 11, 2020, Respondent's counsel of record in this matter entered their appearances.  (Notices of Appearance, Dkts. 21–23.)  In order to give Respondent's counsel time to prepare for the preliminary injunction hearing, the Court converted the August 12, 2020 hearing

into a status conference (8/12/2020 Docket Order), via video[2], during which Respondent consented to a preliminary injunction consistent with the terms of the TRO (8/12/2020 Minute Entry).

During a discovery conference held on August 28, 2020, the Court, *inter alia*, prohibited Petitioner's counsel from providing electronic or physical copies of Respondent's immigration documentation to Petitioner or his counsel in Trinidad and requiring the destruction (with certification) of any copies already provided, and prohibited Petitioner, his counsel, and all others connected to Petitioner from "affirmatively seeking to intervene in or interfere with the adjudication of Respondent's immigration status." (8/28/2020 Minute Order.)

On September 10, 2020, Respondent filed her verified answer to the Verified Petition. (*See* Verified Answer to Petition, Dkt. 44.)

On October 8, 2020, the Court entered a protective order regarding Respondent's complete immigration or "A" file, obtained for *in camera* review pursuant to the Court's September 22, 2020 subpoena to the Department of Homeland Security and United States Citizenship and Immigration Services. (*See* Protective Order Issued Pursuant to Fed. R. Civ. P. 26(c) ("Oct. 8, 2020 Protective Order"), Dkt. 80.) Noting the "extraordinary sensitivity of the documents" the Court imposed specific limitations on the parties' custody and use of copies of these documents and required destruction of these materials after the conclusion of these proceedings. (*Id.*)

On October 14, 2020, the parties jointly filed stipulations of facts. (Joint Stipulations of Fact ("Joint Stip."), Dkt. 92.)[3]

_____

[2] All court proceedings in this matter, including the ten-day evidentiary hearing, were conducted via video, with the parties' consent, due to the COVID-19 pandemic and Petitioner's right to an expedited hearing under the Hague Convention and ICARA.

[3] The Court notes that the parties' Joint Stipulation was "made for the purposes of streamlining" the evidentiary hearing, and the facts contained therein "are not admissions as to the truth . . . for the purposes of any other proceeding. Further, the parties do not concede that any of

On October 15, 2020, the Court commenced an evidentiary hearing, via video.[4]  Given Respondent's concession of Petitioner's *prima facie* ICARA case, Respondent presented evidence in support of her defenses first.  (*See* 10/08/2020 Minute Order.)  The hearing continued on October 16, October 19, October 20, October 23, October 26, October 27, October 28, October 29, and concluded on October 30, 2020.[5]  The Court heard testimony from 16 witnesses, including Petitioner, Respondent, and five expert witnesses.  K.K. did not testify, but Respondent's 13-year old son and K.K.'s brother, J.M., did.[6]

---

the [] stipulated facts is relevant to any claim or defense at issue" in this matter.  (Joint Stip., Dkt. 92, at 1.)

[4] As noted at the hearing, the Court conducted the hearing with an understanding that due to the summary and expedited nature of Hague Convention proceedings, the rules of evidence could be applied in a somewhat more "relaxed fashion."  *Demaj v. Sakaj*, No. 09-CV-255 (JGM), 2012 WL 965214, at *3 (D. Conn. Mar. 21, 2012) ("[T]he Federal Rules of Evidence do apply in Hague Convention and ICARA actions, albeit in a more 'relaxed' fashion." (internal citation omitted)); *see Leonard v. Lentz*, No. 17-CV-3037 (LRR), 2017 WL 11453697, at *1 (N.D. Iowa Oct. 12, 2017) ("In this case, the expedited nature of these proceedings, the truncation of the time period between the date on which the Motion was due and the hearing, the relaxed application of the Federal Rules of Evidence and the court's role in determining the facts, rather than a jury, all suggest that no prejudice will result from the court ruling on the Motion without awaiting a resistance.").  At the same time, as further discussed below, the Court was and remains mindful of the need to adhere to the rules limiting the admission and the Court's consideration of hearsay evidence in Hague Convention matters.  *See*, *e.g.*, *Vazquez v. Vasquez*, No. 13-CV-1445 (B), 2013 WL 7045041, at *1 n.2 (N.D. Tex. Aug. 27, 2013) (collecting cases and noting that when it comes to matters of hearsay in Hague Convention cases, courts are careful to apply the rules of evidence, mindful that "wrongful removal and retention claims often involve he said/she said-type evidence"), *aff'd sub nom. Sealed Appellee v. Sealed Appellant*, 575 F. App'x 507 (5th Cir. 2014).

[5] Throughout the proceedings, consistent with the Court's Oct. 8, 2020 Protective Order, the Court sealed the courtroom, including to exclude Petitioner's non-U.S.-based litigation team, for questions regarding Respondent's "A" File.

[6] On October 13, 2020, the Court issued an Order, on motion of the minor and interested party J.M., Respondent's son and K.K.'s older brother, that it would seal the courtroom during J.M.'s testimony and that portion of the hearing transcript.  (10/13/2020 Docket Order.)  The Court subsequently modified this Order, clarifying that Petitioner's non-U.S. counsel would be excluded from observing, via video or telephone, J.M.'s testimony, but that the parties' identified experts would be permitted to observe J.M.'s testimony.  (10/14/2020 Docket Order.)

Following the hearing, the parties filed extensive post-hearing briefs, setting forth proposed findings of fact and conclusions of law.  (*See* Post-Hearing Brief of Respondent ("Resp't's Br."), Dkt. 119; Petitioner's Post-Trial Brief ("Pet'r's Br."), Dkt. 122), Post-Hearing Reply Brief of Respondent ("Resp't's Reply"), Dkt. 126; Petitioner's Post-Trial Reply Brief ("Pet'r's Reply"), Dkt. 127.)

## II.  Findings of Fact

The Findings of Fact are based on the parties stipulated facts, the evidence presented during the evidentiary hearing, including witness testimony and documents, and the parties' post-hearing submissions.   Unless otherwise indicated, the Court finds any recited fact as having been established by a preponderance of the evidence, meaning that the "fact is more likely true than not true." *Valles Rubio v. Veintimilla Castro*, No. 19-CV-2524 (KAM) (ST), 2019 WL 5189011, at *16 n.17 (E.D.N.Y. Oct. 15, 2019) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)), *aff'd*, 813 F. App'x 619 (2d Cir. 2020) (summary order).  With respect to certain disputed facts, the Court sets forth the relevant evidence and its preponderance findings regarding the established facts.

### A.    The Parties Meet and Begin a Family

In or about 2007, Petitioner and Respondent, who were both living in Trinidad, met, began an intimate relationship, and started living together, which they did continuously until April 5, 2019.  (Joint Stip., Dkt. 92, ¶¶ 6–7, 12.)  Petitioner is a Trinidadian national, while Respondent is a citizen of Guyana, who arrived in Trinidad in 2007.  (*Id.* ¶¶ 4–5.)  Respondent explained that she traveled to Trinidad because she "wanted to get a better life for [her]self and [her] son," J.M., who was just a few months old at that time and initially remained in Guyana.  (Respondent ("Resp't") Tr. 55:7–23 (testifying that J.M. was born in July 2007), 60:20–61:16.)

Respondent confided in Petitioner about her prior abusive relationships with two men, Andrew Moore, who is J.M.'s father, and Ryan Arjun.  (Resp't Tr. 56:13–22, 59:5–17; Petitioner ("Pet'r") 1619:11–20.)  Petitioner promised that he would help Respondent get a ticket for J.M. to come to Trinidad and would help enroll J.M. in school.  (Resp't Tr. 60:12–19; *see* Pet'r Tr. 1618:21–1619:10.)  In 2009, when J.M. was around three years old, he joined his mother and Petitioner in Trinidad, and lived with them continuously until April 5, 2019.  (Joint Stip., Dkt. 92, ¶8; Resp't Tr. 61:19–62:3.)  In November 2010, K.K., the parties' only child together, and the subject of these proceedings, was born in Trinidad.  (Joint Stip., Dkt. 92, ¶¶ 9–10; Resp't Tr. 60:18–19.)[7]  As will be discussed, Petitioner and Respondent married in April 2012 in Trinidad. (Joint Stip., Dkt. 92, ¶ 11.)

**B.    K.K.'s Extended Family, School, and Daycare in Trinidad**

K.K. has other family in Trinidad on Petitioner's side, including her paternal grandmother, Agnes Francis, her paternal aunt, Helen Francis-Baptiste and uncle, Sherwin Baptiste, and their children Adria, Alexia, and Aidan, as well as a paternal uncle and aunt, Christian Francis and Kemba Ifill-Francis, respectively, and their child Kayla.  (*Id.* ¶ 16.)  Petitioner's brother, Christian Francis, a teacher and dean of discipline at a secondary school in Trinidad, visited Petitioner and Respondent's home "on a few occasions."[8]  (Francis Tr. 1365:23-25, 1366:13-15, 1390:1–10.) Prior to 2017, Francis saw K.K. on a near-weekly basis, however, after he and his family moved,

---

[7] From the time of her birth to April 5, 2019, K.K. resided with Petitioner, Respondent, and J.M. in Trinidad and Tobago at three different addresses: (1) McDonald Street Curepe from November 2010 through July 2011, (2) #31 Robin Crescent, Edinburgh 500 Chaguanas from July 2011 to 2014, and (3) #103 Robin Crescent, Edinburgh 500 Chaguanas from 2014 through April 5, 2019.  (Joint Stip., Dkt. 92, ¶ 15.)

[8] At the evidentiary hearing, Christian Francis had difficulty recalling if he had visited the parties' home as often as once a year.  (Francis Tr. 1390:1–10.)

he only saw K.K. at family gatherings, approximately once every two months. (Francis Tr. 1400:9–1401:15, 1401:21–1402:10.) Christian Francis has not had any contact with Respondent or K.K. since they left Trinidad, despite having a Facebook account. (Francis Tr. 1393:3–1394:3.) Although the Francis family discussed having a "family meeting and chat" with K.K., they did not do so. (Francis Tr. 1397:19–1398:2 ("[W]ith all that was happening, the trauma that seemed to be involved, [Petitioner] expressed K.K. being frustrated with the process and so on. We felt we did not want to complicate things any further.").) Helen Francis-Baptiste, Petitioner's older sister, is a social worker in Trinidad. (Francis-Baptiste Tr. 1406:15–25, 1408:20–1412:6.) Since 2016, Francis-Baptiste was not able to visit K.K. often. (Francis-Baptiste Tr. 1445:2–14.) Francis-Baptiste has not spoken with K.K. since she moved to the United States in April 2019. (Francis-Baptiste Tr. 1446:19–21.)

From 2012 through April 5, 2019, K.K. attended Edinburgh Government Primary School in Chaguanas, Trinidad. (Joint Stip., Dkt. 92, ¶ 22.) According to Respondent, K.K. was initially excited to start school in Trinidad, but then became afraid after a boy began bullying her, including pushing her down, twice requiring K.K. to see a doctor for injuries. (Resp't Tr. 172:24–173:23; ▓▓▓▓▓▓▓▓▓▓▓▓▓; Pet'r Tr. 2011:14–16.) K.K. did well in school, but had difficulty in math. (Resp't Tr. 173:24–174:4; Pet'r Tr. 2009:9–17; *see* R005 at R005.004.) Sometimes staff at K.K.'s school hit K.K.'s hand with a ruler. (Pet'r Tr. 2013:10–15.)

As far as childcare duties were concerned, Petitioner "sometimes picked up and dropped off K.K. from daycare, pre-school, and school; occasionally helped K.K. with her homework; and sometimes prepared meals and put K.K. to bed during times that Respondent was at work." (Joint Stip., Dkt. 92, ¶ 20.) Petitioner also "has accompanied K.K. to social events, parties, movies, the beach, and the park." (*Id.* ¶ 21.) Several times a month, however, Petitioner picked K.K. and J.M.

up from daycare as late as midnight—on those nights, Respondent, who was at work, got a call from the daycare center that they could not reach Petitioner, but that the kids were still there and that they were hungry and wearing their school uniforms.  (Resp't Tr. 155:22–156:23, 157:8–158:5; ███████████.)  Because Respondent had limited access to a car, she took a taxi to pick the kids up.[9]  (Resp't Tr. 108:22–109:12, 157:3–7.)

### C.   Petitioner Degrades and Isolates Respondent

Petitioner did not introduce Respondent to his friends when they started dating because, according to Respondent, "his friends like to talk about Guyanese wom[e]n . . . they like to discriminate [against] Guyanese women. So [Petitioner] was kind of ashamed of that, and he tried to hide me."  (Resp't Tr. 69:7–18.)  This made Respondent feel "ashamed" and "embarrassed."  (Resp't Tr. 69:19–23.)   Petitioner was even reluctant to introduce Respondent to his sister.  (Francis-Baptiste Tr. 1413:1–8.)  According to Francis-Baptiste, Petitioner was concerned about how their mother would respond, given that Respondent "doesn't have the same background as we have, she is not from the same country, she doesn't have the same value system that we have."  (Francis-Baptiste Tr. 1414:3–10.)

On or about April 20, 2012, Petitioner and Respondent married at the "Hindu office" through a non-religious, administrative ceremony that was not attended by any of Petitioner's family members.  (Joint Stip., Dkt. 92, ¶ 11; Resp't Tr. 70:9–20, 171:13–21, 172:5–12; Pet'r Tr. 1647:10–1648:14; P006 at PET_0000106)  Petitioner did not invite his family to the wedding because he was "ashamed" that they got married in that manner.  (Pet'r Tr. 1654:23–1655:6.)  Francis-Baptiste found out about the wedding somewhere around 2015 or 2016, when Petitioner

---

[9] Petitioner admitted only to being late to pick the kids up "a couple of times" and getting there at 6:15 p.m. or 6:30 p.m., or sometimes on Fridays at 7:30 p.m. or 8:00 p.m. at the latest.  (Pet'r Tr. 1678:9–1679:2.)  The Court does not credit this testimony.

"kind of dropped it like a bomb."  (Francis-Baptiste Tr. 1426:3–21.)   Christian Francis was likewise shocked by the news.  (Francis Tr. 1378:7–20.)

The night of the wedding, Petitioner went out to karaoke with his friends and did not invite Respondent to join, leaving her to feel "sad . . . ashamed, embarrassed" and "not loved."  (Resp't Tr. 70:22–71:10.)  Following the wedding, the parties' relationship worsened because, according to Respondent, Petitioner would stay out all night at karaoke or the casino, and because of Petitioner's "physical, sexual, [and] controlling behavior," including isolating Respondent from her family and threatening her "with immigration."  (Resp't Tr. 71:11–19.)   From 2011 to approximately 2014, Petitioner sometimes went to karaoke, stayed out until 10:00 p.m. or midnight, drank alcohol, and drove home.  (Pet'r Tr. 2080:8–2081:5, 2096:24–2097:6.)  In the later years of their relationship, Petitioner went to the casino every weekend, typically from 9:00 or 10:00 p.m. to as late as 3:00 a.m., drank alcohol, and drove home.  (Pet'r Tr. 2095:20–2096:23.)

### D.    Verbal Arguments and Immigration Threats by Petitioner

The parties' relationship was rife with heated, verbal arguments, though the evidence indicates that both parties got angry and loud during these arguments.  J.M., who is now 13 years old,[10] ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[10] The Court notes that although the transcript indicates that J.M. testified that he was 15 years old at the time of the evidentiary hearing, the Court finds, based on Respondent's testimony and other evidence in the record (Resp't Tr. 55:7–23 (testifying that J.M. was born in July 2007); P267 at KCDA010 (indicating that J.M. was born in 2007)), as well as the Court's observation of J.M. during his testimony, that J.M. was born in July 2007 and that he was, in fact, 13 years old at the time of the evidentiary hearing.  The Court assumes that J.M.'s purported reference to being 15 was a transcription error given the similarity between the sound of "13" and "15," the proceeding being conducted via video, and J.M. being soft-spoken.

[11] (J.M. Tr. 969:25–971:19; *see* Francis Tr. 1402:15–24 (describing Petitioner as "very expressive, so you would get a response, an expression of displeasure, an expression of anger from him. . . . If he is angry about something, he will express and you will hear from him that he's angry. You'll hear his tone").)

(J.M. Tr. 971:20–972:7; Francis-Baptiste Tr. 1428:25–1430:13 (describing hearing Respondent shout expletives during an argument when Petitioner called her on the phone).)

(J.M. Tr. 972:8–19.) Most of the time, after an argument escalated, Petitioner would slam the door, go outside, and angrily drive away. (Resp't Tr. 74:21–75:1; ; Pet'r Tr. 2021:21–2023:21.)

Respondent testified that she often argued with Petitioner about being so hard on the kids, picking the kids up late at daycare, asking for money, and doing housework. (Resp't Tr. 75:8–15;

) Petitioner agreed that in 2015, he and Respondent "quarreled a lot" about their conflicting work schedules and finances, and that a lot of the time these arguments were in front of K.K. and J.M. (Pet'r Tr. 1692:13–1693:19.) According to Respondent, Petitioner

---

[11] The Court generally notes that J.M.'s demeanor throughout his testimony was thoughtful, respectful, and appropriate. Testifying was clearly difficult for J.M., requiring two breaks, but he remained remarkably composed throughout the experience. The Court found him to be credible and not prone to exaggeration or overstatement, despite the fact that J.M. understandably might feel anger or ill will toward Petitioner or loyalty to his mother. The Court also notes that following one break during J.M's testimony, the Court, at J.M.'s counsel's request, and without objection from Petitioner, asked Petitioner to turn off his video while J.M. testified because with the video format it is not possible to avert one's eyes, and the Court did not want to make J.M. unduly uncomfortable. (Tr. 991:4–993:11.) However, as far as the Court is aware, Petitioner was still able to see and hear J.M. during his testimony.

cursed at her, spoke loudly, sometimes got in her face, and threatened her "with immigration" during arguments.  (Resp't Tr. 72:13–73:9.)  Petitioner, however, characterized his behavior during these arguments differently than Respondent and J.M., suggesting that he cursed at Respondent only if she cursed at him and raised his voice only when Respondent raised her voice.  (Pet'r Tr. 2020:9–12, 2021:1–3.)  Petitioner consulted with his sister, Francis-Baptiste, about issues the parties were having with communication, parenting, and finances.  (Francis-Baptiste Tr. 1428:3–24.)  Francis-Baptiste advised Petitioner on seeking counseling, including through his employee assistance program, however Petitioner expressed concerns about confidentiality, and reported that Respondent was unwilling to seek counseling through her church.  (Francis-Baptiste Tr. 1431:16–1433:20.)

Respondent tried to obtain lawful immigration status in Trinidad for years, first applying for Permanent Residence on April 10, 2013 based on her marriage to Petitioner.  (Resp't Tr. 120:2–128:9; Pet'r Tr. 1658:2–23; R007 (letter to Respondent from Ministry of National Security, Immigration Division reflecting interview dates throughout 2018 and into 2019).)  Respondent's interviews at the immigration office had to be rescheduled numerous times because Petitioner showed up late, failed to show up at all, or failed to bring necessary documents.  (Resp't Tr. 120:8–25.)  Respondent resorted to taking a bus to the immigration office at 5:00 a.m. to be sure that she had a spot in line.  (Resp't Tr. 121:10–17.)  However, Petitioner still failed to show up on time, and the interview could not move forward.  (Resp't Tr. 121:18–122:1.)  Petitioner admitted that there were times when he showed up late for Respondent's immigration interview or failed to bring required documents for which he was responsible, and, as a result, the interview had to be rescheduled.   (Pet'r Tr. 2075:10–2076:2, 2076:11–20, 2078:2–9.)   Respondent eventually abandoned hopes of getting legal immigration status in Trinidad after Petitioner asked why she

was "hurrying to get status" and because Petitioner was "not helpful at all."[12]  (Resp't Tr. 731:25–732:17.)

At some point in 2018, Respondent told Petitioner that because the relationship was getting so bad, she thought about moving and taking the kids with her, but Petitioner told her that he would take K.K. and get Respondent and J.M. deported.  (Resp't Tr. 118:2–15, 178:24–179:3.)  Petitioner made this threat loudly with K.K. and J.M. in their adjoining bedroom, with the door wide open.  (Resp't Tr. 118:21–119:24.)

### E.    Petitioner's Violence Against Respondent in K.K.'s Presence

The parties both testified about a specific physical altercation sometime around 2016 or 2017, but they provide different accounts of the event.  At around 2:00 a.m., Petitioner was lying on the sofa, texting another woman he had been out with that night.  (Pet'r Tr. 1632:19–1633:6, 1637:10–1638:2; Resp't Tr. 89:1–10.)   According to Respondent, when she tried to grab Petitioner's phone, he pushed her into a wall, and then both Petitioner and Respondent hit a glass table, causing it to break.  (Resp't Tr. 89:7–10, 90:12–19.)  Respondent testified that J.M. and K.K. saw the parties fighting and that K.K. was yelling at them to stop.  (Resp't Tr. 89:19–90:11.)  Petitioner testified that Respondent jumped on his back, trying to grab his phone, and that he

---

[12] Relatedly, as a non-citizen, J.M. needed a special permit to attend school in Trinidad. (Pet'r Tr. 129:2–16.)  Respondent filled out the application and Petitioner added his photograph and bank statement, but Respondent also needed Petitioner to attend an interview and speak with the school—neither of which Petitioner did, explaining that he could not take time off work. (Resp't Tr. 130:4–131:4, 132:20–133:4.)   The school initially denied J.M. admission, but Respondent begged the Vice Principal, whom she knew, to help.  (Resp't Tr. 131:8–15.)  J.M. eventually enrolled in school from ages 5 to 11, but never obtained an official school permit, which would have ultimately prevented him from progressing in his education had he remained in Trinidad.  (Resp't Tr. 131:16–20,.133:9–20.)  If J.M. were to return to Trinidad, he would need a permit to attend school because he is not a resident of Trinidad.  (Resp't Tr. 131:23–132:6.)  A Trinidadian citizen who has a relationship with J.M. would have to apply for the student permit, but Respondent could not do so because she is neither a resident nor citizen of Trinidad.  (Resp't Tr. 132:7–19.)

12

traveled from the living room, to the dining room, to the kitchen, with Respondent on his back, before he "leaned forward" and Respondent let go.  (Pet'r Tr. 1633:9–1634:9, 2098:22–2099:15.) Petitioner maintained that he did not try to get Respondent off his back because he was "busy holding [his] phone," and also denied yelling or raising his voice, pushing or striking Respondent, breaking a glass table, and seeing the children during the incident.  (Pet'r Tr. 1634:10–1635:6, 2099:16–20.)  Respondent did not make a police report after this incident because "Trinidad and Tobago police don't take domestic violence seriously; and, you know, I didn't really [get] hurt seriously."[13]  (Resp't Tr. 90:20–25.)

███████████████████████████████████████████████

███████        ██████████████████████████████████████

████████████████████████████████████████  (J.M. Tr. 973:5–18.)  ███

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████        (J.M.  Tr.  974:2–17.)  █████████████████████████

████████████████████████████████████████████████

(J.M. Tr. 975:7–19.)

With respect to the 2016 texting incident, the Court finds Petitioner's version of events— that he traveled from the living room, to the dining room, to the kitchen with Respondent on his back, never yelling or raising his voice, and that the children never woke up—to be incredible. (Pet'r Tr. 1633:9–1635:6, 2099:2–20.)  The Court therefore rejects Petitioner's account and credits Respondent's, █████████████████████████████████████

---

[13] Respondent testified that when Petitioner pushed her into the wall, she hit her back and hand, and hurt her backside.  (Resp't Tr. 89:7–10, 90:12–19.)

███████████████████████████████ (J.M. Tr. 972:20–975:21.) ███████████

████████████████████████████████████████████████████

██████████ (J.M. Tr. 969:25–971:19, 973:5–18, 974:2–17, 975:7–19.) J.M.'s account, which is not overstated, is bolstered by and consistent with the testimony of Petitioner's brother, who euphemistically described Petitioner as "very expressive" (Francis Tr. 1402:11–24 ("If [Petitioner] is angry about something, he will express and you will hear from him that he's angry. You'll hear his tone.")), and Petitioner's sister, who noted that Petitioner was "very strict" and unnecessarily harsh with J.M. (Francis-Baptiste 1436:9–1437:12.) The Court, therefore, finds by a preponderance that on multiple occasions, including during the 2016 texting incident, Petitioner was physically aggressive and violent toward Respondent in the presence of J.M. and K.K.

### F. Petitioner's Dangerous Driving

Respondent and J.M. characterized Petitioner as a dangerous and erratic driver. (Resp't Tr. 100:5–11 (describing how Petitioner "would take his anger [out] on the steering wheel and . . . press on the gas and it will go fast"); ███████████████████████████████

██████████████████████████████ ) Petitioner disputed this characterization, blaming others for the accidents in which he was involved and minimizing the riskiness of his driving and the seriousness of the accidents. (Pet'r Tr. 1695:2–12, 1696:6–1699:9 (describing how other cars "flew" out and were to blame for accidents), 2025:21–2026:18 (admitting that when he was frustrated or angry he "got very quiet" and "maybe [he] drove a little faster, but not beyond the speed limit").) The Court finds by a preponderance that, during the

relevant period of time, Petitioner drove in a reckless and dangerous manner that placed Respondent, J.M., and K.K. all at risk and fear of harm.[14]

Respondent testified that Petitioner "liked to argue in the car" and drove "so hard" that Respondent was scared and prayed that she and the children would be safe. (Resp't Tr. 99:20–100:4.)  During arguments, Petitioner shushed the children, yelled very loudly, and cursed at Respondent. (Resp't Tr. 101:12–21; ███████████████████████████████

██████████████████████████████)  According to Respondent, this happened four to five times a week, and when she looked back to tell K.K. and J.M. to fasten their seatbelts, she saw "the fear in the face, the eyes open and they're quiet and they're froze." (Resp't Tr. 100:21–101:11.)

Between 2007 and April 2019, Petitioner was in five car accidents, three or four of which involved Respondent, J.M., or K.K. in the car with him. (Pet'r Tr. 2111:23–2112:13.)  During an accident in 2008, Respondent hit her head, J.M. hit his foot and hand, and they sought medical treatment at Port of Spain General Hospital. (Resp't Tr. 101:22–104:8.)  During another accident around Christmas 2013, with both K.K. and J.M. in the car, Petitioner was going too fast to avoid hitting another car that had moved unexpectedly. (Pet'r Tr. 1698:1–17, 2029:11–15.)  At the time of this accident, Petitioner was arguing with Respondent on the phone. (Resp't Tr. 104:9–105:4.)

---

[14] The Court notes that Petitioner's minimization or denials about his reckless driving or the driving-related incidents described by Respondent and J.M., are contradicted by Respondent's and J.M.'s testimony.  The Court also notes that Respondent's psychology expert, Pamela Krasner, LCSW, identified the trauma that K.K. experienced from Petitioner yelling in the car and driving fast as a basis for her opinion about K.K.'s current psychological state and the risk of harm associated with repatriation. (*See* Krasner Tr. 1097:6–18, 1114:7–16; *see also* discussion of expert testimony below).  However, because Ms. Krasner did not examine K.K. for treatment purposes, *see*, *e.g.*, *Danaipour v. McLarey*, 386 F.3d 289, 296–99 (1st Cir. 2004) (affirming admissibility of statements about abuse made by children and mother to treating physician under hearsay exception in Federal Rule of Evidence 803(4)), but rather in anticipation of litigation, the Court does not rely on K.K.'s statements in finding that Petitioner in fact engaged in dangerous and reckless driving.

███████████████████████████████████████████████  (J.M. Tr. 986:3–24.)  When the crash happened, J.M., who was not wearing a seatbelt, flew through the middle seats, and hit his foot and head, and K.K. hit her head on the back of the seats.  (███████ ███████  Pet'r Tr. 1698:16–20; 2028:16–20.)  Petitioner called an ambulance and the kids were taken to the health center, where J.M. was given an x-ray, but had no fractures.  (Pet'r Tr. 1698:21- 1699:9.)

On two occasions, in K.K.'s and J.M.'s presence, Petitioner became so angry that he kicked Respondent out of the car and made her walk to work.  (Resp't Tr. 111:21–112:24, 117:2–25.) Respondent complied out of fear because she did not want Petitioner to curse her out in front of the kids and "just want[ed] peace."  (Resp't Tr. 117:2–25; Pet'r Tr. 2036:8–2037:3 (admitting that on "one occasion," when K.K. and J.M. were in the car, he got angry, raised his voice, and told Respondent to get out of the car), *see* 1710:10-16 (minimizing his conduct by noting that the "sun was out" and that Respondent was "less than five minutes from where she worked").)  On another occasion, when driving home from Petitioner's mother's house, Petitioner kicked Respondent out of the car, drove away, and "after awhile" went back to pick her up.  (Resp't Tr. 112: 6–9.)

Similarly, on approximately two occasions, Petitioner got angry at J.M., pulled him out of the car, and shouted, cursed, and screamed at him.  (Resp't Tr. 109:15–111:20; ██████████████ █████████████████████████████████████████████████████████████████; Pet'r Tr. 1707:9–1709:4 (describing how he made J.M. get out of the car on the shoulder of the road and "sternly talked to him").)  When Petitioner forced either Respondent or J.M. out of the car, Respondent observed K.K., who looked sad and scared, and "had on her face like she wanted to cry."  (Resp't Tr. 114:16–115:4.)

## G.      Use and Threats of Corporal Punishment

The evidence indicates that both Petitioner and Respondent used corporal punishment on

K.K. and J.M., although the frequency, severity, and duration of the corporal punishment used as

to each child by each party is disputed.  The Court recites the facts that are either undisputed or

that the Court finds have been proven by a preponderance of the evidence.

While the Court cannot conclude definitively how many times Petitioner used corporal

punishment against K.K., a preponderance of the evidence demonstrates that Petitioner regularly

hit K.K. with a belt or his hand from the time K.K. was five years old up to 2019, leaving marks

on K.K.'s skin.[15]  (Resp't Tr. 142:14–143:23 (reporting that Petitioner hit K.K. with a belt or his

hand maybe three to four times per week); ███████████████████████████████

---

[15] The Court notes that Petitioner's denial of the extent of his use of corporal punishment
on both K.K. and J.M. is contradicted by the testimony of Respondent and J.M.  The Court also
notes that Ms. Krasner identified Petitioner's use of corporal punishment on K.K. and J.M. among
the traumatic events K.K. experienced in Trinidad that informed her opinion about K.K.'s current
psychological state and the risk of harm associated with repatriation.  (*See* Krasner Tr 1097:19–
24, 1107:14–1108:14, 1247:2–19 (*e.g.*, testifying that K.K. reported that Petitioner used corporal
punishment on her more than once, but not remembering frequency, and opining, *inter alia*, that
K.K.'s inability to remember frequency was "in line with trauma exposure" which made timing
and memories not consistent); discussion of expert testimony below)  Although the Court does not
consider the truth of K.K.'s statements to Ms. Krasner, *i.e.*, that she was in fact subjected to
corporal punishment by Petitioner or anyone else while living in Trinidad, the Court does consider
Ms. Krasner's opinion that K.K. suffers from PTSD as a result of, among other potential traumas,
physical abuse, as tending to corroborate Respondent's and J.M.'s testimony about K.K. being
subjected to corporal punishment while living in Trinidad.  *See In re Lozano* (*Lozano I*), 809 F.
Supp. 2d 197, 206 (S.D.N.Y. 2011) (finding petitioner's claim that he never insulted or mistreated
Respondent to be "not credible" because, *inter alia*, respondent's diagnosis of PTSD and
symptoms indicated that she had suffered trauma) *aff'd sub nom. Lozano v. Alvarez* (*Lozano II*),
697 F.3d 41, 58 (2d Cir. 2012) (noting with approval district court's determination that petitioner's
claims that he never insulted or mistreated respondent in any manner were not credible, and that
the district court "reviewed a significant amount of evidence," "had the opportunity to observe the
Parties' demeanor and assess their credibility," and "fully engaged with all of the information that
had been presented to it before announcing its determinations"), *aff'd sub nom. Lozano v. Montoya
Alvarez* (*Lozano III*), 572 U.S. 1 (2014); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 400 (E.D.N.Y.
2005) (considering expert testimony regarding the children's PTSD diagnosis and
symptomatology in finding that petitioner abused the children).



.) Petitioner struck K.K.'s back, butt or hands, and K.K. reacted by crying, screaming, and throwing herself all over the place. (Resp't Tr. 142:15–20, 145:25–146:9; ████████████████████████████████████ .) ████████████████████ ███████████████████████ (J.M. Tr. 983:19–21.) On the one occasion Petitioner admitted to hitting K.K. with a belt, she "cr[ied] uncontrollably," though Petitioner claimed he didn't hit "girl children" hard and that the lashes did not leave any marks.[16]  (Pet'r Tr. 1711:9–16, 2019:3–15.)

In addition to actually hitting K.K. with a belt, Petitioner also inspired fear in K.K. by threatening to hit her with a belt and saying, "Do you want me to get the belt?"  (Pet'r Tr. 2016:16–2017:6, 2018:12–17.)  For example, Petitioner described confronting a then five or six-year old K.K. about whether her school uniform was dirty because she had been playing with boys.  (Pet'r Tr. 1711:25–1712:11, 2018:18–21.)  When K.K. denied it, Petitioner told her "I will go and get the belt" and then moved like he was going to grab a belt, causing K.K. to cry and confess that she had been playing with boys.[17]  (Pet'r Tr. 1712:7–22.)  Petitioner testified that there "might have been other times" he threatened to hit K.K. with a belt, but that he could not recall.  (Pet'r Tr.

---

[16] Petitioner denied hitting K.K., except on one occasion when K.K. was somewhere between six and eight years old.  (Pet'r Tr. 1711:1–19, 2018:12–25.)  Petitioner could not remember what K.K. had done wrong, but that "[K.K.'s] mother said [K.K.] did something wrong with her brother and she needed to get licks, so I needed to give her licks."  (Pet'r Tr. 1711:1–22, 2019:3–7.)  The Court does not find Petitioner's denials credible, based on Respondent's and J.M.'s contrary testimony, the Court's assessment of Petitioner's credibility generally, as discussed below, and for the reasons discussed later in connection with the duration issue.

[17] Petitioner denied getting upset at K.K. for coming home with her school uniform dirty, except on this one occasion when K.K. came home "extremely dirty," and insisted that it was Respondent who would get upset at K.K. for coming home with a dirty uniform.  (Pet'r Tr. 2013:25–2014:23.)  The Court does not find Petitioner's minimization of his conduct credible.

2016:16–2017:6.)   The Court finds K.K.'s tears in response to her father's threat to be corroboration that this was not an isolated incident and that she knew those threats were not empty. (*See* J.M. Tr. 997:4–22 ██████████████████████████████████ ███████████████████████████.)

Petitioner also frequently hit J.M., mostly "with a belt" but also with his hand.  (███████ ██████████ Pet'r Tr. 2054:3–9 (testifying that he did not "regularly" hit J.M. with a belt, but that he "did use the belt on him many times").) ██████████ Petitioner hit J.M. him with a belt[18] on his legs and back.██████████. ██████████████████████ ████████████████ Pet'r Tr. 1704:24–1706:23 (describing one occasion when he gave J.M. "five or six lashes"), 2019:13–23 (testifying that with male children, he "hit a little bit harder, but [knew his] strength").)  When Petitioner used a belt, it left marks on J.M.'s body ███ █████ (████████████ Resp't Tr. 143:17–23, 145:2–5.) ████████████ Petitioner hit J.M. hard on his back with an open hand.  (██████████████ Pet'r Tr. 2059:10–13 (testifying that "a couple times" he did not have a belt, so instead hit J.M. with his hand[19]).) ███ ████████████████████ (J.M. Tr. 983:16–18; Resp't Tr. 145:19–22 (describing how J.M. would "scream down the place, throw himself down on the ground and be shouting and crying")); ██████████████████. (J.M. Tr. 979:14–980:8.) [20]  K.K. and Respondent were present when Petitioner hit J.M. with a belt, and K.K. looked

---

[18] ████████████████████████████████████ ████████████████████████████ ████████████ (J.M. Tr. 1037:12–1038:5.)

[19] The Court notes that Petitioner's admission is consistent with Respondent's testimony that "[s]ometime[s] . . . if [Petitioner] don't get a belt in time, he just use[d] his hand" to hit K.K. (Resp't Tr. 143:2–5.)

[20] Petitioner testified that when he hit J.M. with a belt it did not leave marks and J.M. did not cry.  (Pet'r Tr. 2059:17–21, 2060:3–4.)  The Court does not credit Petitioner's minimization

"frightened" and "would get the face that she was set up to cry." (Resp't Tr. 145:23–24,146:13–19; 

; Pet'r Tr. 2059:22–24 (admitting that K.K. "might have been there once or twice" when he hit J.M. with a belt).)

 Respondent admitted that she hit J.M. and K.K. with a belt years ago, but then realized that it was "not the right thing to do" and that the kids were "not learning from the belt," so she started taking away the computer, TV, snacks, and the phone. (Resp't Tr. 147:9–23, 668:3–19;

.) When Respondent hit the children with a belt, it left marks that lasted a few hours. (Resp't Tr. 163:24–164:6;

.)

Respondent "put two lash[es]" on K.K. with a belt when K.K. was five or six. (Resp't Tr. 669:21–670:4;

.)

 Respondent tried to speak with Petitioner about his use of corporal punishment, explaining that he should take away their favorite things rather than hitting them. (Resp't Tr. 146:23–147:2.) Petitioner told Respondent that she was being "too soft," that the "kids would ride [her]," and that she should "give the kids tough love." (Resp't Tr. 98:23–99:3, 147:3–8.) Petitioner's sister also told him that he did not need to be so harsh with J.M. (Francis-Baptiste Tr. 1436:9–1437:12 (testifying that Petitioner "was a very strict father").)[21]

---

of his use of a belt on J.M. because of the contrary, credible testimony and because of the Court's overall assessment of Petitioner's credibility.

 [21] The Court is not persuaded by Petitioner's argument that Respondent "implicitly admitted" that Petitioner posed no risk to K.K. by leaving K.K. in his care when she was at work and when she traveled (see Pet'r's Br., Dkt. 122, at 70). Given that Respondent had to work,

Regarding the duration of the use and threats of corporal punishment, the Court finds that while Respondent stopped hitting either child at least three years ago (Resp't Tr. 147:9–23, 669:21–670:4 (testifying that she hit K.K. with a belt when K.K. was five or six years old); ████

████████████████████████████████████████████████████████████████████████████████

████), Petitioner continued to hit both children, though J.M. more, until they left Trinidad in April 2019. With respect to J.M., Petitioner variously testified that he stopped hitting J.M. when J.M. was about "six or seven" or between "seven or eight" years old (Pet'r Tr. 1704:20–23, 1706:11–13); that he last disciplined J.M. "between seven and eight years ago. Something like that." (Pet'r Tr. 1705:20–22); that he stopped disciplining J.M. with the belt at some point after his sister told him that he was being too stern with J.M. (Pet'r Tr. 1703:18–1704:3); and that he stopped hitting J.M. with his hand before he stopped hitting J.M. with a belt (Pet'r 2059:1–13).[22] This testimony,

---

Respondent had no choice but to leave the children in Petitioner's care; thus, little can be inferred from that fact. Furthermore, the Courts notes that, in fact, during Respondent's trip to New York in August 2018, the children did *not* stay with Petitioner, who had to work late; J.M. stayed with Respondent's sister and K.K. stayed with her paternal grandmother. (Resp't Tr. 167:13–19; Pet'r Tr. 1716:2–12.) During Respondent's trip to New York, in November 2018, the children stayed with Petitioner during the week so that they could attend school, and with Respondent's sister on the weekends. (Resp't Tr. 167:20–168:3.) Respondent testified that she felt scared about this arrangement because of how Petitioner mistreated the children. (Resp't Tr. 168:5–9.) Furthermore, any statements Respondent may have made about her willingness to allow Petitioner to see or have contact with K.K. do not undermine the Court's own conclusions, based on the evidence, about the future risk of physical and psychological harm Petitioner poses to K.K.

[22] Petitioner denied using a belt on J.M. right before J.M. left for New York in April 2019 because J.M. "was way too old for that," (Pet'r Tr. 2054:10–18), and that he had earlier decided to stop using the belt on J.M. because "it didn't make sense" and instead took things away from him, scolded him, or sent him to his room, even though "that didn't work too well." (Pet'r Tr. 1703:18–1704:3.) Ms. Krasner also testified that K.K. told her that "when she and J.M. did something the parents didn't like and they took away a game, Daddy sometimes did that and Mommy sometimes did it." (Krasner Tr. 1247:2–6.) However, as previously discussed, the Court does not consider K.K.'s statements to Ms. Krasner for their truth. In any event, while the Court assumes that the parties did start taking things away from the children as a form of punishment, that fact does not negate, nor is it mutually exclusive of, Petitioner continuing to use corporal punishment or threaten it against the children.

21

however, is contradicted by Respondent, who testified that Petitioner beat J.M. with a belt from the time J.M. was 3 to 11 years old (*i.e.*, approximately between 2010 and 2019); that Petitioner was physically aggressive or threatening toward J.M. in other ways, including threatening to put J.M. out of the car and pushing J.M. into the wall and threatening to punch his face; and that the majority of these incidents occurred when the family lived at 103 Robin Crescent (*i.e.*, from 2014 through April 5, 2019). (Resp't Tr. 98:6–22.) Notably, Respondent also testified that K.K. was "always present" during these incidents of physical aggression and that she witnessed Petitioner hitting J.M. with a belt up until J.M. was 11 years old. (Resp't Tr. 98:11–15, 145:19–24,146:13–19 (Respondent describing that K.K. "would get the face that she was set up to cry.").)

Regarding how long Petitioner used corporal punishment on K.K, Petitioner claimed to have only hit K.K. once when she was somewhere between six and eight years old, and only because Respondent told him that K.K. had to "get licks" on that occasion. (Pet'r Tr. 1711:1–22, 2018:12–2019:7.) By contrast, as previously noted, Respondent ███████ testified that Petitioner hit K.K. with a belt or his hand more than once a week, leaving marks on K.K.'s skin, and Respondent testified that this corporal punishment started when K.K. was five years old and continued up to 2019. (Resp't Tr. 142:14–143:23; ██████████████████.)

The Court finds by a preponderance that Petitioner used or threatened corporal punishment against both K.K. and J.M. from the time K.K. was five years old and J.M. was three years old until they left Trinidad in 2019. In addition to Respondent's and J.M.'s credible testimony on this issue, the mere fact that J.M. is able to provide detailed testimony ████████████████ ████████████ supports the conclusion that these events occurred far more recently than seven or eight years ago, as Petitioner claims. These are the memories of a child older than six or seven years of age. Had Petitioner, in fact, stopped hitting J.M. seven or eight years ago, when J.M. was

22

still very young, it is unlikely that J.M. would have such vivid, visceral memories of these incidents. Indeed, the Court observed how emotionally difficult it was for J.M. to testify about and, in effect, relive these painful memories during his testimony. Similarly, the mere fact that K.K. was able to tell Ms. Krasner about seeing Petitioner beat J.M. with a belt and that it was very hard and scary for her (Krasner Tr. 1099:19–1100:11, 1113:20–24)[23] contradicts Petitioner's claim that he stopped beating J.M. when J.M. was six or seven, because if true, K.K. would only have been three or four years old when she last witnessed Petitioner hit J.M., making it highly improbable that she would recall or be able to report these events. Lastly, Ms. Krasner's diagnosis of K.K. having PTSD due to multiple past traumas in Trinidad, including being subjected to and witnessing corporal punishment by her father, (Krasner Tr. 1097:6–1098:14, 1099:19–1100:11, 1107:21–1108:13, 1113:20–24, 1247:7–19), further corroborates the testimony of Respondent and J.M. about Petitioner's use of corporal punishment on both K.K. and J.M. until the time they left Trinidad in April 2019.

The Court thus finds, by a preponderance, that Petitioner regularly used and threatened the use of corporal punishment against K.K. from the time she was five years old up to 2019, and also against J.M, often in K.K.'s presence, during the same period of time.

### H.  Petitioner's Bathing of K.K.

Petitioner bathed K.K. until she was five or six years old.  (Pet'r Tr. 2038:8–16.)  He did so with the bathroom door shut, even when K.K. was an infant, because he did not want J.M. to see his sister naked.  (Pet'r Tr. 2039:3–18; ████████████████████████████

████████████████████████████████████████████████████

---

[23] Again, the Court does not consider K.K.'s report to Ms. Krasner about seeing Petitioner beat J.M. for its truth, only for the fact that she had memories of, and was able to report, these events to Ms. Krasner.

██████.)  By the time K.K. was two or three years old, Petitioner "wasn't comfortable" washing K.K.'s private parts. (Pet'r Tr. 2041:19–2042:3, 2042:17–2043:15 (testifying that he thought it was inappropriate and wrong for a father to wash the private parts of his two- or three-year-old daughter).)  According to Respondent, there were two occasions, when K.K. was approximately four to six years old, that Petitioner slammed the bathroom door in Respondent's face and bathed K.K. with the door shut, which made Respondent "very uncomfortable."  (Resp't Tr. 91:8–92:15.)

## I.     Forced Sex in K.K.'s Presence

K.K. slept in her parents' bedroom when the family lived at the 103 Robin Crescent address, starting around the time when K.K. was approximately "four, going on five" years old (*i.e.*, approximately 2015). (Pet'r Tr. 1682:21–1683:11.)  K.K.'s bed was only a foot or two from her parents' bed, with no wall or structure separating the beds.  (Resp't Tr. 83:11–25, 84:10–12; Pet'r Tr. 1684:4–11, 2043:21–2044:5.)  The parties generally agree that they had sex in the room while K.K. was there, that they attempted to use pillows to block K.K.'s view, but that K.K. sometimes woke up while they were having sex, and Petitioner tried to get K.K. to go back to sleep. (Pet'r Tr. 1684:12–17, 1686:8–14, 2044:6–2045:8 (testifying that when he and Respondent were having sex, he "realized that [K.K.] might have been up" and would "put on clothes fast and . . . go and lie down on the bed with her to get her to go back to sleep"); Resp't Tr. 84:13–24, 85:5–86:13.)

However, the parties disagree about whether the sex, with K.K. in the room, was consensual.  Respondent testified that prior to 2016, Petitioner forced her to have sex when she was pregnant with K.K. in 2010, and a few other times, but the frequency of forced sex increased in 2016 when Petitioner began staying out late and coming home drunk. (Resp't Tr. 665:10–666:2, 735:21–737:21 (describing sexual abuse by Petitioner as worse than sexual abuse by other intimate

partners because Petitioner forced her to have sex more frequently).)  Respondent testified that Petitioner forced her to have oral sex by pushing her head down and saying "you have no choice. I'm your husband."  (Resp't Tr. 82:4–17.)  Respondent also testified that Petitioner tried, unsuccessfully, to have anal sex with her and that he repeatedly asked Respondent to ask her friend Tiffany to have a threesome, which Respondent refused to do because she was "ashamed."  (Resp't Tr. 81:5–82:3, 666:21–667:12.)

Respondent gave detailed testimony about forced sex and attempts at forced sex in K.K.'s presence.  She testified that, beginning in 2016, Petitioner began forcing or attempting to force her to have sexual relations approximately three times a week and that this continued until she left for the United States in April 2019.  (Resp't Tr. 79:19–81:4 (describing how the last time Petitioner tried to force himself on her sexually was April 5, 2019, but she fought him off).)  Respondent explained that

> K.K. would be sleeping on the bed with me and [Petitioner] will take her and put her in her own bed and then I will try to get up to go use the washroom and he would push me down on the bed.  And then he would try to take off my underwear and I will tell him, no, I don't want to because I don't know where you're out . . . I don't want to do it and he will force me and he will take his hand and put it to my mouth . . . and tell me to stop making noise.

(Resp't Tr. 78:8–79:5; *see also* 82:24–83:3.)  Respondent tried to get Petitioner to stop by saying, "I don't know where you out and you be cheating on me," and by holding her body in such a way that Petitioner could not get on top of her, but Petitioner was "regularly" successful in forcing her to have sexual intercourse.  (Resp't Tr. 79:6–18, 82:24–83:6 (testifying "I tried to fight [Petitioner] off but he's so strong and I didn't want to wake K.K. up"); ███████████████████████

████████████████████████████████████████████

███████████████████████████████████.)

Respondent testified that during these incidents of forced sex, K.K. would be awake, "lying still

and her eyes would be open . . .  and the pillow used to fall off [the bed] and she [would] be watching all the time.  Sometimes she will get off the bed and come over to our bed."  (Resp't Tr. 84:13–24.)  Respondent tried to talk to Petitioner about how K.K. witnessed these incidents of forced sex, and told J.M. about it, but Petitioner just laughed and said he did not want to put K.K. in the same room as J.M.  (Resp't Tr. 87:6–13, 88:7–25.)

Respondent never filed a police report about Petitioner's forced sex "[b]ecause Trinidad and Tobago police don't take it serious once you marry."  (Resp't Tr. 88:1–6.)  Respondent explained that it was not easy for her talk about Petitioner's forced sexual behavior because she is "a very emotional person and if [Petitioner] wants to hurt [her], [she] would cry" and that she did not "feel safe talking about it with him."  (Resp't Tr. 246:24–247:6.)

Petitioner denied Respondent's claims of forced sex.  He testified that he never "force[d]" Respondent to have sexual intercourse with him, stating that "[w]hen she says no, it's no'" (Pet'r Tr. 1681:19–1682:1, 2050:13–23), or to engage in oral sex (Pet'r Tr. 1682:2–5, 2051:19–25 (testifying that Respondent "wanted to do that")), or anal sex (Pet'r Tr. 1682:6–10 (explaining that the parties "agreed to try [it] once" but that Respondent didn't like it and they never did it again), or to have a threesome (Pet'r Tr. 1682:11–12 (testifying "[t]hat never happened")).[24]  Petitioner also denied that K.K. actually "saw" her parents having sex, though he admitted that she "woke up."  (Pet'r Tr. 2044:16–2045:4.)  In addition, Petitioner denied that Respondent ever raised her concerns about K.K. sleeping in their room and witnessing sex, and claimed that he did not want K.K. sleeping in the same room as J.M. because Respondent had told him that J.M. was hearing voices telling him to pick up a knife.  (Pet'r Tr. 1682:23–1683:11, 2045:5–2047:6, 2049:7–14.)

---

[24] While Petitioner denied that he "forced" Respondent to engage in a threesome, as previously noted, Respondent only testified that Petitioner tried (unsuccessfully) to force her to ask her friend to have a threesome.  (Resp't Tr. 78:8–12, 81:5–17, 666:3–667:12.)

Petitioner texted and spoke to his sister, Francis-Baptiste, about J.M., and she told him to seek counseling for J.M.  (Pet'r Tr. 1688:4–1690:4.)  However, Petitioner never did so, nor did he lock J.M.'s door for the family's protection.  (Pet'r Tr. 1688:4–1690:12 (explaining that he did not seek counseling services through his employer because he "didn't want them knowing [his] business"), 2047:13–2049:24.)  Furthermore, as Petitioner acknowledged, K.K. had been sleeping in the couple's bedroom well before Respondent allegedly told him about J.M. hearing voices.  (Pet'r Tr. 2047:1–12.)

Based on its review of the evidence, the Court finds that Respondent has established by a preponderance that on a regular basis, mostly after 2016, Petitioner forced or attempted to force Respondent to engage in sex acts while K.K. was in the same room, that K.K. was aware of this conduct, and that it made her feel uncomfortable.[25]  In addition to the Court's assessments of the witnesses' credibility, it finds that Petitioner's admissions about regularly going out to the casino and drinking in the later years of their relationship corroborates Respondent's testimony that the incidents of forced sex and attempted forced sex increased when Petitioner began staying out late

---

[25] As in *Lozano I*, the Court has considered K.K.'s contemporaneous reports to her brother, J.M., ███████████████████████████████████████████████████████████████████████████. 809 F. Supp. 2d at 206 (considering respondent's contemporaneous reports to third parties, "[a]lthough presented in a hearsay format," about petitioner's emotional abuse of respondent); *see* Fed. R. Evid. ("FRE") 807 (permitting, with "reasonable notice" to the adverse party, admission of hearsay that "is supported by sufficient guarantees of trustworthiness" and "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts"); *Danaipour*, 386 F.3d at 296 (noting "frequent" use of the FRE 807 residual hearsay exception "when courts receive out of court statements by children in [a] child abuse case outside the Hague Convention context"); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 289 (3d Cir. 2006) ("We also conclude that the District Court admitted hearsay testimony only under the exceptions of the Federal Rules and properly limited its use. Thus, we find no abuse of discretion on these points.").

27

multiple days a week.  J.M.'s testimony about what K.K. heard and how she felt further corroborates Respondent's testimony.[26]

\*     \*     \*

The Court takes this opportunity to discuss in more detail its assessment of the parties' credibility, especially as it relates to their testimony about forced sex.[27]  First, with respect to Respondent, the Court has considered the fact that Respondent has knowingly made and submitted under oath numerous false statements to government agencies or judicial authorities.  On or about December 23, 2019, Respondent filed a Form I-360 VAWA self-petition with USCIS ("VAWA Application"), ███████████████████████████.  (Joint Stip., Dkt. 92, ¶ 32; Resp't

---

[26] As previously noted, the Court deems J.M.'s testimony about K.K's contemporaneous statements to him admissible pursuant to FRE 807.  The Court also notes that Ms. Krasner also testified that during her evaluation of K.K., K.K. reported that while sleeping in the same room as her parents in Trinidad she saw "parent stuff" two times and it made her uncomfortable.  (Krasner Tr. 1098:15–24; 1101:23–1102:1, 1227:20–1232:8 (agreeing that K.K. said she saw "parent stuff" two times, but explaining that regardless of whether a child saw a traumatic incident twice or 20 times it could still have a deleterious effect), 1255:10-1256:7 (explaining that K.K. had difficulty remembering how many times she witnessed "parent stuff" and that difficulty maintaining consistent time frames as it relates to trauma is consistent with trauma symptomatology).)  Ms. Krasner also described K.K. as being visibly uncomfortable discussing and drawing the "parent stuff" she had observed.  (Krasner Tr. 1102:2–17.)  However, because Ms. Krasner did not examine K.K. for treatment purposes, *see*, *e.g.*, *Danaipour*, 386 F.3d at 296–99 (1st Cir. 2004) (affirming admissibility of statements about abuse made by children and mother to treating physician under hearsay exception in Federal Rule of Evidence 803(4)), but rather in anticipation of litigation, the Court does not rely on K.K.'s statements in finding that the parties, in fact, engaged in sex with K.K. in the room—a fact that the parties do not actually dispute.  Furthermore, K.K.'s statement is not relevant on the issue in dispute, *i.e.*, whether those sex acts were compelled.

[27] The Court notes that it had ample opportunity to assess both Petitioner's and Respondent's testimony, the former of which lasted approximately two-and-a-half days and the latter of which spanned three days.  *See Lozano II*, 697 F.3d at 58 (rejecting petitioner's argument that district court relied on "self-interested hearsay testimony" in making preponderance findings because the district court "not only reviewed a significant amount of evidence but also had the opportunity to observe the Parties' demeanor and assess their credibility. Far from glossing over inconsistencies in the evidence, the district court fully engaged with all of the information that had been presented to it before announcing its determinations.").



Tr. 310:18–22, 316:4–6.) ███████████████████████████

███████ ██████████ ██████████████████████████

██████████████████████ (Resp't Tr. 320:17–321:9, 325:8–22); ████████████

███████████████████████████ (Resp't Tr. 321:10–322:3, 323:5–18, 324:6–21, 328:3–329:4, 335:12–336:22); █████████████████████████

██████████████████████████████████████████ (Resp't Tr. 325:23–326:25); ███████████████████████████

█████████ (Resp't Tr. 331:3–332:9); ████████████████████████████

██████████████████████████████ (Resp't Tr. 334:5–335:2); ████████████████████████████

█████████ (Resp't Tr. 337:2–22).[29]  In addition, and as Respondent again admits, she filed a divorce petition in Trinidad Family Court in which she falsely claimed that she and Petitioner had been living apart for at least two years and had no children together.  (Resp't Tr. 179:25–181:1; *see* P006 at PET_0000102.)  Respondent made the same false statement under oath in a related

---

[28] ██████████████████████████████████ (Resp't Tr. 319:11–20); ██████████████████ (Resp't Tr. 319:21–320:16); ███████████████ (Resp't Tr. 331:3–18); ██████████ (Resp't Tr. 344:20–345:4). ████████████████████ (Resp't Tr. 352:16–22.)

[29] █████████████████████████████████████ ███████████████████████████████████ ████████ (Resp't Tr. 322:3–323:4.) ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ █████████ (Resp't Tr. 332:10–17, 335:3–7, 337:14–19.)

court proceeding before a Trinidadian judge, the Honourable Mr. Justice J. Tam.[30]  (P013.1,

P013.2.) ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████      (Resp't Tr. 459:23–462:10; 726:5–727:11; P122.)  During her testimony at the

hearing, Respondent admitted that she had knowingly lied and sought to explain why she lied. ██

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

(Resp't Tr. 181:15–21, 353:21–354:4.).[31]  In sum, it is clear to the Court that Respondent has been

willing in the past to lie when it served her needs, especially when those perceived needs involved,

as here, protecting or advancing her or her children's safety and happiness.

While recognizing Respondent's history of lying and her clear incentive to lie in this case,

given its direct impact on the safety and well-being of her children, the Court nonetheless, and

after careful consideration, finds that she testified credibly about being regularly subjected to

---

[30] There is nothing in the record indicating Justice Tam's first name.

[31] █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████      (See Osborne Tr. 1476:3–1498:23, 1510:5–1517:7, 1523:24–1536:18; Resp't Tr. 354:5–
355:3, 479:2–487:15.) ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████ █████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

forced sex and attempts at forced sex by Petitioner in K.K.'s presence.[32]  The Court bases this

determination largely on its direct observation and assessment of Respondent during her two and

a half days of testimony.  *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) ("It is

within the province of the district court as the trier of fact to decide whose testimony should be

credited.  And as trier of fact, the judge is entitled . . . to believe some parts and disbelieve other

parts of the testimony of any given witness." (internal quotations and citations omitted)).  In

general, the Court found Respondent's testimony during these proceedings to be credible,

particularly with respect to her claims of abuse and mistreatment by Petitioner toward herself and

the children.  One point of comparison the Court has considered is the January 7, 2019, divorce

petition hearing, the recording of which was played at the evidentiary hearing.  During that

proceeding, at which Justice Tam suspected, and we now know, Respondent was not telling the

truth (as explained in greater detail below), Respondent sounded nervous, unsure of herself, and

uncomfortable.  By contrast, that is not how Respondent presented herself in these proceedings.

Respondent consistently provided forthright answers, even to difficult questions.  A second point

of comparison that the Court has considered is Respondent's demeanor during testimony regarding

the forced sex as compared to other topics.  In contrast to her demeanor during wide-ranging

testimony that covered everything from the circumstances of her immigration to Trinidad, to her

12 years with Petitioner and trying to build a life in Trinidad, to her and her children's lives after

---

[32] The Court, of course, neither condones nor approves of Respondent's conduct, and views her misrepresentations to government agencies and judicial authorities as serious misconduct. However, this is not the proper forum for meting out punishment, if any is due, for those acts; rather the Court only considers Respondent's prior false statements to the extent they bear on her credibility regarding testimony she has given in this matter, *i.e.*, whether the Court should believe or accept her testimony and/or how much of her testimony is to be believed.  The Court notes that it rejects Petitioner's argument that Respondent's prior misrepresentations poison her credibility for all purposes.  (Pet'r's Br., Dkt. 122, at 66–68.)

arriving in the United States, Respondent's demeanor during testimony about Petitioner forcing sex in front of K.K. was viscerally more genuine and real; Respondent's discomfort, pain, and emotional trauma as she was remembering and recounting these incidents was palpable and unmistakable.[33]  The Court also finds that Respondent's testimony is partially corroborated by J.M.'s testimony about ████████████████████████████████████████ ████████████████████████████████  While K.K.'s statements do not go to whether the parties' sex was consensual, if there is anything that is established by Respondent's past behavior, including the lying, it is that she has always sought to protect and take care of her children, which, the Court infers, would include not having sex in front of them.[34]

---

[33] As noted on the record, Respondent cried when she explained that her relationship with Petitioner got worse when he stayed out late and engaged in "physical, sexual, [and] controlling behavior," (Tr. 71:14–72:8 (noting that Respondent "does appear to be crying"), and when she described how Petitioner would force her to have sex in front of K.K. (Tr. 84:13–85:3 (observing, "I do see [Respondent's] face with tears or tearing").)  Respondent did not show a comparable emotional response at any other point in her testimony, despite discussing other difficult situations involving K.K. and J.M. and prior abusive partners.

[34] The Court notes that Respondent's psychology expert, Dr. Chitra Raghavan, who was asked to determine, *inter alia*, any mental health effects of the parties' relationship on Respondent, opined that Respondent suffered an episode of PTSD that was at its worst between 2016 and 2018, and was triggered by Petitioner's abuse, including successful attempts at forced sex in front of K.K., which increased with frequency to multiple times a week after the parties' relationship began to deteriorate in 2015 or 2016.  (Raghavan Tr. 772:6–17, 779:10–780:13, 781:1–19 (describing how Respondent gave in to Petitioner's demands for sex to avoid waking K.K. up—"between giving up her autonomy and suffering the indignity of marital rape and having her child witness it and then talk about it, she picked the former"), 783:7–22 (describing how not having sexual autonomy is one of the leading causes of PTSD and how Respondent became less able to say no to Petitioner because K.K. was in the room and Petitioner's demands for sex were more frequent and more violent).)  Although the Court does not consider the truth of Respondent's statements to Dr. Raghavan, *i.e.*, that Petitioner regularly forced her to have sex in front of K.K., nor does the Court consider Dr. Raghavan's assessment of Respondent's truthfulness in reporting this abuse (*see* discussion of expert testimony below), the Court does consider Dr. Raghavan's opinion that Respondent's PTSD was triggered by Petitioner's conduct as tending to corroborate Respondent's already credible and compelling testimony that Petitioner regularly forced or attempted to force her to have sex in K.K.'s presence.  *See Lozano I*, 809 F. Supp. 2d at 206; *Elyashiv*, 353 F. Supp. 2d at 400.

Again, in finding Respondent credible, the Court does not minimize the seriousness of her past lies. But there is no substitute for live testimony and the Court having the opportunity to directly observe Respondent and assess her credibility regarding facts relevant to the case. The Court simply cannot find that the false statements Respondent made in government forms and a Trinidadian court diminish the credibility of her compelling testimony during the hearing describing the forced sex to which she was subjected by Petitioner.

By contrast, the Court does not credit Petitioner's denials about forcing Respondent to engage in sex acts while K.K. was in the room. In general, the Court had concerns about Petitioner's credibility during these proceedings.[35] When confronted with a bad fact, Petitioner was evasive, quick to deflect blame (often back on Respondent), or to offer an explanation that seemed unlikely, including with respect to allegations of abuse and mistreatment. For example, the Court does not credit Petitioner's testimony that the reason he wanted K.K. to sleep in the parties' bedroom was that Respondent had told him that J.M. was hearing voices—testimony that was belied by Petitioner's failure to take any action to address J.M.'s purported condition and the fact that these alleged concerns arose well after K.K. had been sleeping in her parents' bedroom.

---

[35] The Court notes that Petitioner cried when describing how he left home in the evenings to drive Uber and K.K. asked where he was going. (Tr. 1693:20–1694:2 (noting that Petitioner was crying).) The Court interpreted this genuine showing of emotion as evidence that Petitioner loves and misses his daughter, and that he harbors some regret and sadness over the time he spent away from K.K. when she lived in Trinidad, including when he was working at night.

By contrast, however, the Court does not find that Petitioner's admissions about multiple instances of infidelity (Pet'r Tr. 1642:12–1643:25, 2078:15-21, 2080:5–7, 2081:12–2082:12 (Alicia), 1639:12–21, 1641:14–16, 2092:6–2095:8 (Latoya), 1630:23–1632:23, 2086:24–2090:23 (Tianna), 1644:10–1646:14, 2082:19–2086:23 ("Debbian")), or that he regularly stayed out late at bars, to be indicative of Petitioner's credibility or candor; rather, these concessions felt grudging, calculated, and strategic to the Court, that is, intended to bolster Petitioner's credibility with respect to his denials about other more serious conduct, such as forced sex, use of corporal punishment on the children, and dangerous driving.

Similarly, although Petitioner signed the divorce consent form (stating that the parties had lived

apart for at least two years), he improbably testified that he did not read the form before signing it

and was unaware that it contained any false statements.  Petitioner persisted in this improbable

denial at the hearing despite the recording of the divorce hearing before Justice Tam being played,

during which Petitioner is heard confirming his signature on the consent form and not objecting

when the false terms of the divorce petition (*i.e.*, the couple's period of separation and being

childless) were read aloud as the basis for granting the *Decree Nisi*.  Based on this evidence, the

Court finds that Petitioner's denial of knowingly signing the partially false divorce consent form

is not credible, which, in turn diminishes his overall credibility in this matter.[36]

To the extent Petitioner argues that Respondent should not be believed about the incidents

of forced sex and other abuse because she never filed a police report, the Court rejects that

argument, finding that Respondent credibly explained that she did not do so "[b]ecause Trinidad

and Tobago police don't take it serious once you marry."  (Resp't Tr. 88:1–6.)  Moreover, the

Court rejects Petitioner's arguments that Respondent's allegations of sexual abuse, disclosed in

this proceeding, should not be trusted because she never addressed the abuse with Petitioner when

she left him in April 2019, ██████████████████████████████ and

remained with Petitioner for 12 years despite her "track record of promptly extricating herself"

from other abusive partners.  (*See* Pet'r's Br., Dkt. 122, at 71–73.)  Again, the Court finds that

---

[36] The Court notes that its skepticism of Petitioner's denial that he knowingly consented to a divorce on false terms is consistent with Justice Tam's view of the issue, as expressed during the May 6, 2019 hearing on Petitioner's petition to set aside the *Decree Nisi*.  (*see* P014.1, P.014.2). During this hearing Justice Tam stated that the documents before the court showed that Petitioner was served with the divorce petition, which clearly stated the false terms of the divorce, and that Petitioner "allowed the court to pronounce the decree.  He allowed the court to say there are no children of the family.  He was here.  He let the court say that."  (*see* P014.1, P.014.2).  Justice Tam further stated, "it seems to me that the two of them [Petitioner and Respondent] colluded to get a divorce by saying they had no children" and "they are both guilty here."  (*see* P.014.2).

Respondent testified credibly that she did not "feel safe talking [with Petitioner] about" the sexual abuse (Resp't Tr. 246:1–247:6) and that she tried to speak with Petitioner about his use of corporal punishment, but he rebuffed her as being too soft (Resp't Tr. 98:23–99:3, 146:20–147:8).

████████████████████████████████████████████████████████████████

███████  ████████████  █████████████████████████████████████████████

██████████████████████████████████████████████ (Resp't Tr. 717:20–721:3.)

Moreover, the Court does not find the fact that Respondent stayed with Petitioner longer than with other abusive partners particularly meaningful, given that the Court has no way to compare the circumstances of those other relationships to her relationship with Petitioner, including the degree or type of abuse in each, and whether or when Respondent could safely leave those other relationships.  If the Court can infer anything, it is that Respondent may have been able to more easily extricate herself from her other abusive relationships—which either occurred in her country of citizenship, Guyana, or with men with whom she did not share a child—than from her relationship with Petitioner, where separating from Petitioner meant she was at risk of deportation from Trinidad and separation from K.K.—both of which Petitioner, in fact, threatened her with when she spoke of leaving him.  (Resp't Tr. 118:2–15.)

As a final note, the Court recognizes that the evidence in this case, as in many under the Hague Convention or involving domestic relationships, is largely and perhaps unavoidably of the "he said-she said" variety.  As a result, the Court's factual findings are necessarily and substantially based on its credibility assessments of the parties and other witnesses who testified at the hearing.

---

[37] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████

The Court, however, has considered all relevant expert and non-testimonial evidence to ensure that its factual findings are grounded on all competent evidence in the record. The Court also recognizes, as indicated throughout this decision, that where the evidence—testimonial and otherwise—is simply insufficient to meet the proponent's burden, the Court must find the fact unproven.

**J.    The Parties' Divorce**

In 2018, Respondent decided that her relationship with Petitioner was irreparable. (Resp't Tr. 175:10–176:16; *see also* Pet'r Tr. 1638:18–22.) During an August 2018 trip to New York, Respondent met a man named Bruce Blocker, who asked for Respondent's phone number, and then began texting her every day. (Resp't Tr. 206:1–20.) Several weeks after Respondent returned from this trip, she gave Petitioner some "divorce papers." (Pet'r Tr. 1716:23–1717:3.) Though the parties dispute whether they discussed the contents of the divorce papers, the Court credits Respondent's testimony that before filing anything, she and Petitioner discussed the divorce, including what the divorce papers would say. (Resp't Tr. 177:5–178:2.) Respondent prepared a draft divorce petition, with the assistance of someone at the Trinidadian Family Court, that contained several inaccurate statements, including that the parties had lived apart for two years or more, and that they had no living children. (Resp't Tr. 176:24–177:4, 179:25–180:14; *see* P006 at PET_0000102.) The parties agreed to make these misrepresentations because Respondent "wanted a quicker divorce" and the parties did not want to "fight over custody, over K.K." (Resp't Tr. 180:23–181:13 (explaining that she understood from Petitioner that "you can't get a divorce without being separated first").) Petitioner signed the divorce consent form, which falsely stated

that he and Respondent had been living separately for at least two years.[38]  (Resp't Tr. 181:22–

185:11 (describing how she observed Petitioner review the divorce petition and that he did not

object to the terms); Pet'r Tr. 1717:14–1723:11 (testifying that although he was initially resistant,

he eventually signed the consent form); P006 at PET_0000108 (consent form dated September 20,

2018 with Petitioner's signature).)  The divorce petition and Petitioner's signed consent form were

filed with the Trinidadian court on September 20, 2018, with the parties to return for a hearing on

January 7, 2019.  (P006 at PET_0000098 (noting that the divorce petition was filed September 20,

2018).)

████████████████████████████████████████████  (Resp't Tr.

456:22–457:1.)  Even though Respondent was not yet divorced from Petitioner, Blocker pressured

her to get married.  (Resp't Tr. 725:21–726:4.)  Respondent testified that Blocker filled out the

marriage license application, and that she did not review it before signing because she trusted

Blocker.  (Resp't Tr. 726:5–24.)  ████████████████████████

████████████████████████████████████████████████

Respondent testified that she did not understand the meaning of "impediments" at the time.  (Resp't

Tr. 460:23–462:10; 726:25–727:11; P122.)[39]

---

[38] At the hearing, Petitioner testified that he did not recognize the divorce petition and did
not review the consent form before signing it.  (Pet'r Tr. 1721:4–1723:11.)  While the Court cannot
determine whether this statement is true, it nonetheless finds that Petitioner and Respondent had
agreed to falsely claim that they had not lived together for at least two years and did not have
children to facilitate a quicker divorce, as Respondent testified, and that Petitioner knew he was
consenting to a divorce on those false terms, regardless of whether he reviewed the divorce petition
and consent form before signing it.  (*See* P.014.2 (Justice Tam stating "it seems to me that the two
of them [Petitioner and Respondent] colluded to get a divorce by saying they had no children" and
"they are both guilty here").)

[39] The Court does not entirely credit Respondent's claim that she did not know of or
understand the false statements in the marriage application that Blocker submitted for them, *e.g.*,
that the couple, in fact, did not live together in Brooklyn, or that there was no "impediments," *i.e.*,
Respondent still being married to Petitioner.  However, as discussed above, even assuming that

On January 7, 2019, Justice Tam of the Trinidadian Family Court conducted a hearing regarding the parties' divorce petition. (P013.1, P013.2.)  Petitioner was not present at the start of the hearing.  (P013.1.)  Respondent appeared and testified falsely under oath by confirming the misrepresentations in the divorce petition.  (*Id.*)  Justice Tam admonished Respondent, expressing concerns about her truthfulness after she stumbled while trying to recall the year she separated from Petitioner, and asked Respondent to step into the hall to review her papers.  (*Id.*)  By the time the hearing resumed, Petitioner had arrived and was present before Justice Tam.  (P013.2.) Respondent was reminded that she was under oath and that lying in court was a serious crime for which she could be prosecuted.  (*Id.*)  Petitioner confirmed his signature and consent to the divorce. (*Id.*)  Justice Tam asked Respondent another question, but then stopped her from answering because he did not "want [her] to incriminate herself" or cause him to have to "report this matter to the immigration authorities."  (*Id.*)  Justice Tam stated that he would grant the *Decree Nisi* on the basis that the parties had lived apart continuously for two years and Petitioner's consent, further explaining that the decree would "not be made absolute before six weeks" and that there were "no children of the family."  (*Id.*)  Justice Tam concluded "your divorce has been granted, but you are not divorced as yet."[40]  (*Id.*)  At no point during the hearing did Petitioner address or object to the inaccurate statements in the divorce petition.  (*Id.*)

---

Respondent knowingly submitted, or allowed Blocker to submit, a marriage license application that contained false information, this fact does not affect the Court's assessment of Respondent's credibility on the critical facts in this matter.

[40] The *Decree Nisi* states that the Court decrees the marriage "be dissolved unless sufficient cause be shown to the Court ***within six (6) weeks*** from the making of this Decree why such Decree should not be made absolute." (P007 (emphasis in original).)  There is no evidence that during the six-week period, Petitioner sought to contest the divorce.

On February 20, 2019, Respondent filed an application for a Decree Absolute, in order to finalize the parties' divorce.  (Resp't Tr. 176:3–8; P008.)  At the evidentiary hearing in this matter, Respondent testified that she believed that the Trinidadian Court had granted the Decree Absolute, though she had not received a copy, and that she was divorced from Petitioner.  (Resp't Tr. 176:3–8, 363:7–365:24.)

### K.     Respondent, K.K., and J.M. Travel to New York

On April 5, 2019, Petitioner met Respondent, J.M., and K.K. at the airport in Trinidad to say goodbye, believing that they were going to Guyana for a two-week vacation, based on Respondent's statements.  (Joint Stip., Dkt. 92, ¶¶ 3–5, 23.)  But the three did not travel to Guyana on that date (or any date thereafter) and instead flew directly to the United States, landing in New York City on April 6, 2019.  (Joint Stip., Dkt. 92, ¶¶ 24–25.)  Respondent never told Petitioner that she was planning to take K.K. and J.M. to the United States or that the move would be indefinite or permanent.  (Resp't Tr. 234:12–21.)

### L.     Petitioner's Knowledge of K.K.'s Whereabouts and Continued Contact

Since April 2019, Petitioner has been communicating with K.K. through phone calls, video chats, and messages on Facebook Messenger, which K.K. accesses through Respondent's Facebook account.  (Pet'r Tr. 2002:11–2008:17.)  Though unable to see whether Respondent is online or what she is doing on Facebook, since April 2019, Petitioner has been able to communicate fully with Respondent's Facebook account, including sending and receiving messages through Facebook Messenger.  (Pet'r Tr. 2004:18–2008:17.)

Respondent's plan was to stay in New York, but she did not discuss this with Petitioner, who assumed she was going to Guyana.  (Resp't Tr. 234:12–21.)  Respondent did not correct Petitioner's assumption because, for safety reasons, she did not want him to know her whereabouts

39

with the children.  (Resp't Tr. 235:3–7.)  Even after arriving in New York, in late April 2019, Respondent told Petitioner she was in Guyana with K.K. (Resp't Tr. 235:8–17.)  However, on June 12, 2019, Respondent posted the Flatbush, Brooklyn address of her nail business on Facebook to try to build clientele; Petitioner was one of her Facebook friends and could have seen the post. (Resp't Tr. 236:11–239:16, 240:16–25; R018.)  Although Respondent had blocked Petitioner from her Facebook account for a few days in April or May 2019, she later unblocked him after deciding it was not fair to prevent K.K. from communicating with her father.  (Resp't Tr. 241:4–19, 732:18– 24.)  On June 30, 2019, Respondent posted the same Flatbush, Brooklyn address on the public Instagram page for her nail business, which Petitioner was aware of.  (Resp't Tr. 241:25–244:25, 711:10–712:3; R104)

In June 2019, Petitioner was informed by his mother that Respondent had posted on Facebook that she was working as a night nurse at a hospital in the United States.  (Pet'r Tr. 2067:6–2068:15.)  On July 8, 2019, Respondent relayed to his Trinidadian attorneys that a relative had informed him that Respondent was advertising on Facebook and Instagram that she was taking nail appointments in the United States.  (Pet'r Tr. 2070:8–13; *see* P010 at PET_0000194–96.)  On or before July 22, 2019, Francis-Baptiste told Petitioner that she had learned that Respondent, K.K., and J.M. were living in Brooklyn, New York.  (Pet'r Tr. 2069:1–2070:7.)

**M.   K.K.'s Life in New York**

1.   K.K.'s Ongoing Residence in Flatbush, Brooklyn

Prior to leaving Trinidad, Respondent sent money to a friend of her mother named "Lloyd" who was supposed to help Respondent and Blocker get an apartment, but Lloyd took Respondent's money and never provided an apartment.  (Resp't Tr. 192:10–23, 596:14–597:10, 600:6–601:2, 601:19–21, 708:3–19.)  Respondent and Blocker assumed that at some point they would live

together with K.K. and J.M. after Respondent and the children moved to the United States in April 2019.  (Resp't Tr. 707:24–708:2.)  They tried to find other apartments to live in together but were unsuccessful.  (Resp't Tr. 710:6–22.)  Respondent called her aunt, Barbara Osborne, who lives in Rosedale, New York, to ask if she knew about any apartments and about living with Osborne, but Osborne did not know about any apartments, and her son was already living in her basement. (Osborne Tr. 1462:18–19; 1464:18–19; 1469:2–18.)  Respondent eventually contacted her friend Patrice Carter-Carmichael, whom she had met a year or two earlier and had stayed with during her August 2018 and November 2018 trips to New York, to see if she and the children could stay with Carter-Carmichael for one night.   (Resp't Tr. ██████  645:5–21; Carter-Carmichael Tr. 1273:18–1274:20, 1276:6–16, 1278:3–10, 1289:19–1291:1.)

Respondent and the children ended up living with Carter-Carmichael and Carter-Carmichael's two sons in Flatbush, Brooklyn for five to six weeks after arriving in New York in April 2019.  (Resp't Tr. 191:17–192:9; 1279:22–1280:6.)  Respondent, K.K., and J.M. shared one of the three bedrooms in Carter-Carmichael's apartment, which had a queen-size bed.  (Resp't Tr. 195:1–5; Carter-Carmichael Tr. 1280:14–17.)  While Respondent, K.K., and J.M. were staying with Carter-Carmichael, Respondent bought her own groceries with her own money and cooked small meals.   (Carter-Carmichael Tr. 1281:6–13; 1282:1–2.)   Carter-Carmichael advised Respondent on groceries to buy for the kids.  (Carter-Carmichael Tr. 1281:17–25.)  During this time period, Respondent was working doing nails, and never asked Carter-Carmichael for money or for food.  (Carter-Carmichael Tr. 1282:3–19.)  J.M. and K.K. were very well behaved and quiet, particularly K.K.   (Carter-Carmichael Tr. 1287:24–1288:15.)   J.M. played videogames with Carter-Carmichael's son, and K.K. played dolls with her nieces.  (Carter-Carmichael Tr. 1287:24–1288:15.)  In the mornings, Respondent and/or Carter-Carmichael walked or drove K.K. and

Carter-Carmichael's son to school.   (Resp't Tr. 193:16–194:17.)   Then, in the afternoon, Respondent picked K.K. up from school, or if she was running late with clients, Carter-Carmichael picked up K.K.  (Resp't Tr. 193:23–194:2.)  Carter-Carmichael was "very caring" and made sure that K.K. and J.M. got up on time for school and made them meals.  (Resp't Tr. 194:21–25.)

At some point in May 2019, while still living with Carter-Carmichael, Respondent, K.K., and J.M. spent one night with Blocker at a shelter in the Bronx where they were trying to obtain an apartment, but ultimately were unsuccessful.  (Resp't Tr. 202:17–203:23; 376:3–13; ███████ ██████████.)  Carter-Carmichael first met Blocker the day of his wedding to Respondent, and after that, had very few interactions with him. (Carter-Carmichael Tr. 1290:21–13; 1291:1– 1293:2.)  Also, at some point during Respondent's stay with Carter-Carmichael, Respondent mentioned that J.M. was getting bites, and Carter-Carmichael determined that the cause was bedbugs.[41]   (Carter-Carmichael Tr. 1285:19–1286:3; 1287:19–23.)   Carter-Carmichael was alarmed, but expressed that she "wasn't upset" with Respondent because, in her words, "I know New York we have an issue with bugs."  (Carter-Carmichael Tr. 1287:17–21.)  To alleviate the situation, Carter-Carmichael cleaned all the furniture.  (Carter-Carmichael Tr. 1287:22–23.)

After a few weeks at Carter-Carmichael's apartment, Respondent felt she had "overstay[ed] [her] welcome" and that it was time to move out.  (Resp't Tr. 195:6–9.)  Carter-Carmichael did not kick Respondent out, but noted that her views about Blocker, including that she got a "weird feeling from him" and that he should have been more prepared for Respondent's move to New York, had an impact on the living situation.  (Carter-Carmichael Tr. 1293:3–1297:5 (describing how she expressed her misgivings about Blocker to Respondent and Blocker).)

---

[41] In late April 2019 and then again in June 2019, Respondent took K.K. to Kings County Hospital for treatment for bumps on her legs related to bedbugs.  (Resp't Tr. 625:4–627:5; 628:10– 629:10.)

On May 12, 2019, Respondent, K.K., and J.M. went to stay with Elaine Heron, who previously dated Respondent's uncle and whom Respondent affectionately refers to as "Aunt." (Resp't Tr. 195:15–23; 196:11–15; Heron Tr. 1332:1–6.)   Heron's three-bedroom apartment, which she shares with her adult children, who are away most of the time, is also in Flatbush, Brooklyn, just one block from Carter-Carmichael's apartment.   (Resp't Tr. 195:24–196:10, 196:21–197:23.)   Respondent, K.K., and J.M. shared a room with a bunkbed—J.M. slept on the top bunk, and Respondent and K.K. shared a double bed on the bottom bunk.[42]   (Resp't Tr. 197:24–198:19.)

Heron had contact with K.K. every day and would wake K.K. and J.M. up, get them ready for school, and take them to parties, the park, shopping, and the grocery store.   (Resp't Tr. 198:24–199:7.)   During their stay with Heron, Respondent did most of the cooking for K.K. and J.M., and walked or drove K.K. to school.   (Resp't Tr. 199:8–24.)   When Respondent had to work, Heron watched K.K. and J.M.   (Resp't Tr. 200:8–10.)   During the summer, K.K. spent time outside with Heron, biking or skateboarding with children from the neighborhood.   (Heron Tr. 1345:15–1346:22 (testifying that her neighbors "love the ground that [she] walk[s] on.").)   Heron testified that K.K. was a "quiet little girl" from the time she met her, and that K.K. didn't change much, "she's just like that."   (Heron Tr. 1340:8–20.)   While Respondent lived with Heron, Respondent paid Heron $600 each month to assist with rent and other expenses, ███████████████████ ██████.   (Resp't Tr. 373:9–374:25; 727:20–728:1.)

---

[42] Initially, Respondent, J.M., and K.K. all shared a queen size bed, but they had to get rid of that bed and replace it with the bunkbed after discovering that bedbugs had followed them from Carter-Carmichael's apartment.   (Resp't Tr. 733:15–735:11.)   Being from the Caribbean, Respondent knew nothing about bed bugs, and had inadvertently brought them from Carter-Carmichael's home to Heron's home, not realizing that she needed to throw away their suitcases and wash their clothes with hot water to get rid of the bedbugs.   (Resp't Tr. 631:15–632:7.)

Heron first met Blocker when he helped Respondent move, but she did not see him more than one or two times after that.  (Heron Tr. 1352:15–1353:4.)  During Respondent's relationship with Blocker he interacted with K.K. nearly every day, including helping her with homework and sharing meals.  (Resp't Tr. 221:15–222:2.)  Blocker was alone with K.K. on one occasion, before October 2019, when he picked her up from school and walked her 10 to 15 minutes to Respondent's salon.  (Resp't Tr. 222:7–223:1.)  Respondent and K.K. never lived with Blocker, and Blocker never slept overnight at Carter-Carmichael's or Heron's apartments.  (Resp't Tr. 224:17–24; Heron Tr. 1337:23–1338:4.)  K.K. never slept overnight at the shelter where Blocker was living, nor visited his room there.  (Resp't Tr. 224:25–225:10.)  ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████  (J.M. Tr. 1004:15–1006:18.)

Respondent's relationship with Blocker ended in October 2019 after two incidents that made Respondent feel that it was "not safe for [Respondent] and the kids" and realize that she did not want to repeat the same "mistake" she had made with Petitioner, referring to "[t]he assault, the controlling behavior."  (Resp't Tr. 206:21–207:11.)  The two incidents, which were a few days apart, involved Blocker being physically violent towards Respondent.  (Resp't Tr. 207:13–208:6; Heron Tr. 1354:16–1355:6, 1355:16–1356:4.)  ██████████████████

██████████████████████████████████████████████████████████████

██████████  (Resp't Tr. 340:7–341:23; 504:8–12, 506:3–14.)

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ (Resp't Tr. 342:19–345:16, 509:19–510:11.)  Neither K.K. nor J.M. were present for these incidents (they were both inside Heron's apartment at the time), but they did see Respondent crying afterwards.  (Resp't Tr. 216:10–15, 507:4–508:11; ████████ ████████.)

On or about October 1, 2019, Respondent filed a Domestic Incident Report ("DIR") with the New York City Police Department ("NYPD") against Blocker describing these two incidents. (Joint Stip., Dkt. 92, ¶¶ 28, 29; R094.)  Several days after the second incident, Blocker showed up at Respondent's salon and cursed her out; ██████████████████████████ (Resp't Tr. 218:5–23, 345:20–348:2.)  On or about October 10, 2019, Respondent filed a second DIR with the NYPD against Blocker.  (Joint Stip., Dkt. 92, ¶ 30; R094.)  Following the second report, the police placed Respondent, K.K., and J.M in a shelter and called K.K.'s school to have Blocker's name removed from the authorized pick-up list.  (Resp't Tr. 223:17–224:16, 514:2–21; P017 at PS315_0000024 (noting "precinct contacted principal that no one other than mom can pick up child"), PS315_0000031 (crossing out Blocker's contact information and noting "ONLY MOM CAN PICK UP 10/10/19").)  After one night at the shelter, Respondent decided it was safe to return to Heron's apartment because she had a temporary order of protection against Blocker and he told her that he would turn himself in.  (Resp't Tr. 203:24–205:1.)

On October 16, 2019, Blocker was arrested based on Respondent's complaints against him. (Williams Tr. 2146:23–2147:6.)  On December 11, 2019, Respondent obtained a two-year Order of Protection against Blocker.  (Joint Stip., Dkt. 92, ¶ 31; R048.)  The Order of Protection covers only Respondent and does not include K.K. or J.M. as protected parties.  (Resp't Tr. 221:9–14; *see* R048.)  If K.K. or J.M. had been present during the incidents, they would be included in the Order

of Protection, and Blocker would have also been charged with endangering the welfare of a child. (Weir Tr. 2232:7–15.)

When Respondent began her relationship with Blocker, he told her that he had spent a few months in prison following an argument related to seeing his son in which he had to defend himself, and that he had been on parole in connection with that incident.  (Resp't Tr. 225:11–16, 227:5–15; 351:7–14 ███████████████████████████████████████████

██████.)  However, Respondent did not learn about his full criminal history until she filed the police report against Blocker.  (Resp't Tr. 226:3–17.)  Up to that point in time, she had no concerns for K.K. or J.M.'s safety around Blocker.  (Resp't Tr. 227:22–228:6.)  In fact, Blocker has a substantial criminal history, including a 2010 incident in which he violated an order of protection by violently assaulting the mother of his three-year old son in his son's presence, causing serious injury, and resulting in a sentence of seven to nine years for Attempted Murder in the Second Degree, Assault in the First Degree, Burglary in the First Degree, Assault in the Second Degree, and Aggravated Criminal Contempt.  (*see* P238 at DOCCS_0000114–116.)

Since the October 2019 incidents, Respondent has had only two contacts with Blocker. Blocker contacted Respondent from prison ███████████████████████████████

██████ when he got out of prison in June 2020 to pick up various documents and his truck from Barbara Osborne's house (where it had been parked since October 2019).  (Resp't Tr. 232:19–233:23, 486:5–10, 554:15–22, 729:15–730:19; Osborne Tr. 1472:3–22; 1473:11–14.)  At the time of these contacts, Respondent did not have a copy of the Order of Protection.  (Resp't Tr. 729:22–25; 730:16–19.)[43]  However, Respondent understood that the Order of Protection would go into

_____

[43] Respondent had not seen or received a copy of the Order of Protection until a few weeks before the evidentiary hearing, when it was provided to her by her counsel in this matter.  (Resp't Tr. 730:1–15, 745:4–7.)  None of the records maintained by the Kings County District Attorney's

effect after Blocker was released from an eight-month prison sentence.[44]  (Resp't Tr. 217:16–218:1.)  June 2020 was Petitioner's last contact with Blocker.  (Resp't Tr. 233:20–23.)

In mid-October 2020, Respondent, K.K., and J.M. moved out of Heron's apartment. (Heron Tr. 1334:12–13.)  Respondent decided it was time to move out of Heron's apartment because, in her words, "I'm here for a year and a couple month.  I'm doing good.  I want my kids to look up and not seeing that their mom is not doing well, and I work up my way to get them a better place, and a spacious place."  (Resp't Tr. 250:3–8.)  Respondent, K.K., and J.M., currently reside in their own apartment in Flatbush, Brooklyn that costs $1,650 per month, and has a living room, dining room, kitchen, bathroom, and two bedrooms—one shared by K.K. and J.M., who have bunkbeds, and the other occupied by Respondent.  (Resp't Tr. 52:24–25, 249:17–250:2.)

## 2.    Respondent's Employment and Financial Status

Respondent currently works as a nail technician at a salon, Monday to Saturday, from 10:00 a.m. to 8:00 p.m.  (Resp't Tr. 288:3–21, 290:4–5.)  Respondent also works as a home health aide four nights a week (Saturday, Sunday, Monday, and Tuesday), from 10:30 p.m. to 7:00 a.m. (Resp't Tr. 290:8–16, 399:2–7.)  Respondent makes between $1,400 and $1,500 per month as a home health aide, and between $3,200 or $4,000 per month as a nail technician; she is the sole source of income for herself, K.K., and J.M.  (Resp't Tr. 703:20–704:24.)  From March to June

---

office demonstrate that Respondent ever received a copy of the Order of Protection against Blocker.  (Weir Tr. 2236:22–2237:6, 2237:17–2238:2.)

[44] On June 17, 2020, Blocker was released from his mandated intensive drug treatment, domestic violence, anger management program, into parole supervision.  (Williams Tr. 2171:14–2172:15.)  Under parole supervision, Blocker is designated a "Compass Level 1," which means there is a high probability he will reoffend, and so he is monitored more closely by his parole officer.  (Williams Tr. 2143:23–2144:16.)  In light of his extensive history of domestic violence and violations of orders of protection in the past, Blocker was given a GPS monitor in order to monitor his compliance with the current Order of Protection.  (Williams Tr. 2172:14–18; 2179:18–22.)

2020, when the salon temporarily shut down due to COVID-19, Respondent worked at Healthy Juice Blend.  (Resp't Tr. 292:21–293:3.)  Respondent testified that more recently she applied for a job at a geriatric home that would allow her to work five days a week, 7:00 a.m. to 2:00 p.m., so that she can be at home with the kids at night.  (Resp't Tr. 291:16–292:2.)

When Respondent is working, K.K. and J.M. either stay at Heron's house, including on the four nights Respondent works as a home health aide, or at the salon, where there is a room in which K.K. and J.M. could read, do homework, or play on the salon's computer.  (Resp't Tr. 288:18–25, 289:7–9, 290:17–23; ██████████████.)  K.K. and J.M. are never left at home without an adult.  (Resp't Tr. 702:19–703:13; ██████████████.)

Respondent obtained health insurance for K.K. through MetroPlus, effective September 1, 2019.[45]  (Resp't Tr. 277:13–19; R020 at R020.008–09.)  K.K. has a pediatrician at Kings County Hospital, is up to date with her immunizations, and has had a physical examination each year since arriving in New York.  (Resp't Tr. 277:23–278:11 (explaining that K.K. had a physical examination scheduled for December 2020); R020 at R020.008–09.)

### 3.   K.K.'s School, Extracurriculars, and Church

In April 2019, Respondent registered K.K. to attend the ████████████████ at P.S. ███ in Brooklyn, New York.  (Joint Stip., Dkt. 92, ¶ 27.)  Carter-Carmichael helped Respondent enroll K.K. and J.M. in school using Carter-Carmichael's address.  (Carter-Carmichael Tr. 1282:20–1283:24.)  Since April 2019, K.K. has continuously attended P.S. ███ and is now doing virtual learning.  (Resp't Tr. 247:21–248:16.)  P.S. ███ is a 25- to 30-minute-walk or a 10-minute van ride from Respondent's current apartment.  (Resp't Tr. 248:24–249:9.)

---

[45] The Courts assumes "MetroPlus" refers to MetroPlusHealth, the health care plan available to residents of New York City.  *See* https://www.metroplus.org/About-Us/overview (last visited Jan. 7, 2021).

Prior to the COVID-19 pandemic, K.K. went on several school trips, including to the zoo, movies, ballet, science fair, museum, and pumpkin-picking.  (Resp't Tr. 263:18–264:1.)

In the 2019-2020 school year, when K.K. was in fourth grade, she was only marked absent on four days, which were due to a bout of the flu (Resp't Tr. 270:17–20) and had three late arrivals. (P017 at PS315_0000028).  When the school transitioned to remote learning, K.K.'s attendance was "not good" because of connectivity issues, but Respondent worked with the school and corrected the problem.  (Resp't Tr. 270:25–271:14.)  Respondent provided K.K. with a laptop and other school supplies.  (Heron Tr. 1342:11–20.)  As of the evidentiary hearing, the 2020-2021 school year had been "fully remote" and K.K.'s attendance had been good.  (Resp't Tr. 270:17–271:22.)  During the spring 2021 semester, either Respondent or Heron will get K.K. ready for online school to start at 8:30 a.m. (Resp't Tr. 289:16–290:1), and K.K. and J.M. will do remote learning from Heron's home or the salon.  (Resp't Tr. 702:19–703:10; Heron Tr. 1341:14–1342:1 (describing the scene of K.K. and J.M. attending virtual school from the table in Heron's dining area).)  They will never be left at home alone.  (Resp't Tr. 703:11–13.)

K.K.'s report card for the first two marking periods of the 2019-2020 school year shows consistent or improved performance in all subjects.  (P017 at PS315_0000028–29.)  K.K. showed her highest performance in Listening Speaking and Language; Science; Physical Education; Dance; Technology; and Social-Emotional Development.  (*Id.*)  K.K. has made strides in Reading, in which she improved from "[w]ell below standards" to "[b]elow standards" with a teacher's comment that K.K. "is currently reading on a level 'P' which is approaching grade level."  (P017 at PS315_0000028.)  K.K. has also made strides in Social Studies and History, in which she improved from "[w]ell below standards" to "[p]roficient."  (*Id.*)  K.K. struggled with math for two marking periods, scoring "[w]ell below standards" (*id.*), which prompted the school to send

49

Respondent a letter warning that unless K.K. made "significant progress" in both math and English Language Arts she risked staying in the same grade for the 2020-2021 school year (P093). Respondent spoke with K.K.'s teacher, Ms. Lopez, about K.K.'s grades and asked for "extra lessons" and support. (Resp't Tr. 250:17–252:7.) Ms. Lopez provided books and told Respondent to focus K.K. on math. (Resp't Tr. 251:3–6.) Last school year, K.K. also attended an aftercare program three days a week, where she received academic support in math and English, and was also able to sing, dance, and play in the gym. (Resp't Tr. 253:17–254:9.) K.K. ultimately passed the required test and was promoted to fifth grade. (Resp't Tr. 252:1-15; *see* P017 at PS315_0000030 (indicating that K.K. is in fifth grade).)

Respondent testified that K.K. made friends at P.S. ██. (Resp't Tr. 255:17–25.) Prior to the COVID-19 pandemic, K.K. saw these friends outside of school to go bowling and to the movies. (Resp't Tr. 268:16–269:5.) K.K. has a best friend from school, Fermeada, whom she spent time with at Fermeada's apartment and at the salon; K.K. and Fermeada play, do homework and have snacks together. (Resp't Tr. 255:17–25, 268:16–269:5.) ████████████

████████████████████████████████████████████████████

████████████████████████████ (J.M. Tr. 997:23–24, 1000:15–20; Carter-Carmichael Tr. 1298:22–1299:4 (testifying that she observed K.K. "skipping alongside her mom" as they walked to school).) Still, at the evidentiary hearing, an October 13, 2019 message from K.K. to Petitioner was introduced, which said, "Please call me tomorrow [] I feel lonely [] no one talks to me at school." (P234 at PET_0000925.) The Court also viewed numerous photos and videos of K.K. with her classmates. (*See* Resp't Tr. 259:12–263:14; R028 (photo of K.K. having snack time with classmates); R041 (video of classmates singing Happy Birthday to K.K. and celebrating with balloons and cupcakes); R088 (photo of K.K. with

classmates doing a holiday gift exchange).)  In addition to these friends from school, K.K. spends time with the children of Respondent's friends, including on a trip to a mall for a birthday celebration.  (Resp't Tr. 264:15–265:16; *see* R056, R057, R058, R059, R060, R061, R062, R063, R064, R065, R066.)

During her first summer in the United States, K.K. participated in a day camp program in which she regularly visited different parts of New York City, and at the end of the summer was awarded a trophy for "Best Manners."  (Resp't Tr. 254:10–255:25; R023.)  Prior to the COVID-19 shutdown, Respondent attempted to enroll K.K. in a Y.M.C.A. ballet class, but the class was full, and at the point she could enroll, the COVID-19 shutdown had taken effect.  (Resp't Tr. 270:4–16.)

Before the pandemic, Respondent, K.K., and J.M. attended ▬▬▬▬▬▬ Church in their Flatbush, Brooklyn neighborhood every Sunday, and sometimes on Wednesdays.  (Resp't Tr. 273:9–274:4, 274:20–25; Heron Tr. 1344:21–1345:4; ▬▬▬▬▬▬.) ▬▬



(J.M. Tr. 1008:12–1009:9.)  K.K. also sang and danced at church.  (Resp't Tr. 273:9–274:4; 274:20–25.) Since the COVID-19 shutdown, they have been attending church services online.  (Resp't Tr. 273:24–274:4; Heron Tr. 1344:21–1345:4.)

▬▬▬▬▬▬ (J.M. Tr. 1006:22–1008:11.)  The Court viewed numerous photos and videos depicting snapshots of K.K.'s life in New York—*e.g.*, K.K. walking to a Harvest Program at her school (R044), dressing up as Wonder Woman for Halloween (R029, R030), bowling (R031), going to church with Respondent (R032), walking to school for her second day of fourth grade

(R034), walking to the salon after school with Respondent (R035), posing with Respondent on Christmas (R050), posing in the lobby of Heron's building before going to church (R051), celebrating her birthday at dinner at a restaurant with J.M. (R073), hoverboarding in the lobby of Heron's building (R074), and going on a beach trip for J.M.'s birthday (R075).  (Resp't Tr. 295:14–303:25, 307:5–308:21.)

4.    <u>Respondent and K.K.'s Immigration Status in the United States</u>



(Resp't Tr. 396:2–14; 423:2–9.)  As previously discussed, on or about December 23, 2019, Respondent filed a VAWA Application ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆.  (Joint Stip., Dkt. 92, ¶ 32; Resp't Tr. 310:18–22, 314:3–7.) Respondent has since received work authorization, valid from June 5, 2020 to June 4, 2021. (R117.)

(Resp't Tr. 352:12–15.)

(Resp't Tr. 355:4–23.) [46]

---

[46] The U nonimmigrant stats (U visa) is available to victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity.  *See* https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status (last visited Jan. 26, 2021).

(Resp't Tr. 356:3–8.) ██████████████████████████████

████████████████ (Resp't Tr. 315:14–22.)

### N.    Circumstances Should K.K. Return to Trinidad

On May 3, 2019, Petitioner filed a petition in the Trinidadian court to set aside the January

7, 2019 *Decree Nisi*.  (P010 at PET_0000130–134.)  That petition went before Justice Tam, who,

on May 6, 2019, ordered that the January 7, 2019 *Decree Nisi* would not be made final or absolute

until after a hearing and determination on Petitioner's application for custody of K.K.  (P009.)[47]

In addition, on July 24, 2019, Justice Tam ordered that pending the determination of K.K.'s

custody, Petitioner would have "[s]ole interim custody, care, and control of the child" and that

Respondent shall immediately return to Trinidad and Tobago.  (P011.)  If K.K. is returned to

Trinidad, Petitioner intends to enforce the July 24, 2019 sole custody order.  (Pet'r Tr. 1994:9–

11.)

Petitioner currently works at an elevator company installing and repairing elevators, and

as a driver for "TT Rideshare," which is similar to Uber.  (Pet'r Tr. 1606:11–13, 1607:21–25;

1610:8–18.)  Petitioner filed for vacation time to, in his words, "spend some time with my

daughter."  (Pet'r 1783:21–23.)  Petitioner currently lives alone in St. Helena, Trinidad (which is

in a different area from Chaguanas, where K.K. previously lived), and has an extra room for K.K.

(Pet'r Tr. 1605:19–1606:8; 1993:18–22.)  Petitioner's plans for where K.K. might attend school

are unclear.  Petitioner indicated that K.K. would be able to attend the school she previously

---

[47] Petitioner testified that the parties are still married.  (Pet'r Tr. 2115:11–19.)  As Petitioner understands it, because of the actions of his attorneys, the divorce with Respondent has been nullified.  (Pet'r Tr. 2118:15–24.)  Petitioner does not want to be married to Respondent.  (Pet'r Tr. 2118:25–2119:2.)  However, Petitioner explained that because of the discrepancies in the divorce petition, the Court needed to reopen the proceedings in order to address the custody dispute.  (Pet'r Tr. 2119:6–17.)

attended if that was his preference, though students often attend the school closest to where they live.  (Pet'r Tr. 1994:12–1996:13.)  Petitioner "organized to purchase a laptop" so that K.K. can do online school at home or at his brother Christian's house, which is in a different part of Trinidad, approximately 20 minutes from Petitioner's current residence.  (Pet'r Tr. 1783:10–19; Francis Tr. 1371:16–1372:3, 1389:10–25.)

Petitioner spoke with his family about arrangements if K.K. returns to Trinidad.  (Pet'r Tr. 1784:14–21.)  If Petitioner needs to travel for work, K.K. will stay with Petitioner's mother or with his brother.  (Pet'r Tr. 1783:24–1784:4.)  Christian Francis testified that he would "render support, especially as an educator," and since he is currently conducting classes online, K.K. would be able to do her schooling, along with his daughter, from his home.  (Francis Tr. 1388:10–21.)  Helen Francis-Baptiste told Petitioner that she would "prepare and be ready and available to provide all the support that he needs," because her three children are grown and she has time.  (Francis-Baptiste 1440:20–1441:6.)

At of the time of the evidentiary hearing, ███████████████████████████ ████████████████████████  Respondent is not sure whether she would be allowed to return to Trinidad and remain there.  (Resp't Tr. 236:6–10, 391:5–18, 585:5–7.)

## III.   Expert Testimony

During the evidentiary hearing, the Court heard from five expert witnesses.  Respondent called Dr. Chitra Raghavan, Pamela Krasner, LCSW, and Dr. Edward Tronick.  Petitioner called Dr. Karen Moore and Dr. Rachel Safran.  The Court finds the expert testimony and opinions of Drs. Raghavan and Tronick and Ms. Krasner to be relevant, reliable, and well-supported, but does not find the expertise, testimony, or opinions of Drs. Moore and Safran to be probative or relevant, as discussed below.

A.      **Dr. Chitra Raghavan**

Dr. Chitra Raghavan, who has a PhD in clinical and community psychology, was qualified as an expert in psychology and coercive control, including multicultural issues and the assessment and treatment of coercive control tactics.[48]   (Raghavan Tr. 749:10–21, 757:20–758:19.)   Dr. Raghavan defined "coercive control" as "an abuse dynamic that's ongoing and looping" that is "intended . . . to strip the victim of autonomy . . . so to trap her or him." (Raghavan Tr. 750:12–19; 751:21–752:7.)  Dr. Raghavan was asked to evaluate the nature of the relationship between Petitioner and Respondent to determine if there was, in fact, domestic violence, any mental health effects on Respondent, and the extent to which Respondent was being truthful or malingering.[49] (Raghavan Tr. 757:1–10.)

Dr. Raghavan met with Respondent for approximately nine hours, was told there were no documents or witnesses related to the abuse, and did not interview Petitioner.[50]  (Raghavan Tr.

---

[48] Dr. Raghavan is a professor of psychology at John Jay College of Criminal Justice, and directs the Forensic Mental Health Counseling Program. (Raghavan Tr. 749:10–21.) Dr. Raghavan examines coercive control in the contexts of sex trafficking, domestic violence, and sexual assault. (Raghavan Tr. 750:12–19; 751:21–752:7.)  Dr. Raghavan maintains a clinical practice in which she conducts forensic and psychological evaluations in these contexts, using clinical interviews, standardized assessments of trauma, and semi-structured interviews to look at a variety of "traumatic outcomes," such as trauma bonding or post-traumatic stress disorder ("PTSD"). (Raghavan Tr. 751:4–20.)

[49] Dr. Raghavan explained that malingering, which is different from lying, is defined as either "faking good," meaning seeming better or more noble than you are, or "faking bad," meaning seeming sicker or exaggerating symptoms of PTSD or depression,  all with the particular purpose of gaining some kind of advantage during litigation. (Raghavan Tr. 827:8–22.) Dr. Raghavan has never been proffered as an expert on the subject of malingering; rather, she explained, the ability to assess for malingering is part and parcel of the evaluations she performs. (Raghavan Tr. 864:8–865:12.)

[50] Dr. Raghavan did not interview Petitioner because this evaluation was not about Petitioner's "state of mind or his intention or his motivations," but rather was about Respondent's experience of Petitioner's treatment and what happened as a result of that treatment. (Raghavan Tr. 790:5–18.)  In three previous cases, Dr. Raghavan did ask to interview the abuser, but those

759:6–762:9, 790:5–18.)  Dr. Raghavan diagnosed Respondent using the clinician-administered PTSD scale for the DSM-5 ("CAPS-5"), as well as two other objective tests that provide information about general psychopathology and traumatic symptoms.  (Raghavan Tr. 764:16–766:22 (describing that she administered the Trauma Symptom Inventory-2 and Personality Assessment Inventory).)  Dr. Raghavan described Respondent as having "mild to moderate elevations" on these tests and explained that the CAPS-5 showed a "long term" pattern of PTSD. (Raghavan Tr. 766:24–768:6.)

Dr. Raghavan opined that: (1) during Respondent's twelve-year relationship with Petitioner, Respondent experienced a wide variety of coercive control tactics, including isolation and surveillance, intimidation, manipulation, degradation, and deprivation; (2) Petitioner's abuse triggered a second episode of PTSD;[51] and (3) with a reasonable degree of professional certainty, Respondent is telling the truth about the abuse inflicted by J.M.'s father and by Petitioner, and her resulting trauma.  (Raghavan Tr. 763:4–15, 772:24–774:2, 775:2–786:11.)  Dr. Raghavan described Respondent as having two episodes of PTSD in her life—the first, starting in 2007 and resolved by 2008, due to emotional, physical, and sexual abuse by J.M.'s father, Andrew Moore; and the second, beginning in 2010 and at its worst between 2016 and 2018, triggered by Petitioner's abuse, including his betrayals and particularly his successful attempts at forced sex. (Raghavan Tr. 769:3–770:16; 772:6–17.)[52]

---

were situations where she thought the subject of the examination was not telling the whole story, which was not the case here.  (Raghavan Tr. 790:19–791:9.)

[51] The Court notes Dr. Raghavan's testimony that Respondent's experiences of abuse prior to her relationship with Petitioner contributed to her second episode of PTSD, but that the second episode of Petitioner's PTSD was still triggered by Petitioner's abuse.  (Raghavan Tr. 770:17–772:17 (describing the compounding effect of abuse over time).)

[52] While the Court permitted Dr. Raghavan to offer her opinion on whether Respondent was being truthful or malingering, the Court has not relied on that opinion in determining

### B.  Pamela Krasner, LCSW

Pamela Krasner, who has a master's degree in social work and is a licensed clinical social worker, was qualified as an expert in psychotherapy and the diagnosis of childhood trauma.[53] (Krasner Tr. 1058:10–1059:10, 1079:16–24.)  Ms. Krasner was retained to evaluate K.K., who was nine years old at the time of the evaluation, to determine her "psychological status" and whether there was any potential exposure to trauma when she was living in Trinidad and since she has been in New York, as well as to evaluate her general safety and well-being.  (Krasner Tr. 1073:19–25, 1221:23–25.)

---

Respondent's credibility generally or, more specifically, with respect to the abuse allegedly perpetrated by Petitioner against her, including sexual abuse.  In a bench trial, the "credibility and weight of testimony are questions to be decided exclusively by the finder of fact."  *Haimdas v. Haimdas*, No. 09-CV-2034 (ENV) (MDG), 2010 WL 652823, at *3 (E.D.N.Y. Feb. 22, 2010) (declining to qualify expert to testify, *inter alia*, on the "credibility" of the children).  Therefore, "it is well-established that 'witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.'"  *Id.* (quoting *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988), *aff'd on reh'g,* 856 F.2d 5 (2d Cir. 1988)).  Where experts are concerned, "opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."  *Id.* (quoting *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) (collecting cases)).  However, experts with medical knowledge and skills that relate directly to credibility, "*may be permitted to testify to relevant physical or mental conditions*."  *United States v. Jones*, No. 16-CR-553 (AJN), 2018 WL 1115778, at *8 (S.D.N.Y. Feb. 27, 2018) (emphasis added) (quoting *Scop*, 846 F.2d at 142) (prohibiting expert from testifying as to whether he found defendant credible, but permitting his expert opinion that defendant suffers from a delusional disorder caused by abuse and a history of trauma).

[53] Ms. Krasner is currently employed as the director of special initiatives at the Joe Torre Safe at Home Foundation, and for the last 10 years has also had her own private practice specializing in child and adolescent trauma.  (Krasner Tr. 1059:11–1060:8.)  Through her undergraduate and graduate studies, internships, work, trainings and workshops, she has developed expertise working with children and adolescents that have been exposed to all types of trauma, including witnessing domestic violence, child abuse or neglect, sexual assault, molestation, rape, and human trafficking.  (Krasner Tr. 1060:9–14; 1061:1–1062:21.)  Krasner testified that, in her current private practice and in her supervisory work overseeing other clinicians, she frequently assesses for PTSD, and has screened and diagnosed hundreds of individuals, mostly children, for trauma.  (Krasner Tr. 1064:11–1065:7.)

Ms. Krasner interviewed K.K. for four-and-a-half hours over a period of three days,[54] conducted about nine hours of collateral interviews, including with Respondent, Petitioner, J.M., Elaine Heron, Christian Francis, Helen Francis-Baptiste, and Agnes Francis (Petitioner's mother), and reviewed documents, such as K.K.'s birth certificate, immigration documents, and K.K.'s school records for the 2018-2019 year in New York.[55]   (Krasner Tr. 1081:3–1082:5.)  During the clinical interview with K.K., Ms. Krasner utilized open-ended questions before asking more direct questions, and incorporated drawing.[56]   (Krasner Tr. 1093:3–10, 1094:11–17.)   Ms. Krasner testified that K.K. initially presented as very timid and shy, even hiding behind Respondent, but then over the course of multiple sessions, K.K. opened-up, and by the third meeting, she was sharing stories with Ms. Krasner.  (Krasner Tr. 1093:13–1094:1.)

Ms. Krasner also administered several different standardized tests.  K.K. scored as having a full diagnosis of PTSD on the UCLA Post-Traumatic Stress Disorder Reaction Index ("UCLA Test"), which is scored using a computerized system and incorporates both yes-or-no questions

---

[54] Due to COVID-19 concerns, Ms. Krasner evaluated K.K. in a public park with masks on.  (Krasner Tr. 1083:22–1084:11.)  Ms. Krasner testified that she did not feel that her conclusions or report were impacted by the fact that K.K. was wearing a mask because K.K. had her mask down during portions of the interview, so Ms. Krasner was able to view her facial expressions.  In addition, K.K.'s body language, including the openness of her eyes and tone of voice, were equally informative.  (Krasner Tr. 1266:14–1267:11.)

[55] Ms. Krasner conducted K.K.'s evaluation using a "multiprong method" that included trauma-informed direct clinical interviewing using psychological testing and standardized measures, gathering collateral data, and observing behavior, including brief interactions with Respondent.  (Krasner Tr. 1082:6–18.)  Ms. Krasner described this as "the best practice" and "most thorough approach" because it incorporates multiple kinds of information-gathering processes and allows for the inclusion of collateral information about the child's functioning.   (Krasner Tr. 1082:21–1083:3.)

[56] At the beginning of the interviews with K.K., Ms. Krasner did not discuss the difference between a truth and a lie because this was not part of her training and is not recommended, as telling a child the rules of how they must act may frighten them when the goal is to help them become comfortable with a stranger.  (Krasner Tr. 1094:18–4.)

about multiple types of trauma, as well as questions about symptomatology on a scale of 0 to 4.[57]

(Krasner Tr. 1086:4–1087:18.)   K.K. also scored as having a diagnosis of PTSD on the Child

PTSD Symptoms Scale ("CPSS"), which asks about symptomatology on a 0 to 3 scale, and as

having multiple traumas exposure on the Trauma History Questionnaire ("THQ"), which asks

about trauma exposures.[58]   (Krasner Tr. 1087:19–1088:24, 1090:11–22.)   Ms. Krasner confirmed

that K.K.'s reports of symptomatology were consistent across the UCLA Test and the CPSS.

(Krasner Tr. 1088:25–1089:2.)   Both the CPSS and THQ have a component that is administered

to the person who has been providing care for the child in the last two weeks; Ms. Krasner

administered these parent tests to Respondent, and the results corroborated K.K.'s scores as having

PTSD and multiple traumas exposure.   (Krasner Tr. 1089:3–1090:10, 1090:23–1091:7.)   Ms.

---

[57] The Court also notes that while Ms. Krasner did not conduct a full evaluation of J.M., she did administer the UCLA Test to him because he was reporting high levels of symptomatology during their conversation, however, J.M. did not have a full diagnosis of PTSD.   (Krasner Tr. 1122:17–1123:16 (noting that J.M.'s high levels of symptomatology imply that he would need follow up treatment).)   Ms. Krasner testified that J.M. identified six types of trauma, including a natural disaster (flood), being in a car accident, experiencing corporal punishment by Petitioner, witnessing corporal punishment of K.K., seeing a friend get beaten up, and having a friend killed in a violent shooting, with the car accident and the death of his friend being the two traumas that bothered him the most.   (Krasner Tr. 1182:18–11183:18; *see id.* 1115:5–14 (testifying that J.M. reported that he "feared for his life" when Petitioner would drive fast and that being in the car, thinking he was going to die, was one of the scariest moments of his life), 1123:6–12.)   Ms. Krasner explained that she viewed her assessment of J.M. and his high levels of symptomatology as relevant to her assessment of K.K. because they were living in the same home and exposed to the same experiences.   (Krasner Tr. 1264:11–23.)   The Court recognizes the limited scope of Ms. Krasner's assessment of J.M., and does not consider his statements to Ms. Krasner for their truth, however, the Court does consider Ms. Krasner's assessment of J.M.'s high levels of symptomatology as a result of, among other potential traumas, experiencing and witnessing corporal punishment of K.K. by Petitioner and Petitioner's fast driving, as tending to corroborate Respondent's and J.M.'s own testimony about these issues.   *See Lozano I*, 809 F. Supp. 2d at 206; *Elyashiv*, 353 F. Supp. 2d at 400.

[58] Ms. Krasner explained that she likes to use the CPSS and THQ in addition to the UCLA Test because some of the questions are easier for children to understand, and because it incorporates responses from the child's caregiver to allow for a more complete picture of the child. (Krasner Tr. 1088:2–1089:13.)

Krasner also testified that K.K. scored a 6 out of 10 on an assessment called the "PEARLS ACEs," which screens children for adverse childhood experiences.  (Krasner Tr. 1091:8–14.)  This score indicates that K.K. is at a "pretty high risk of developing health concerns later in life if you don't do something to try to protect and prevent them at this point."  (Krasner Tr. 1091:8–1092:22.)

Based on her evaluation of K.K. and conversations with collateral witnesses, Ms. Krasner concluded that "it was clear that K.K. was exposed to multiple traumas[59] during her time living in Trinidad, which resulted in symptomology that she is still experiencing and a diagnosis of post-traumatic stress disorder."  (Krasner Tr. 1085:4–11.)  Further, Ms. Krasner concluded that K.K. would be at further risk of harm, health conditions later in life, and effects on her functioning if she were to return to Trinidad because she experienced multiple traumas there and has a "severe diagnosis."  (Krasner Tr. 1085:12–19.)  Ms. Krasner testified that she reached these opinions with a "reasonable degree of certainty."  (Krasner Tr. 1085:20–22.)

███████████████████████████████████████████

████████████████████████████████████████████

███████████   (Krasner Tr. 1240:1–11, 1243:2–7.)  Ms. Krasner opined that K.K. experienced "many different traumas, both within her home, within her school, sometimes out of the home." (Krasner Tr. 1097:6–10.)  Among the traumatic events that informed Ms. Krasner's opinion were Petitioner's yelling at Respondent in the car and driving fast (Krasner Tr. 1097:6–18, 1104:12–21 (describing K.K.'s report that she would be really scared and sad when Petitioner would yell at Respondent and drive fast), 1114:7–16); Petitioner's use of a belt to discipline K.K. and J.M., the

---

[59] Ms. Krasner defined trauma in the context of a child as "the experience of an event that is frightening and dangerous or violent that poses a threat to their direct body or life sometimes and also could be posing a threat to a loved one's life or body. . . . [W]hat makes it more traumatic is that the individual feels like they have no control over the situation or no way of getting out or stopping the situation . . . it overtakes them."  (Krasner Tr. 1095:17–1096:6.)

latter of which K.K. witnessed (Krasner Tr 1097:19–24, 1099:19–1100:11 (describing K.K.'s report that seeing Petitioner hit J.M. with a belt was very hard and scary), 1107:14–1108:13 (describing K.K.'s report that Petitioner's use of corporal punishment on her, including when she got her clothes dirty playing with boys, made her feel hurt, sad, and scared that when she did something wrong she was going to get into trouble)); Petitioner's failure to pick K.K. and J.M. up from daycare until 11:00 p.m. or midnight, leaving them hungry and in dirty clothes (Krasner Tr. 1097:25–1098:6); Petitioner's bathing and dressing of K.K. behind closed doors (Krasner Tr. 1098:25–1099:6);[60] and Petitioner's treating J.M. unfairly by not giving him food or attending his soccer games (Krasner Tr. 1099:19–1100:8 (describing K.K.'s report that Petitioner did not treat J.M. fairly, which made her feel uncomfortable and sad)).[61]  Ms. Krasner also identified traumatic events at K.K.'s school, including that K.K. was bullied and experienced corporal punishment by teachers or school staff.  (Krasner Tr. 1098:7–13 (describing K.K.'s report that she feared a bully at school).)

---

[60] Ms. Krasner explained that she was not sure of the impact of Petitioner's bathing and dressing K.K. because K.K. was not able to give much detail, however, it was clear that this really affected K.K., and that more information might come out if Ms. Krasner had had more time with K.K., as these issues are difficult for a child to discuss, especially with someone they just met. (Krasner Tr. 1098:15–1099:18.)

[61] The Court notes that Ms. Krasner's testimony regarding K.K.'s statements during their interview, as well as the statements of other collateral witnesses, are considered not for their truth, but only insofar as they have allowed the Court to understand and evaluate Ms. Krasner's opinion. *See* Fed. R. Evid. 703; *Jones*, 2018 WL 1115778, at *7 (permitting expert testimony about defendant's history of abuse, as described in hospital records, which was relevant to understanding and evaluating expert's opinion).  In the context of Hague Convention cases, courts considering expert testimony as to a child's psychological status and the potential harms of repatriation may recount the trauma upon which the expert's opinion is based.  *See Reyes Olguin v. Cruz Santana*, No. 03-CV-6299 (JG), 2005 WL 67094, at *3 (E.D.N.Y. Jan. 13, 2005); *Application of Blondin v. Dubois* (*Blondin III*), 78 F. Supp. 2d 283, 290–92 (S.D.N.Y. 2000), *aff'd sub nom. Blondin v. Dubois* (*Blondin IV*), 238 F.3d 153 (2d Cir. 2001).

Of particular note was Ms. Krasner's evaluation of K.K.'s report that she slept in the same room as her parents and would see "parents stuff" and "things I'm not supposed to see," which made her uncomfortable. (Krasner Tr. 1098:15–24, 1101:23–1102:1.) Ms. Krasner explained that she could not determine the extent of the impact on K.K. because K.K. was not able to give much detail and had difficulty remembering the number of times she witnessed "parents stuff."[62] (Krasner Tr. 1098:15–24; 1309:19–1310:23.) When Ms. Krasner tried to explore the issue, K.K. said "I don't want to talk about it," which Ms. Krasner characterized as consistent with avoidance and trauma. (Krasner Tr. 1101:9–22 (noting K.K.'s report that she was uncomfortable and that she told J.M. that she was uncomfortable).) Ms. Krasner explained that K.K.'s inability to recall details related to uncomfortable experiences is a "main symptom of trauma and [] PTSD" because "she's trying to cope with the situation by forgetting things." (Krasner Tr. 1102:18–1103:7.) Ms. Krasner offered to K.K. that she could draw and explain her picture, and reported that K.K. was very clearly able to draw the room, all of her things, herself in the bed, and included a pillow, but was visibly uncomfortable and "hovering over the picture, not drawing anything" when it came to drawing her parents. (Krasner Tr. 1101:3–8, 1102:2–14.)



(Krasner Tr. 1234:9–1236:7.)

(Krasner Tr. 1235:24–1236:2.)

(Krasner Tr. 1102:12–17, 1236:3–9.)

---

[62] As explained above, the Court notes Ms. Krasner's testimony that K.K. reported seeing "parent stuff" two times and that she also had difficulty remembering how many times she witnessed "parent stuff," which is consistent with trauma symptomatology. (Krasner Tr. 1101:23–1102:1, 1230:9–11, 1255:15–1256:7.) Of greater importance to the Court than the specific number of times K.K. reported seeing "parent stuff," particularly given Respondent's credible testimony on this issue, is Ms. Krasner's testimony that, regardless of whether a child saw a traumatic incident twice or 20 times, it could still have a deleterious effect. (Krasner Tr. 1227:20–1232:8.)

Ms. Krasner concluded that K.K. would be at great risk of further symptomatology if she was returned to Trinidad because all of the traumas she experienced occurred there, many in connection with Petitioner and some at school, so there is the risk of re-traumatization just from K.K. being back in the place where these traumas occurred, in addition to the possibility that these traumas could occur again.  (Krasner Tr. 1124:19–1125:10.)  In particular, Ms. Krasner expressed concern about K.K. returning to her same school and having unsupervised visits with Petitioner. (Krasner Tr. 1267:20–1268:18 (explaining that she did not know whether supervised visits in the presence of a social worker would be possible in Trinidad).)  This opinion was formed, in part, by the fact that on multiple occasions during all three sessions, when Ms. Krasner brought up the idea of going back to Trinidad, K.K. became visibly upset, shook her head, and said "I don't want to go back.  I don't want to go back.  I want to stay here."[63]  (Krasner Tr. 1124:19–1125:15, 1129:19–25.)  K.K. also said several times that "[i]f my Mommy's not with me, who's going to take care of me."  (Krasner Tr. 1126:24–1127:2.)

Ms. Krasner described K.K.'s relationship with her mother and brother as "protective factors," which can mitigate the effects of trauma and minimize the level of symptomatology, which is still high and would be much higher if Respondent and J.M. were not present.  (Krasner Tr. 1128:13–1129:1.)  In addition, according to Ms. Krasner, Elaine Heron, whom K.K. spoke about during their sessions, "seemed to have a really positive influence on the family as a whole," and could be considered a "protective factor" for K.K. in New York because K.K. feels comfortable with her, has spent a lot of time living with her, and feels safe with her.  (Krasner Tr.

---

[63] The Court again notes that it has not considered K.K.'s statements about not wanting to go back to Trinidad for their truth, *i.e.*, that K.K. does not want to return to Trinidad, but has considered her statements to Ms. Krasner to the extent they are relevant to Ms. Krasner's opinions that K.K. suffers from PTSD due to her experiences with Petitioner and in Trinidad, and is at risk for re-traumatization if she returns to Trinidad.

1132:5–10, 1132:22–1133:15.)  Conversely, Ms. Krasner did not believe that other members of Petitioner's family would be protective factors for K.K. if she returned to Trinidad because, although they clearly love her, they did not seem to have a lot of contact with her and there is not the same level of connection—in fact, K.K. did not mention any of these relatives during any of the interviews.  (Krasner Tr. 1129:5–18.)  Ms. Krasner also explained that the report of Dr. Karen Moore, who testified about services in Trinidad for children who have experienced trauma (described below), did not change Ms. Krasner's conclusions because the services available in Trinidad have no effect on K.K.'s current PTSD diagnosis and K.K. would still be exposed to the place and people involved in her prior trauma.  (Krasner Tr. 1130:1–1131:15.)

Ms. Krasner considered the impact of K.K.'s travel to the United States, her separation from Petitioner and his family in Trinidad, and her multiple moves since arriving in the United States in her assessment, and concluded that these circumstances did not negatively affect K.K., both because K.K. did not report any negative effects and Ms. Krasner did not identify any during her observation and evaluation, but also because K.K. spoke so positively about her experiences in the United States.  (Krasner Tr. 1252:5–1253:19.)  Ms. Krasner also testified that Respondent's experience of domestic violence by Blocker did not inform Ms. Krasner's evaluation of K.K. because K.K. was not exposed to that abuse, K.K. never mentioned Blocker during the evaluation, J.M. never mentioned Blocker, and they were never living with Blocker.  (Krasner Tr. 1152:22–1153:10.)  Ms. Krasner reported that it appears that K.K. has not been exposed to any trauma in New York, that K.K. speaks with a smile on her face about her school, and that K.K. reports only positive things about her time here so far, including that she loves her teachers, loves being with her mother and brother and has many friends, whom she identified by name, and that it is easier to make friends here.  (Krasner Tr. 1125:16–22, 1131:19–24, 1132:5–21.)

64

### C.     Dr. Edward Tronick

Dr. Edward Tronick, who has a master's degree in comparative psychology and experimental psychology and a Ph.D. in developmental psychology and neuroscience, was qualified as an expert in developmental psychology and the impact of trauma and adverse experiences on child development.[64]   (Tronick Tr. 876:11–877:10, 893:22–24, 894:6–10.)   Dr. Tronick was retained to present evidence on the effects of abuse, neglect, and adverse experiences on a child's behavior, and the effects of returning a child to an environment of adverse and neglectful treatment and maltreatment, on their development.   (Tronick Tr. 893:4–8, 893:13–16.) Dr. Tronick reviewed the scientific literature on the effects of maltreatment, adverse experiences, or trauma—including experiences involving physical, verbal, or emotional abuse, and witnessing the abuse of a parent, forced or unforced sexual activity, and physical abuse of a sibling—on a child's development.   (Tronick Tr. 894:15–895:11.)   Dr. Tronick spoke with Dr. Ragavan and Ms. Krasner, though he did not form any opinions about what did or did not take place in this case. (Tronick Tr. 895:13–22, 897:17–25.)   Dr. Tronick did not interview K.K. or Respondent.   (Tronick Tr. 951:5–8.)

Dr. Tronick offered two opinions.   First, maltreatment, including witnessing violence, adverse parenting experiences, and traumatic events have serious effects on a child's development, including his or her social-emotional development and cognitive development, as well as on the

---

[64] Dr. Tronick is currently a professor in the developmental brain sciences program at the University of Massachusetts in Boston and has an appointment as a research associate in the pediatrics department of Harvard Medical School.   (Tronick Tr. 877:12–19.)   Dr. Tronick is considered an expert in infant and young child social-emotional development and in neurobehavioral and social-emotional development of infants, and has published over 200 papers in peer-reviewed journals on topics that include infant behavior, social-emotional development, and the effects of parental trauma on infants and young children.   (Tronick Tr. 883:1–17, 887:23–888:4.)

underlying neurologic brain processes and the physiologic processes that allow a child to cope with stress. (Tronick Tr. 897:19–898:5.) Second, returning a child to an environment in which those traumatic events occurred would not only trigger these effects because of the child's prior experiences, but make these effects more severe. (Tronick Tr. 898:6–13.) Moreover, "[i]f the child is separated from the parent to whom the child is most strongly attached, that separation alone can be traumatic to the child and it can trigger other previous problems that the child may have had." (Tronick Tr. 898:14–19.)

Dr. Tornick described the fundamental principles of child development that come into play when a child faces an adverse event. First, a child needs to have a secure, safe relationship with one person who protects the child and helps the child deal with stressful events; this may be referred to as a "secure attachment" relationship. (Tronic Tr. 902:3–18, 908:25–909:5) When a child does not have this relationship, the child remains distressed and is not able to play, engage with people, and do the other activities that are central to child development. (Tronick Tr. 902:19–903:9.) Second, a child needs to learn how to regulate their own emotions and stress response, *i.e.*, go from a state of excitement or fear to a "normal level of operation," but a child who is abused or highly stressed doesn't have the time or capacity to return to normal. (Tronick Tr. 903:10–904:6.) When a child's stress response is "chronically triggered," which may happen due to witnessing violence, experiencing physical abuse, or being shamed, it becomes toxic to the brain— and actually kills brain cells—such that the child is no longer able to get "back to their base state." (Tronick Tr. 904:2–905:15.)

Dr. Tronick explained that the development of a child's brain is "experience dependent," and that abuse or maltreatment at a young age can impact a child's narrative memory and sense of place and time, language development, decision-making, and result in "school-based problems"

66

and psychopathology, such as depression and anger management problems.  (Tronick Tr. 919:13–926:10.)  Further, there is an "accumulation of effects," such that the more incidents of neglect or abuse a child experiences, the more the child's development is compromised.  (Tronick Tr. 926:14–24.)  The research literature shows that four or more adverse events before age eighteen, which may range from experiencing physical abuse to witnessing violence to being shamed by a parent, predicts problematic outcomes for a child that include physical disease, mental health disorders, and mortality.  (Tronick Tr. 926:25–927:25.)  Dr. Tronick testified that adverse events "come as a package" and happen frequently and repeatedly—a view supported by epidemiologic literature addressing the likelihood that perpetrators of abuse toward women and children will re-engage in the same or similar behaviors, and the likelihood that one who perpetrates violence on their partner is highly likely to perpetrate violence upon their child.  (Tronick Tr. 928:1–23, 937:20–938:20.)

Dr. Tronick also explained that when a child who has been maltreated is removed from the situation, but then returns, it can be very triggering: "for a child coming back into a situation with the person who's a perpetrator but also the house, the things that are around that bring back the memories of prior events, are likely to trigger . . . the kinds of compromises, disruptions, behavioral and psychological effects that were engendered by . . . the maltreatment."  (Tronick Tr. 939:19–941:6.)  Dr. Tronick opined, however, that children who have suffered the effects of parental maltreatment or adverse parenting can recover, but they need a setting that is "secure and fostering of development and that is really empathetic to the child's development," which includes both school and the parenting situation, and they need professional treatment.  (Tronick Tr. 941:17–942:19.)

Finally, Dr. Tronick testified that the availability of resources and treatment options in Trinidad, as described in Dr. Karen Moore's report (described below), did not alter his view about the risk of a child who had experienced maltreatment or neglect returning there because the child would likely be separated from the mother, and would be, at least some of the time, in the care of the father, "and that would have all those triggering effects" in addition to the "high likelihood of revictimization of the child." (Tronick Tr. 944:20–945:25.)  Dr. Tronick also testified that returning to the place where the alleged victimization occurred would itself be triggering, and even if she was not seeing her father, she might be anxious about running into him or other people who have known her father. (Tronick Tr. 958:4–18.) This would be compounded by the stress of losing what may be a stable situation here in the United States, the fear of being separated, possibly permanently, from her mother, and having to be in the care and control of her father. (Tronick Tr. 958:19–25.)

**D.     Dr. Karen Moore**

Dr. Karen Moore, who lives and works in Trinidad and has a bachelor's degree and Ph.D in psychology, was qualified as an expert on the availability of services provided either for free or by the government or not-for-profit organizations in Trinidad for children who have experienced trauma.[65] (Moore Tr. 1545:7–14, 1563:19–1564:14.) Dr. Moore was not retained to perform any psychological evaluations or to analyze the work of Respondent's experts, Dr. Raghavan and Ms.

---

[65] Dr. Moore currently works in private practice with children and adolescents and their families on issues such as child abuse, trauma, parenting, depression and anxiety. (Moore Tr. 1546:3–7.)  She also works for an employee assistance program in Trinidad that provides therapeutic services to children, adolescents, and their families, and is a coordinator for the Franciscan Institute trauma team, which dispatches volunteer mental health professionals to disasters in the Caribbean region. (Moore Tr. 1546:8–19.) Dr. Moore's experience with the Trinidad Family Court includes conducting evaluations of allegations of sexual abuse and physical abuse, preparing reports, and making recommendations in custody matters. (Moore Tr. 1552:15–23.)

68

Krasner.  (Moore Tr. 1561:25–1562:6.)  Dr. Moore testified that her task in this matter, *i.e.*, to compile a listing and description of services available in Trinidad for children who experience trauma, is similar to what she does for many of her clients or would do for anyone asking her for advice or information.  (Moore Tr. 1570:14–21.)  In preparing for this matter, Dr. Moore consulted two newspapers, a policy paper, and some videos created by a child abuse awareness organization, in addition to relying on her own knowledge from working with some of these services.  (Moore Tr. 1562:7–18.)  Dr. Moore also reviewed the website listings for different organizations, including organizations responsible for campaigns combatting child abuse that aired on local television.  (Moore Tr. 1572:6–25.)  In particular, Dr. Moore described the "Break the Silence" campaign, which began in 2007 or 2008, to encourage the reporting of child abuse through community activities, a media campaign, and the creation of a 24-hour helpline for children to call and report abuse.  (Moore Tr. 1573:1–25.)

Dr. Moore testified that, in Family Court cases dealing with allegations of child abuse, services are available through the Children's Authority of Trinidad and Tobago, to which all cases of child abuse are supposed to be reported, and which has the "latitude [to] either provide therapeutic services in-house from their psychologists or to refer out to an external psychologist." (Moore Tr. 1557:4–14.)  In addition, the Family Court can order therapy for children and adolescents, and has mandated that parents seek therapy for the child in cases of abuse.  (Moore Tr. 1557:15–18.)  There is also a "helpline child line" for children who have not yet come to the attention of authorities.  (Moore Tr. 1557:19–21.)  Further, there are "various low-fee services" through charitable organizations and private practitioners who offer pro bono services.  (Moore Tr. 1557:22–1558:5.)

69

Dr. Moore offered an opinion that "[t]here are resources available in Trinidad and Tobago who work with traumatize[d] children and youth.  There are resources available to do that, public and private."  (Moore Tr. 1574:3–8.)  Dr. Moore's six-page report consisted of a list of services available in Trinidad and Tobago, and did not analyze how any particular services would address the needs of K.K. or Respondent.  (Moore Tr. 1578:2–14.)  Dr. Moore also did not provide any analysis of potential barriers to accessing these services, such as capacity issues or waitlists, eligibility requirements (including income-eligibility and immigration status), documentation requirements (including the need for police reports), nor the types of abuse that warrant intervention by these services, or the impact of COVID-19 on the availability of services.  (Moore Tr. 1578:21–1588:10.)

While the Court does not doubt Dr. Moore's general knowledge about services that might be available to child victims of trauma in Trinidad, her testimony is of little value in this case because, as Dr. Moore acknowledged, the availability of the services she identified is dependent upon a myriad of variables and contingencies that cannot be determined at this time, such as capacity issues or waitlists, eligibility requirements, documentation requirements, whether the services address only certain types of abuse, and the impact of COVID-19 on the availability of services.  (Moore Tr. 1578:2–14, 1586:14–1588:10.)  At the same time, Dr. Moore's testimony does not, and cannot, address the more fundamental issue that Ms. Krasner and Dr. Tronick opined about regarding the re-traumatization and re-victimization K.K. will experience simply by being returned to Trinidad and placed in her father's custody.  Dr. Moore's testimony offers only a feeble and largely irrelevant response to this expert testimony.  The Court also finds the relevance of Dr. Moore's testimony further diminished by the fact that K.K.'s access to any such services will likely be dependent on Petitioner or a member of his family having the wherewithal and willingness to

assist K.K. in obtaining services, and based on the evidence from the hearing, that seems a dim prospect.

### E. Dr. Rachel Safran

Dr. Rachel Safran, who has a master's degree in psychology and a Ph.D. in counseling psychology, was qualified to testify as an expert on the methodology for conducting forensic evaluations.[66] (Safran Tr. 1809:24–1810:11, 1811:2–13, 1829:10–19.) Dr. Safran did not conduct a forensic evaluation of Respondent, did not interview Petitioner, and did not interview or conduct a forensic evaluation of K.K. (Safran Tr. 1906:22–1907:3, 1928:16–18, 22–24.) Dr. Safran was retained to review the reports and evaluations conducted by Dr. Raghavan and Ms. Krasner, and to review the methodology used in conducting those evaluations. (Safran Tr. 1817:10–15.) Dr. Safran applied the Specialty Guidelines in Forensic Psychology, which were published by the American Psychological Association in 2013 in the journal American Psychologists ("APA Guidelines"), to the methodology—not the underlying specialized science—of the reports. (Safran Tr. 1825:9–1827:24, 1907:17–1908:10.) Dr. Safran acknowledged on cross-examination that she was not sure whether the APA is a governing body for the profession of psychology, that membership in the APA is not required for licensure in New York, and that publications in the journal American Psychologists are not binding upon licensed psychologists. (Safran Tr. 1908:22– 1909:10.) Further, Dr. Safran acknowledged that the APA Guidelines differ from mandatory or enforceable standards because they are aspirational in intent, non-exhaustive, may not apply to

---

[66] Dr. Safran is a licensed psychologist in New York and New Jersey, and conducts a range of forensic psychological evaluations in different contexts, including fitness-for-duty evaluations for civilians and law enforcement officers, parenting risk assessments for Child Protective Services ("CPS"), and fitness to carry firearms, as well as evaluations in guardianship and custody proceedings. (Safran Tr. 1787:18–1788:11.) In terms of evaluations involving CPS, Dr. Safran has evaluated approximately 59 adults and seven children, ranging in age from four to fourteen. (Safran Tr. 1803:3–13.)

every professional situation, and are not intended to take precedence over the judgment of psychologists.  (Safran Tr. 1909:21–1910:15.)

Dr. Safran criticized Dr. Raghavan's methodology as inconsistent with the APA Guidelines for: (1) failing to rely on multiple sources of data and only relying on her interview of Respondent and Respondent's responses on psychological tests (Safran Tr. 1837:11–1838:13); and (2) failing to conduct third-party interviews or collect collateral sources of data to comment on Respondent's "functioning or psychological history" (Safran Tr. 1838:15–25).  Dr. Safran also found Dr. Raghavan's report to be biased against Petitioner because there were comments about his behavior and conduct, but he was not interviewed and no other collateral sources of data were collected or reviewed.  (Safran Tr. 1840:1–10.)  Dr. Safran faulted Dr. Raghavan for failing to include in her expert report all of the data reflected in Dr. Raghavan's notes; for example, the fact that Petitioner was scrutinized more as the source of Respondent's trauma than other possible sources of trauma from Respondent's childhood and other abusive relationships.  (Safran Tr. 1841:23–1843:8, 1845:20–4.)  Dr. Safran noted that an analysis of the CAPS tests relating to Respondent's abuse by prior domestic partner Andrew Moore was not included in Dr. Ragavan's report.  (Safran Tr. 1850:22–1851:20.)  Nor were the results of the objective tests run by Dr. Ragavan, which in Dr. Safran's opinion, should have been included in Dr. Raghavan's discussion of psychological testing.  (Safran Tr. 1853:9–22, 1856:22–1858:9, 1860:18–1861:7, 1862:9–18.)  Dr. Safran also criticized Dr. Raghavan for not conducting a full psychological evaluation nor CAPS test related to each of the traumatic events and abusive individuals in Respondent's life.  (Safran Tr. 1862:19–1870:13.)  Dr. Safran noted that Dr. Raghavan's report did not indicate consideration of Respondent's lying in prior legal proceedings or on an affidavit submitted under penalty of perjury. (Safran Tr. 1870:18–1871:8.)

Regarding Ms. Krasner's report, Dr. Safran testified that Ms. Krasner "developed very good rapport with K.K., [and] she did a very good job of questioning K.K. about what occurred in her parents' bedroom that she saw and adequately questioned it and stopped questioning once there wasn't any further information that K.K. was spontaneously disclosing."  (Safran Tr. 1883:4– 1884:2.)  In particular, Dr. Safran noted Ms. Krasner's use of open-ended questions to explore K.K.'s disclosure that she was uncomfortable because of "parent stuff."  (Safran Tr. 1884:13– 1885:14.)  Dr. Safran also noted, without criticism, that Ms. Krasner gave K.K. the opportunity to draw and that K.K.'s drawing was consistent with what she verbally reported.  (Safran Tr. 1885:18–1886:14.)  However, Dr. Safran opined that she did not believe K.K. could have been conclusively diagnosed with PTSD based on the method of Ms. Krasner's evaluation and the data that she collected.  (Safran Tr. 1931:6–14.)  Dr. Safran criticized Ms. Krasner for utilizing closed-ended questions and failing to exhaust all open-ended questions in her questioning about whether K.K. was having difficulty concentrating in school.  (Safran Tr. 1887:10–1888:22.)  Dr. Safran also criticized Ms. Krasner for not asking enough questions about how K.K.'s symptoms were related to feelings or thoughts about what K.K. identified as her most stressful event, or about how K.K.'s level of functional impairment related to those symptoms.  (Safran Tr. 1889:4–1890:11.)  For example, Dr. Safran noted that K.K. complained of bad dreams about monsters and clowns, but Ms. Krasner did not ask follow up questions tying this complaint to K.K.'s reported worst trauma (her mother and father arguing).[67]  (Safran Tr. 1889:16–24, 1891:23–1892:5, 1894:2–17.)

---

[67] Dr. Safran concluded that this violated the APA Guidelines regarding accuracy, fairness, and the avoidance of deception (Guideline 11.01), as well as encouraging forensic practitioners to provide opinions based upon adequate scientific foundation and valid principles (Guideline 2.05). (Safran Tr. 1840:19–1841:2, 1879:3–8, 1894:13–1895:3.)  On this particular issue, the Court notes and credits Ms. Krasner's testimony that K.K. reported having nightmares about monsters and clowns, which Ms. Krasner characterized as "very typical of trauma . . . [b]ecause children don't

Dr. Safran also criticized Ms. Krasner as lacking training and experience in forensic interview protocol with children,[68] noting that Ms. Krasner had not been trained on how to interview in the context of litigation, and failed to follow several procedures at the beginning of the interview, including a discussion of the child's understanding of the difference between a truth and a lie. (Safran Tr. 1969:23–1971:24; 1973:6–1974:8.)

Dr. Safran agreed, however, that Ms. Krasner has extensive experience as a psychotherapist treating children who are victims of trauma and domestic violence, and acknowledged that Ms. Krasner has the necessary training and experience to diagnosis PTSD.  (Safran Tr. 1929:19–25, 1932:7–25 (noting that her opinion in this case specifically relates to the use of forensic interview protocol), 1933:10–13.)   Further, Dr. Safran admitted to the limitations of her own relevant experience, including that all of her work in psychotherapy occurred during internships prior to receiving her doctorate (Safran Tr. 1815:1–1817:8, 1820:18–25); that she has only ever conducted seven forensic evaluations of children for trauma, three of which involved children who were exposed to domestic violence (Safran Tr. 1819:20–1820:17, 1967:4–11); that she has never performed a forensic evaluation of a child in connection with a custody matter (Safran Tr. 1975:2–8); and that none of her research, which has primarily focused on the Orthodox Jewish community, relates to forensic evaluations of children or victims of domestic violence (Safran Tr. 1821:4–1823:13).

---

often dream exactly of what happened to them, so they would dream symbolically."  (Krasner Tr. 1250:18–1251:8.)

[68] Dr. Safran explained that her assessment of Ms. Krasner's interview with K.K. was based primarily on her own training on the "ChildFirst" or "Finding Words" interview protocol, but acknowledged that there are a number of other interview protocols.  (Safran Tr. 1933:19–1934:25.) The ChildFirst protocol is published by the Gundersen National Child Protection Training Center, which is not a licensing body for psychologists and social workers, but provides a five-day training on use of the ChildFirst protocol.  (Safran Tr. 1935:8–1936:14.)

The Court finds that while Dr. Safran may have expertise in the methodology for conducting forensic evaluations, such expertise has little relevance here. Neither Dr. Raghavan nor Ms. Krasner were qualified as experts in forensic evaluations, nor did they purport to conduct forensic evaluations in this matter. And Petitioner has failed to explain why forensic evaluations are required or constitute the relevant professional standard. Indeed, as Dr. Safran herself acknowledged, the APA Guidelines are neither mandatory nor enforceable standards. Dr. Safran's attack on Dr. Raghavan's and Ms. Krasner's reports based on the APA Guideline therefore is a red herring and irrelevant. The Court also finds Dr. Safran's criticisms of Ms. Krasner's approach to interviewing unpersuasive, given that Dr. Safran approved of much of Ms. Krasner's interview of K.K. Dr. Safran's discrete disagreements with Ms. Krasner's approach in questioning K.K. were just that—differences in style and approach, not substance. Again, the practices that Dr. Safran has been trained in and the APA Guidelines, do not define the appropriate standard or reliable methodology with respect to the psychological examination of K.K. conducted by Ms. Krasner.

## DISCUSSION

### I.   *Prima Facie* Case

The International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* (formerly codified at 42 U.S.C. § 11601 *et seq.*) implements the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, 1988 WL 411501 ("Hague Convention" or "Convention"). The Convention was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access," *Ermini v. Vittori*, 758 F.3d 153, 160 (2d Cir. 2014) (quoting Hague Convention, pmbl., 51 Fed. Reg. at 10,494, 10,498 (1986)), and "is not designed to adjudicate custody claims, but only to determine the merits of claims of wrongful removal and abduction,"

*see id.*  "'[T]he Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings,' and it is not within the province of this Court to make determinations regarding which party is the better parent."  *Porretti v. Baez*, No. 19-CV-1955 (RJD), 2019 WL 5587151, at *2 (E.D.N.Y. Oct. 30, 2019) (quoting *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012)).  A petitioner

> seeking the return of a child under the Convention must prove, by a preponderance of the evidence, that: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."

*Marks ex rel. SM v. Hochhauser*, 876 F.3d 416, 418–19 (2d Cir. 2017) (quoting *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005)).

Here, the parties agree that the following stipulated facts establish Petitioner's *prima facie* case of wrongful removal or retention under the Hague Convention: (1) K.K. was habitually resident in Trinidad and Tobago from her birth until April 5, 2019; (2) immediately prior to April 5, 2019, the parties "jointly exercised custodial rights to K.K. under the laws of Trinidad and Tobago from her birth"; (3) prior to leaving Trinidad and Tobago on April 5, 2019, Respondent informed Petitioner that she intended to take K.K. and J.M. on a two-week vacation to Guyana; (4) prior to leaving Trinidad and Tobago on April 5, 2019, Respondent did not inform Petitioner that she intended to take K.K. to the United States; and (5) prior to leaving Trinidad and Tobago on April 5, 2019, Respondent did not inform Petitioner that she intended to remove K.K. from Trinidad and Tobago for any purpose other than an approximately two-week vacation.  (Joint Stip., Dkt. 92, ¶¶ 1–5, n.1.)  The Court finds that, based on these stipulated facts, a *prima facie* case under the Hague Convention has been established.

If a petitioner meets his burden under the Convention, then the child is to be returned, unless the respondent establishes one of four defenses or "exceptions." *Ermini*, 758 F.3d at 161. These defenses are to be construed narrowly, and even where established, "the district court is not necessarily bound to allow the child to remain with the abducting parent." *Blondin v. Dubois* (*Blondin II*), 189 F.3d 240, 246, 246 n.4 (2d Cir. 1999)*; accord Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013).

Here, Respondent has raised two defenses in support of her argument that K.K. should not be returned to Trinidad and Tobago—first, that the Verified Petition was filed more than one year after the alleged wrongful removal and K.K. is well-settled in New York; and second, that returning K.K. to Trinidad and Tobago would subject her to a grave risk of physical and psychological harm.

## II.   The "Well-Settled" Defense

One of the defenses to the Convention's presumption of repatriation is available when "judicial proceedings were not commenced within one year of the child's abduction and the child is well-settled in the new environment." *Blondin II*, 189 F.3d at 246 (citing 22 U.S.C. § 9003(e)(2)(B); Hague Convention art. 12); *Broca v. Giron*, 530 F. App'x 46, 47 (2d Cir. 2013) (summary order) ("If the proceedings are commenced after the one-year period, the court 'shall also order the return of the child, *unless it is demonstrated that the child is now settled in its new environment.*'" (emphasis in original) (quoting Hague Convention art. 12)); *see also Lozano II*, 697 F.3d at 53–54 ("[T]he Convention's drafting history strongly supports [respondent]'s position that the one-year period in Article 12 was designed to allow courts to take into account a child's interest in remaining in the country to which she has been abducted after a certain amount of time has passed. . . . A child may develop an interest in remaining in a country in which she has lived for a substantial amount of time regardless of her parents' efforts to conceal or locate her."). This

defense is unavailable if the petition was filed within one year of the abduction and must be established by a preponderance of the evidence.[69]  *See Blondin II*, 189 F.3d at 245–47.

The definition of "settled" is not provided by the Convention or ICARA.  *Lozano II*, 697 F.3d at 56.  However, the Second Circuit has explained that it should be "viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in [his or her] new environment."  *Id.*  And, while "a court may consider any factor relevant to a child's connection to [his or her] living arrangement," courts should generally consider the following factors:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Id.* at 56–57 (alteration in original) (quoting *Duarte v. Bardales*, 526 F.2d 563, 576 (9th Cir. 2008) and collecting cases); *accord Broca*, 530 F. App'x at 47.

## A.      Petitioner did not Commence the Proceedings Within the One-Year Period

As an initial matter, the Court concludes that Respondent may assert the "well-settled" defense because the "judicial proceedings were not commenced *within one year* of the child's abduction."  *See Blondin II*, 189 F.3d at 246 (emphasis added); *Lozano III*, 572 U.S. at 5 ("[A]t least in some cases, failure to file a petition for return within one year renders the return remedy unavailable."); *cf. Blondin II*, 189 F.3d at 247–48 (explaining that the well-settled defense was not available where the petition seeking the child's return was filed 10 months after the abduction).

---

[69] "To meet the preponderance of the evidence standard, the evidence presented must 'prove that the fact is more likely true than not true.'"  *Valles Rubio*, 2019 WL 5189011, at *16 n.17 (quoting *Fischl*, 128 F.3d at 55).

For purposes of the well-settled defense, judicial proceedings are "commenced" upon the filing of "a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." 22 U.S.C. § 9003(b); *see also id.* § 9003(f)(3); *In re R.V.B.*, 29 F. Supp. 3d 243, 255 (E.D.N.Y. 2014) ("ICARA defines 'commencement of proceedings' as used in Article 12 to mean the filing of a petition under 42 U.S.C. § 11603(b)"[70] (citing 42 U.S.C. § 11603(f))). Here, Petitioner filed the Verified Petition seeking K.K.'s return pursuant to the Convention and ICARA in the Eastern District of New York on July 23, 2020 (*see generally* Verified Petition, Dkt. 1)—*more than 15 months* after Respondent, K.K., and J.M. flew from Trinidad and Tobago to New York on April 5, 2019 (Joint Stip., Dkt. 92, ¶ 25). Therefore, because these proceedings were commenced more than one year after K.K. was removed from Trinidad, Respondent may advance the well-settled defense.

Moreover, to the extent Petitioner argues that he is entitled to equitable tolling of the one-year period because Respondent concealed K.K.'s whereabouts, this argument is unsupported by the law and inconsistent with the facts. The Second Circuit and the United States Supreme Court have made clear that the one-year period is not subject to equitable tolling. *Lozano II*, 697 F.3d at 52 ("Tolling the time before a parent can raise the settled defense is [] inconsistent with the [Hague Convention]'s purpose."), *aff'd Lozano III*, 572 U.S. at 4 ("The question in this case is whether th[e] 1–year period is subject to equitable tolling when the abducting parent conceals the child's location from the other parent. We hold that equitable tolling is not available."). Notably, the Supreme Court specifically rejected the argument that Petitioner makes here, *i.e.*, that "absent

---

[70] The Court notes that ICARA was originally codified at 42 U.S.C. § 11603, but has since been editorially reclassified to 22 U.S.C. § 9003.

equitable tolling, concealment 'probably will' result in non-return" of the subject child, thereby undermining the goal of the Convention to deter child abductions. *Lozano III*, 572 U.S. at 16.  The Supreme Court explained that "the Convention does not pursue that goal at any cost," and that the child's interest in settlement "may overcome the return remedy." *Id.*  Further, as a factual matter, an abducting parent who conceals the child's whereabouts will not necessarily "profit by running out the clock on the 1-year period" because "steps taken to promote concealment," *e.g.*, frequently moving around or isolating the child from their new community, may prevent the sort of attachments necessary to establish that the child is "well-settled." *Id.* at 17. In other words, "[e]quitable tolling is [] neither required by the Convention nor the only available means to advance its objectives." *Id.*

Even assuming arguendo that tolling of the one-year period were permissible, the facts do not support tolling in this case.  Although Respondent initially told Petitioner that she was taking K.K. to Guyana and did not disabuse him of this misimpression in the weeks after her arrival in the United States (Resp't Tr. 234:12–21; 235:3–17), by mid-June 2019, Respondent was posting the Flatbush, Brooklyn address of the salon where she worked on social media in order to advertise her nail business (Resp't Tr. 236:11–239:16, 240:16–25; R018).  Respondent's Instagram post was made on a public page.  (Resp't Tr. 241:25–244:25, 711:10–712:3; R104.)  Respondent's Facebook post would have been visible to all of Respondents Facebook "friends," including Petitioner.  (Resp't Tr. 239:11–18, 240:16–241:3.)  Although Respondent briefly "blocked" Petitioner from viewing her Facebook account for a few days in April or May 2019, by the time she made her June 2019 post, Petitioner would have been able to see it and know that Respondent was in Brooklyn, New York, not Guyana.  (Resp't Tr. 239:11–18, 240:16–241:19, 732:18–733:6.)

In fact, the evidence indicates that Petitioner knew where Respondent was by June 2019. In June 2019, Petitioner was informed by his mother that Respondent has posted on Facebook that she was working as a night nurse at a hospital in the United States.  (Pet'r Tr. 2067:6–2068:15.) On July 8, 2019, Petitioner told his Trinidadian attorneys that a relative had informed him that Respondent was advertising on Facebook and Instagram that she was taking nail appointments in the United States.  (Pet'r Tr. 2070:8–13; *see* P010 at PET_0000194–96.)  On or before July 22, 2019, Francis-Baptiste told Petitioner that she had learned from her Aunt that Respondent, K.K., and J.M. were living in Brooklyn, New York.  (Pet'r Tr. 2069:1–2070:7.)  Additionally, Petitioner has continuously communicated with K.K. since her arrival in New York, including on Facebook messenger, which K.K. accesses through Respondent's Facebook account.  (Pet'r Tr. 2002:11– 2008:17.)

In sum, the Court finds, by a preponderance, that any efforts by Respondent to conceal K.K.'s whereabouts were short-lived and limited, and that, by June or July 2019—approximately a year before the filing of the Verified Petition—Petitioner reasonably should have known that his daughter was in the United States, if not specifically in Flatbush, Brooklyn.  The Court concludes that Petitioner failed to commence the proceedings within one year of K.K.'s removal from Trinidad, and therefore, Respondent is entitled to a merits evaluation of her argument that K.K. is well-settled in New York.

### B.     Evaluating the *Lozano* Factors

#### 1.     Age of the Child

In determining whether Respondent has established a well-settled defense, the age of the "child is a factor to be considered, [though] courts are not in total agreement as to the existence of a correlation between age and degree of settlement."  *Mohácsi v. Rippa*, 346 F. Supp. 3d 295, 324

(E.D.N.Y. 2018) (quoting *Broca v. Giron*, 11-CV-5818, 2013 WL 867276 (SJ) (JMA), at *6 (E.D.N.Y. Mar. 7, 2013)).  While "the age of an older child may cut in favor of a finding of settlement if the child has few relatives, friends, and social involvements in his or her home country, and has them in the United States, [] it cannot be said that an older child is either less settled or more settled than a younger child." *Wtulich v. Filipkowska*, 16-CV-2941 (JO), 2019 WL 1274694, at *8 (E.D.N.Y. Mar. 20, 2019) (internal quotations and citation omitted).  Courts in the Second Circuit have found the well-settled defense available where children are younger than or comparable in age to K.K., who is now 10 years old.  *See id.*, 2019 WL 1274694, at *8 (finding that child "is now approximately ten years old and thus old enough to form meaningful attachments to her new environment" (citation omitted)); *Matute-Castro v. Jimenez-Ortiz*, No. 15-CV-04568 (DLI) (JO), 2016 WL 8711076, at *12 (E.D.N.Y. Aug. 26, 2016) (finding six year-old child old enough to develop meaningful connections); *Mohácsi*, 346 F. Supp. 3d at 325 (finding that four year-old's "age is not determinative" and rejecting "Petitioner's categorical assertion that the well-settled defense is inapplicable to children of [that] age"); *Gwiazdowski v. Gwiazdowska*, No. 14-CV-1482 (FB) (RER), 2015 WL 1514436, at *4 (E.D.N.Y. Apr. 3, 2015) (finding that ten year-old and eight year-old "are old enough to form meaningful attachments to their new environment" (citation omitted)); *Taveras v. Morales*, 22 F. Supp. 3d 219, 237 (S.D.N.Y. 2014) (finding eight year-old who had been in the United States for over 15 months to be "settled"), *aff'd sub nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015) (summary order).

As discussed below, K.K. attends school, participates in afterschool and day camp programs, attends church, and has formed relationships with teachers, other adults, and friends. Based on this evidence, the Court concludes that K.K., at ten years of age, can form, and has

formed, meaningful attachments to her new environment, and that this factor supports a finding that she is well-settled.

2.      Stability of the Child's Residence in the New Environment

Petitioner argues that this factor does not support a finding that K.K. is well-settled because Respondent, K.K., and J.M. have lived at a number of different residences since arriving in the United States.  (Pet'r's Br., Dkt. 122, at 57–58.)  The Court disagrees.

A finding of stability is not foreclosed by the fact that a child may have lived in several residences since arriving in the new environment, particularly where the residences are within the same city and school district.  *See Mohácsi*, 346 F. Supp. 3d at 325 (finding child "well-settled" and that a "contrary result" was not dictated by child having "lived in several different residences since coming to the United States, [because] all of those residences were in New York City" (record citations omitted)); *cf. Wtulich*, 2019 WL 1274694, at *9 (finding that child "has not had a stable residence while in the United States" because "[s]he attended kindergarten and first grade at one school in New York, but then transferred to another school in New Jersey for third and fourth grades" (record citations omitted)); *In re R.V.B.*, 29 F. Supp. 3d 243, 257 (E.D.N.Y. 2014) (finding child not sufficiently settled where she "lived in at least three different locations," causing her to attend "three different school" in a span of three school years).

Before leaving Trinidad with K.K. and J.M., Respondent sought out stable housing in New York.  Respondent called her aunt, Barbara Osborne, to see if she could stay in her apartment; sent money to her mother's friend Lloyd, who promised to help her get an apartment, and tried to find an apartment with Blocker.  (Osborne Tr. 1462:18–19, 1464:18–19, 1469:2–18; Resp't Tr. 192:10–23, 596:14–597:10, 600:6–601:2, 601:19–21, 708:3–19, 710:6–22.)  However, when nothing materialized, Respondent arranged to stay with her friend Patrice Carter-Carmichael, upon arrival

in New York in April 2019.  (Resp't Tr. 372:2–12, 645:5–21; Carter-Carmichael Tr. 1273:18–1274:20, 1276:6–16, 1278:3–10, 1289:19–1291:1.)

Although the stay with Carter-Carmichael was not Respondent's initial plan, it nonetheless provided a solid foundation for Respondent, K.K., and J.M. to transition into their new environment in Flatbush, Brooklyn, which remains their neighborhood to this day.  In April 2019, Carter-Carmichael helped Respondent enroll K.K. in P.S. ■, a school within walking distance of Carter-Carmichael's home.   (Carter-Carmichael 1282:20–1283:24; Resp't Tr. 194:10–15.) Respondent and Carter-Carmichael shared the responsibility of walking or driving the kids to and from school.  (Resp't Tr. 193:16–194:17.)   Carter-Carmichael advised Respondent on grocery shopping, and Respondent prepared small meals for K.K. and J.M. in Carter-Carmichael's apartment. (Carter-Carmichael Tr. 1281:6–13, 1281:17–25, 1282:1–2.).  When Carter-Carmichael discovered bedbugs, she remedied the situation and did not blame Respondent.   (Carter-Carmichael Tr. 1287:17–21.)   After living with Carter-Carmichael for five or six weeks, Respondent decided it was time to move—Carter-Carmichael did not kick her and the children out. (Resp't Tr. 195:6–9; Carter-Carmichael Tr. 1293:3–1297:5.) Though Respondent and Carter-Carmichael's friendship may have become somewhat strained as Respondent and the children stayed longer than the originally requested one night, by all accounts, Carter-Carmichael's home was a stable, safe, and happy entry point for K.K. into her new environment.

On or about May 12, 2019, Respondent, K.K., and J.M. moved approximately one block away to "Aunt" Elaine Heron's three-bedroom apartment.  (Resp't Tr. 195:24–197:23.)  This move, within the same Flatbush, Brooklyn neighborhood, allowed the family to preserve the routines they had established while living at Carter-Carmichael's apartment—most notably, K.K. continued attending school at P.S. ■.  (Resp't Tr. 247:21–248:14.)  Respondent continued to

walk or drive K.K. to school, and to cook meals for K.K. and J.M.  (Resp't Tr. 199:8–24; Heron Tr. 1344:4–20.)  During the summer, K.K. spent time outside with Heron, biking or skateboarding with children from the neighborhood.  (Heron Tr. 1345:15–1346:22.)

In mid-October 2020, after living with Heron for approximately 17 months, Respondent, K.K., and J.M. moved into their own apartment in Flatbush, Brooklyn, just a short distance from Heron's apartment.  (Heron Tr. 1334:12–13; Resp't Tr. 52:24–25, 249:17–19.)  Respondent's new apartment is much more spacious, with a living room, dining room, kitchen, bathroom, and two bedrooms—one of which is shared by K.K. and J.M., who have bunkbeds, and the other is occupied by Respondent.  (Resp't Tr. 249:17–250:2.)  K.K. continues to attend P.S. ▮, which is a 25- to 30-minute walk from her new home, although school is now virtual.  (Resp't Tr. 248:24–249:9.)

The Court finds that, far from being itinerant, since arriving in New York, Respondent, K.K., and J.M. have "spent the majority of their time at one address," namely "Aunt" Heron's apartment, and they otherwise lived at Carter-Carmichael's apartment "for only a few weeks immediately after arriving in the United States."  *See Mohácsi*, 346 F. Supp. 3d at 325.  In the Court's view, K.K. has not been pinballing between multiple addresses.  The stay with Carter-Carmichael was relatively short-lived and allowed the family to get on its feet.  Most importantly, since arriving in New York, K.K. has remained in the same neighborhood, attended the same school, and resided "the majority of [her] time" with Heron.  *See Mohácsi*, 346 F. Supp. 3d at 325; *cf. In re R.V.B.*, 29 F. Supp. 3d at 256–57.  These are the hallmarks of stability for a school-age child.  *See Taveras*, 22 F. Supp. 3d at 237 (in assessing the "stability of the child's residence" factor, finding that "since arriving in the United States, [the child] has lived in the same apartment, with the same family members (her father and grandmother), and has attended the same school,"

which "strongly favors a finding that [the child] is settled"); *cf. Wtulich*, 2019 WL 1274694, at *9. It is also important that Respondent has now secured an apartment of her own and has been living there with K.K. and J.M. for almost four months as of this decision. *Cf. Broca*, 2013 WL 867276, at *7 (finding an unstable environment where Court was "less [cognizant] of the number of moves (as the children remained in the same community and lived in only two places, one of which is with family) but because Respondent has yet to establish a home of her own for the children"), *aff'd,* 530 F. App'x 46 (2d Cir. 2013) (summary order). Even cynically assuming that the move to the current apartment was timed to occur before the evidentiary hearing, so as to be a conveniently helpful fact for Respondent, the fact of the move nonetheless means that K.K.'s life continues on a trajectory toward ever-greater stability.

The Court rejects Petitioner's overblown assertion that K.K. has "lived in five locations, including two shelters" as inconsistent with the facts. (Pet'r's Br., Dkt. 122, at 57.) Since her arrival in New York over 20 months ago, K.K. has spent a total of two nights in locations other than Carter-Carmichael's, Heron's, or Respondent's current apartment. In May 2019, Respondent, K.K., J.M., and Blocker overnighted at a shelter in the Bronx while seeking to qualify for an apartment. (Resp't Tr. 202:17–203:23, 376:3–13.) ███████████████████ ████████████████████████████████████ (J.M. Tr. 1005:21–1006:18.) In October 2019, Respondent, K.K., and J.M. spent one night at a domestic violence shelter after Blocker had assaulted Respondent. They returned to Heron's apartment the next day after Respondent decided that it was safe to do so because an order of protection against Blocker was in place. (Resp't Tr. 203:24–205:1.) Thus, the two nights out of over 20 months that Respondent and her children spent in shelters—the first night in service of finding longer-term housing, and

the second night in service of safety—provide no basis for finding any instability in K.K.'s new environment.

The Court also rejects Petitioner's argument that "Respondent endangered K.K.'s physical and emotional safety once she decided to make Bruce Blocker the foundation of her new life in the United States." (*See* Pet'r's Br., Dkt. 122, at 61–64.)  While the Court does not underestimate the seriousness of the threat that Blocker posed to the safety of Respondent and her children during the time that Blocker and Respondent were involved, there is no evidence that Blocker ever harmed either K.K. or J.M., that K.K. or J.M. ever witnessed Blocker's mistreatment of Respondent, that Respondent had reason to think Blocker posed a danger to K.K., J.M., or herself, or that Blocker continues to pose a risk of harm to Respondent or her children.  During Respondent's relationship with Blocker, K.K. and J.M. both interacted with Blocker on a nearly daily basis, but without incident; in fact, Blocker helped K.K. with homework and shared meals with her (Resp't Tr. 221:15–222:2), ████████████████████████████████ (J.M. Tr. 1004:15–1006:18).  Blocker was alone with K.K. on only one occasion, when he picked her up from school and walked her to Respondent's salon 10 or 15 minutes away; this was before the two incidents in which Blocker assaulted Respondent.  (Resp't Tr. 222:7–223:1.)[71]  K.K. was not present during the two assaults by Blocker, but was in ████████ the salon when Blocker verbally harassed Respondent at work.  (Resp't Tr. 216:10–15, 218:2–23, 345:20–348:2, 507:4–508:11 ████████ ████████████████████████████████████████████████ ; Heron Tr. 1354:16–1355:6, 1355:16–1356:4.)  Following these assaults,

---

[71] The Court also notes that K.K.'s contact with Blocker was limited by the fact that K.K. never lived with Blocker, and Blocker never slept overnight at Carter-Carmichael's or Heron's apartments.  (Resp't Tr. 224:17–24.)  Further, K.K. also never slept over at the shelter where Blocker was living, nor visited his room there.  (Resp't Tr. 224:25–225:10.)

Respondent filed DIRs with the NYPD (Joint Stip., Dkt. 92, ¶¶ 28–30), asked the NYPD to contact K.K.'s school to prohibit Blocker from picking K.K. up (Resp't Tr. 223:17–224:16, 514:2–21; P017 at PS315_0000024, PS315_0000031),[72] and on December 11, 2019, obtained an Order of Protection against Blocker that remains in effect until December 10, 2021 (*See* Joint Stip., Dkt. 92, ¶ 31; R048). Although Blocker has contacted Respondent twice since the Order of Protection has been in effect, most recently in June 2020 (Resp't Tr. 232:19–233:23, 486:5–10, 554:15–22, 729:15–730:19),[73] neither she nor her children have seen Blocker in over a year (Resp't Tr. 206:21-24, 232:12-233:23; ████████████████), despite the fact that Blocker has been out of custody for nearly six months (Resp't Tr. 228:7–19).

In the absence of any concrete evidence that Blocker endangered K.K., that K.K. was exposed to Blocker's violent acts toward Respondent, or that Blocker presents an actual threat to K.K.'s future safety, the Court is unwilling to speculate that such a threat exists. Nor does the Court conclude that Respondent's relationship with Blocker undermines the stability of K.K.'s life since she began living in Flatbush, Brooklyn in April 2019.

---

[72] Indeed, that same day, Blocker showed up at K.K.'s school, but the school security guard had already been alerted to the situation and knew that Blocker was prohibited from picking her up. (Carter-Carmichael Tr. 1300:23–1302:15 (testifying that she saw Blocker at K.K.'s school and was told by school security guard that Blocker was prohibited from picking anyone up).) ████████████████████████████████████████████████ ████████████████████ (Resp't Tr. 348:9–22.) Although the Court does not consider Respondent's hearsay testimony as to what actually occurred at the school that day, the Court notes that there is no evidence that Blocker had any contact with K.K. that day or any other day after Blocker's assaults against Respondent.

[73] Based on the testimony offered during the evidentiary hearing, it does not seem that Respondent had a copy of the Order of Protection at the time of these contacts. (Resp't Tr. 729:22–730:19, 745:4–7.) Nor is it clear that Respondent understood that the Order of Protection was in effect until she reportedly received a call from Blocker's parole officer in June 2020, informing her that Blocker was going to be released from incarceration, and that she should call 911 if he tried to contact her or showed up near her home or workplace. (Resp't Tr. 228:7–19.)

Accordingly, the Court finds that the stability of K.K.'s residence in her new environment supports a finding that she is well-settled.

### 3.   The Child's Regular Attendance at School

A child's "consistent attendance at school and academic improvement strongly favor a finding that [the child] is settled." *See Taveras*, 22 F. Supp. 3d at 237; *In re D.T.J.*, 956 F. Supp. 2d 523, 535–36 (S.D.N.Y. 2013) (finding strong support that child who, *inter alia*, had "just six unexcused absences over the course of th[e] past school year" was "settled"). This does not mean that a child must show exceptional academic performance in their new environment, but the court should look for evidence of an "upward trajectory" that indicates that the child is finding her way. *See In re D.T.J.*, 956 F. Supp. 2d at 535 (finding that child's "report card indicates that she passed all of her classes, with grades ranging from 75 to 95, and that she is academically on a strong upward trajectory" (record citation omitted)); *Matute-Castro*, 2016 WL 8711076, at *4, 9 (finding that although the child still struggles with reading, progress evaluations demonstrating improvement from "Partial Progress" to "Substantial Progress" support a finding that the child is well-settled). Where a child is struggling in school, the kind of interventions and support offered by both the parent and the school may be meaningful. *See Matute-Castro*, 2016 WL 8711076, at *9 ("What is critical to the Court's determination are the extensive steps taken by Respondent and the school to address the child's learning disability and the fact that he is thriving and doing well in school despite his learning disability.") A child's positive feelings about their school, teacher, and classmates are also meaningful to the court's assessment of this factor. *See Taveras*, 22 F. Supp. 3d at 237 (noting that eight-year-old child "remarked that she studies hard . . . ; proudly proclaimed her 'point' level at school . . . and explained that music was her favorite subject, noting that she looked forward to joining chorus next year in fourth grade" (record citations omitted)); *In*

*re D.T.J.*, 956 F. Supp. 2d at 535 (noting that 14-year-old child provided "overwhelmingly positive" testimony about school, including that she is "delighted with her teachers, has a multitude of friends, and is very excited to begin tenth grade").

K.K. has attended P.S. ▪ since arriving in New York in April 2019.  (Joint Stip., Dkt. 92, ¶ 27; Resp't Tr. 247:21–248:14.)  In the 2019-2020 school year, when K.K. was in fourth grade, she had only four absences, which Respondent explained were due to a bout of the flu (Resp't Tr. 270:17–20) and three late arrivals (P017 at PS315_0000028, 30.)  Since Respondent solved connectivity issues that arose when K.K.'s school first went remote, K.K.'s attendance for remote school has been good.  (Resp't Tr. 270:17–271:22.). As of the time of the evidentiary hearing, either Respondent or Heron got K.K. ready for online school starting at 8:30 a.m. (Resp't Tr. 289:16–290:1), and both K.K. and J.M. were doing remote learning from Heron's dining table or the salon; they were never at home alone.  (Resp't Tr. 702:19–703:13; Heron Tr. 1341:14–1342:1.) The Court finds that this evidence demonstrates K.K.'s consistent school attendance, even in the face of challenges presented by COVID-19 and remote learning.

As far as academic performance, K.K.'s report card for the first two marking periods of the 2019-2020 school year shows either consistent or improved performance in all subjects.  (P017 at PS315_0000028–29.)  K.K. showed her highest performance in Listening Speaking and Language; Science; Physical Education; Dance; Technology; and Social-Emotional Development.  (*Id.*)  K.K. made strides in Reading (P017 at PS315_0000028 (showing improvement from "[w]ell below standards" to "[b]elow standards")) and Social Studies and History (*id.* (showing improvement from "[w]ell below standards" to "[p]roficient")).  When K.K. struggled with math, the school sent Respondent a letter warning that K.K. had to make "significant progress" in both math and English

Language Arts to avoid being held back a grade during the 2020-2021 school year.  (P093.)[74] Respondent addressed the situation by working with K.K.'s teacher, Ms. Lopez, to get K.K. math books and additional academic support, which included K.K. attending an aftercare program three days a week.  (Resp't Tr. 250:17–252:7, 251:3–252:7, 253:17–254:9.)  K.K. ultimately passed the required test to be promoted to the fifth grade.  (Resp't Tr. 252:1-15; *see* P017 at PS315_0000030.) The record thus demonstrates both consistency and "significant progress" in K.K.'s academic performance, as well as Respondent's determination to get K.K. the academic support she needs to succeed.  As discussed, K.K.'s improved grades are important insofar as they demonstrate the "upward trajectory" of K.K.'s academic performance since beginning at P.S. ■ in April 2019. *See In re D.T.J.*, 956 F. Supp. 2d at 535; *Matute-Castro*, 2016 WL 8711076, at *4, 9.

Petitioner argues that K.K. has failed to form connections and is socially isolated at school, pointing to an October 13, 2019 message from K.K. to Respondent saying, "I feel lonely [] no one talks to me at school."  (Pet'r's Br., Dkt. 122, at 58 (alteration in original); P234 at PET_0000925.) However, the Court finds that this single message, sent early in a new school year over a year ago, is far outweighed by all of the other evidence indicating that K.K. has found a warm and enriching community at P.S. ■, and that she likes her school and going to school.  (*See* Resp't Tr. 296:14– 297:8, 308:3–8; R033 and R034 (photo and video of K.K. grinning and joking with Respondent on her walk to the second day of fourth grade in 2019).)  Respondent testified that K.K. made friends at P.S. ■, including a best friend named Fermeada.  (Resp't Tr. 255:17–25.)  Carter-Carmichael observed K.K. "skipping alongside" Respondent as they walked to school (Carter-

---

[74] In assessing K.K.'s academic performance, the Court also considered Ms. Krasner's testimony that she was not surprised that K.K. was performing below standards in the 2018-2019 and 2019-2020 school years, given that K.K. was "suffering from [PTSD,] which affects concentration, focus, ability to do schoolwork and be present in school."  (Krasner 1158:18– 1161:3.)

Carmichael Tr. 1298:22–1299:4), ███████████████████████

█████████ (J.M. Tr. 997:23–24, 1000:15–20).  Ms. Krasner testified that K.K. speaks with a

smile on her face about her school.  (Krasner Tr. 1125:16–22.)  This testimony is corroborated by

photos and videos showing K.K. with her classmates during celebrations at school, including a

Birthday celebration for K.K. with balloons and cupcakes.  (Resp't Tr. 259:12–263:14; R028;

R041; R088.)[75]

Finally, to the extent Petitioner argues that K.K.'s academic performance was or would be

better in Trinidad, the Court does not find this fact to be established by a preponderance.

Furthermore, even assuming it was, this fact would not "detract from the finding that [K..K.]'s

school attendance and life at [P.S. ███] is a component of her being 'well-settled' in the United

States."  *In re D.T.J.*, 956 F. Supp. 2d at 536.  In particular, the Court notes that, as at P.S. ███,

math was the subject that K.K. performed relatively lower in at her school in Trinidad (*see* R005

at R005.004), █████████████████████████

███████████████████████ (J.M. Tr. 996:16–997:3), including incidents that

required medical treatment (███████████████ Resp't Tr. 172:24–173:23).  In addition to

bullying, K.K. also faced corporal punishment by staff at her Trinidadian school who hit her hands

with a ruler, leaving marks.  (Pet Tr. 2013:10–15.)

---

[75] Because the Court did not hear directly from K.K., it relies on other evidence to assess
K.K.'s relationships in New York, including photographs of K.K. with her classmates at school.
*See In re D.T.J.*, 956 F. Supp. 2d at 536 (noting photographs that "corroborate" testimony of child
about the "group of very close friends she has made in the United States").  In reviewing this and
other evidence of K.K.'s new relationships, the Court has taken into consideration that, by all
accounts, K.K. is naturally shy, quiet, and well-behaved.  (Krasner Tr. 1093:13–1094:1; Carter-
Carmichael Tr. 1287:24–1288:15.; Heron Tr. 1340:8–20; Pet'r Tr. 2018:12–17; Resp't Tr. 254:10–
255:25; R023 (K.K. won trophy for "Best Manners" at summer camp).)

In sum, the consistency of K.K.'s school attendance, the upward trajectory of her academic performance, her improved socialization at P.S. ■■■, and her meaningful connection to the school community at P.S. ■■ support a finding that she is well-settled.

4.    The Child's Regular Participation in Church and Extracurricular Activities

Courts have found that evidence of a child's regular engagement in community-based activities, including participation in church, supports a finding that the child is well-settled. *Taveras*, 22 F. Supp. 3d at 238 (finding that evidence of child's participation in activities at school and with other community organizations, and twice-a-week church attendance with her father, supported a finding that the child is settled); *Matute-Castro*, 2016 WL 8711076, at \*10 (finding that evidence that child "attends church, is preparing for his First Communion, and participates in a Tae Kwon Do program after school four to five days per week" weighed in favor of finding child settled (record citations omitted)). This is because "church provides [a child] with additional social ties to her community." *Broca*, 2013 WL 867276, at \*7 (noting that children's consistent church attendance since their arrival in New York, and one child's church attendance four times per week and participation in youth group and choir, favored finding both children settled).

Prior to the COVID-19 shutdown, K.K. attended ■■■■■■■■■■■■■■■ Church in their Flatbush, Brooklyn neighborhood every Sunday, and sometimes on Wednesdays, with Respondent and J.M.  (Resp't Tr. 273:9–274:4; 274:20–25; Heron Tr. 1344:21–1345:4; ■■■■■■■■■■ ■■■■.) K.K. and J.M. attended "junior class" at church, where K.K. had friends, and K.K. also sang and danced. (■■■■■■■■■■■ Resp't Tr. 273:9–274:4, 274:20–25.) Since the COVID-19 shutdown, K.K., Respondent, and J.M. have been attending church services online. (Resp't Tr. 273:24–274:4; Heron Tr. 1344:21–1345:4.)

93

Prior to the COVID-19 shutdown, K.K. also participated in an aftercare program at school three days per week, which in addition to providing academic support, offered opportunities for singing, dancing, and playing in the gym.  (Resp't Tr.  253:17–254:9.)  During K.K.'s first summer in the United States, she attended a day camp program through which she regularly visited different parts of New York City, and at the end of the summer was awarded a trophy for "Best Manners." (Resp't Tr. 254:10–255:25; R023.)  Respondent attempted to enroll K.K. in a Y.M.C.A ballet class, but the class was full and then the pandemic prevented future registration.  (Resp't Tr. 270:4–16.)

Taken together, this evidence demonstrates not only K.K.'s regular participation in church and extracurricular activities, but also that Respondent has consistently encouraged and tried to facilitate such participation.  The Court concludes that this evidence supports a finding that K.K. is well-settled.

5.    Respondent's Employment and Financial Stability

In a case arising under the Hague Convention, the stability of a respondent's employment and financial circumstances undoubtedly impacts the stability of all aspects of the subject child's life in the new environment—from housing, to food security, healthcare access, education, and recreation.  Notably, courts have found a child well-settled even where the respondent is unemployed and supported by family.  *See Mohácsi*, 346 F. Supp. 3d at 325 (finding child well-settled where respondent was unemployed and child was supported by $1,000 monthly payments by grandfather); *In re D.T.J.*, 956 F. Supp. 2d at 536 (finding child well-settled where respondent was unemployed and child was supported by grandparents' monthly pension).  A child may also be well-settled even where a "[r]espondent's household income is limited" or "less [than] the disposable income [of] other families in" their area, so long as the child's "basic needs are being met."  *Taveras*, 22 F. Supp. 3d at 238 (finding child well-settled where respondent began working

at McDonald's shortly after arriving in the United States, earning an annual salary of $11,000, and then as a waiter, earning $15 per hour, and the family relied in part on public assistance).

From the time Respondent arrived in New York, she has demonstrated self-reliance and a commitment to paying her own way.  During the first few weeks that Respondent, K.K., and J.M. were in New York and living with Carter-Carmichael, Respondent earned money by doing nails. (Carter-Carmichael Tr. 1282:3–19.)  During this time period, Respondent bought all her own groceries and never asked Carter-Carmichael for money or food.  (Carter-Carmichael Tr. 1282:3–19.)  When Respondent and the children lived with Heron, Respondent paid Heron $600 cash each month to assist with rent and other expenses, ██████████████████████████████.  (Resp't Tr. 373:9–374:25; 727:20–728:1.)  Respondent currently works two jobs, one as a nail technician at a salon and the other as a home health aide during the overnight hours.[76]  (Resp't Tr. 288:3–13.) Respondent reportedly makes between $1,400 and $1,500 per month as a home health aide, and between $3,200 and $4,000 per month as a nail technician, for a monthly total between $4,600 and $5,500.  (Resp't Tr. 703:20–704:24.)  Respondent's monthly income appears adequate to cover $1,650 in monthly rent for her apartment, as well as $600 in monthly childcare payments to Heron, and other monthly expenses.  (Resp't Tr. 52:24–25; 249:17–19.)  When the salon temporarily shut down due to COVID-19, Respondent got a job at Healthy Juice Blend.  (Resp't Tr. 292:21–293:3.) Respondent has also applied for a position at a geriatric home that would allow her to work five days a week during the daytime, so that she can be at home with the children at night.  (Resp't Tr. 291:16–292:2.)

---

[76] ██████████████████████████████████████████████
███████████████████████████████████████ (Resp't Tr. 401:4–15.)
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
(Resp't Tr. 401:23–402:3.)

Respondent obtained health insurance for K.K. through MetroPlus, effective September 1, 2019.  (Resp't Tr. 277:13–19; R020 at R020.008–09.)  K.K. has a pediatrician at Kings County Hospital, is up to date on her immunizations, and has had a physical exam each year since arriving in New York, with another one scheduled for December 2020.  (Resp't Tr. 277:23–278:11; R020 at R020.008–09.)  Respondent has obtained a laptop for K.K. and other school supplies.  (Heron Tr. 1342:11–20.)  In addition, before the COVID-19 shutdown, Respondent took K.K. and J.M. to eat out at restaurants, see movies, and on other outings in New York City.  (Resp't Tr. 271:23–272:5; 239:19–294:1; ███████████████████.)

The evidence before the Court demonstrates, without dispute, that Respondent is a "hardworking individual who has been consistently employed" since arriving in New York, and that K.K.'s "basic needs are being met" and more.  *Taveras*, 22 F. Supp. 3d at 238.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████ (*See* Pet'r's Br., Dkt. 122, at 59–60.) ███████████

███████████████████████████████████████████████ (Resp't Tr. 355:4–23), the Court notes that Respondent's employment authorization card became valid on June 5, 2020 (R117)—approximately 14 months after Respondent arrived in the U.S., when she had already been supporting her family and was making monthly payments to Heron for rent and childcare.  Though the work Respondent performed during this time may not have been authorized, this consistent work history attests both to Respondent having provided financial stability for herself and her children, and her ability and commitment to doing so in the future.  Similarly, while the expiration of Respondent's current work authorization permit, either on June 4, 2021 (R117) or another date, may interfere with Respondent's ability to continue working in the same way, it

does not negate the evidence establishing the financial stability that K.K. has enjoyed thus far and that Respondent has the wherewithal to provide.  Indeed, based on Respondent's continuous work history, unstinting work ethic, and demonstrated ability to provide for K.K. and J.M., it is clear to the Court that Respondent will endeavor, no matter the circumstances, to maintain the financial stability she has achieved to date.

In any event, the Court need not speculate about what might happen to Respondent's work status in the future.  In the absence of evidence to "suggest" that Respondent's employment and financial status "is in jeopardy, or is unlikely to continue for the foreseeable future," the "principal focus of the Court's inquiry is whether the child is *now* settled."  *Matute-Castro*, 2016 WL 8711076, at *10 (quoting *Lozano I*, 809 F. Supp. 2d at 232).  Based on the evidence produced at the hearing, the Court finds that Respondent's employment and financial stability support a finding that K.K. is well-settled.

6.     The Child's Friends and Relatives in the New Area

Whether a child has relationships with friends and family members in their new environment is meaningful to the Court's assessment of whether the child is well-settled.  *See Matute-Castro*, 2016 WL 8711076, at *11 (finding evidence that six year old had "multiple friends in his new neighborhood and interact[ed] with them regularly" and a "loving and happy relationship with all the relatives that reside in his household" strongly supported well-settled defense); *Taveras*, 22 F. Supp. 3d at 238 (finding evidence that eight-year-old child had close friends with whom she spent time outside of school, and family members she saw frequently "favors a finding that she is well-settled").

Since arriving in New York, K.K. has made friends at church and at school, including a best friend, Fermeada, with whom she spent time prior to the COVID-19 pandemic.  (Resp't Tr.

97

255:17–25, 268:16–269:5, 273:9–274:4; 274:20–25; ███████████████████.)  K.K. also biked and skateboarded with children in Heron's neighborhood (Heron Tr. 1345:15–1346:22), and spent time with the children of Respondent's friends.  (Resp't Tr. 264:15–265:16).

Aside from friendships with other children, K.K. has developed meaningful bonds with adults in her life.  Although Heron is not a blood relative, she is a constant presence in K.K.'s life, and has been since May 2019.  Respondent described Heron as "very caring" for K.K. and J.M., including waking them up, getting them ready for school, taking them to parties, the park, shopping, and the grocery store.  (Resp't Tr. 198:24–199:7.)  Even since Respondent, K.K., and J.M. moved into their own apartment, K.K. still sees Heron approximately four times a week when she sleeps over on the nights that Respondent is working.  (Resp't Tr. 201:4–202:16.)  K.K. often does remote schooling from Heron's dining table.  (Heron Tr. 1341:14–1342:1.)  The constancy and closeness of the relationship is such that Ms. Krasner opined that Heron could be considered a "protective factor" for K.K. in New York because K.K. feels comfortable with her, has spent a lot of time living with her, and feels safe with her.  (Krasner Tr. 1132:5–10, 1132:22–1133:15.)  K.K. also developed an attachment to her fourth-grade teacher, Ms. Lopez, who during the 2019-2020 school year, frequently sent Respondent photos and updates on K.K. and helped K.K. progress when she was struggling with math.  (Resp't Tr. 250:13–252:7, 259:12–17, 262:23–263:12.)

The Court rejects Petitioner's argument that the COVID-19 pandemic and consequent at-home restrictions, negate the significance of the bonds K.K. has formed in her new environment.  (Pet'r's Reply, Dkt. 127, at 6–7.)  The friendships, relationships, and connections that K.K. has developed at school, at church, and in her neighborhood were formed *before* the COVID-19 pandemic began, and there is no reason to believe that they are not continuing, albeit in a different

form, and will not resume after the effects of the pandemic have abated.  The pandemic has undoubtedly redefined what it means to be "connected" and "together," but based on the evidence presented, K.K. continues to maintain these friendships and relationships, as best as she (and any of us) can, by attending school and church remotely, and continuing to see Heron in person most days of the week.

The Court also disagrees with Petitioner's focus on the primacy of kinship over all other relationships.  As some matters under the Hague Convention well demonstrate, family members can be among the most destabilizing forces in a child's life.  To be sure, there may be cases where a child's relationships with extended family members serve as a stabilizing force in the new environment.[77]   However, non-familial bonds, like the one K.K. shares with Heron, also demonstrate "security, stability, and permanence" in a new environment.  *See Lozano II,* 697 F.3d at 56 (citation omitted).  Further, the Court notes that when K.K. was living in Trinidad, she saw Petitioner's family far less than she has seen Heron over the past 20 months.  K.K.'s uncle, Christian Francis, testified that he could not recall whether, while K.K. was living in Trinidad, he had visited Respondent and Petitioner's home even once a year, and after 2016, he saw K.K. only about once every other month.  (Francis Tr. 1390:1–10; 1400:16–1401:15; 1401:21–1402:10.) K.K.'s aunt, Helen Francis-Baptiste, testified that after 2016 she did not visit K.K. often.  (Francis-Baptiste Tr. 1445:2–14.)  Indeed, Petitioner was reluctant to introduce Respondent to his family because she is Guyanese, and did not even tell them he was married to Respondent until three or four years after the wedding.  (Francis-Baptiste Tr. 1413:1–8, 1414:3–10, 1426:3–21; Francis Tr.

---

[77] The Court notes that Barbara Osborne, K.K.'s biological great aunt, is not estranged from her.  Osborne testified that prior to the hearing, she saw Respondent, and sometimes K.K., at the salon every two months, and that on a couple of occasions, she brought things for K.K. and J.M. to the apartment where Respondent was living.  (Osborne Tr. 1469:19–1470:6; 1417:4–6.)

1378:7–20.)  In short, this is a not case where, as they say, "blood is thicker than water."  *See Gwiazdowski*, 2015 WL 1514436, at *4 (noting in its assessment of the "friends and relatives" that while "children have several relatives who live in Poland, . . . [i]t is [] unclear how much contact the children would have with these family members").

Accordingly, the Court concludes that K.K. has established meaningful friendships and relationships in her school, church, and neighborhood, which support a finding that she is well-settled in New York.

7.    The Immigration Status of the Child and the Respondent

Immigration status is not dispositive in the well-settled analysis.  Rather, "immigration status should only be one of many factors courts take into account when deciding if a child is settled" and "in any given case, the weight to be ascribed to a child's immigration status will necessarily vary."  *Lozano II*, 697 F.3d at 56; *Broca*, 530 F. App'x at 47 ("The [*Lozano*] test is a 'fact-specific multi-factor' test, in which no factor, including immigration status, is dispositive." (quoting *Lozano II*, 697 F.3d at 57)).  The Second Circuit has explained that

> [t]he importance of a child's immigration status will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits.

*Lozano II*, 697 F.3d at 57.  As the Second Circuit instructs, "rather than considering the weight to be given to a child's immigration status in the abstract, courts deciding whether a child is settled must simultaneously balance many factors which . . . may not support the same determination.  *Id.* In *Lozano II*, the Circuit affirmed the district court's "focus on 'stability' in the near future," in light of "the child's psychiatric history and documented fragility," noting that the child and the respondent "had overstayed their visas," but "that there [was] nothing to suggest that, at this

moment, or in the near future, the immigration status of the child and [the respondent] is likely to upset the *stability* of the child's life here in New York." *Id.* at 58 (emphasis in original) (internal quotations and district court citation omitted).[78]

In balancing the immigration status factor along with the other *Lozano* factors, a child may be "well-settled," even where the child and respondent do not have legal status, or an easy path to legal status, and the uncertainty or fragility of the child's legal status impacts other areas of the child's life. *See Broca*, 2013 WL 867276, at *8 (finding children well-settled even though "respondent, [and children], illegally entered the United States and remain here illegally" and "[t]here is little doubt that . . . [respondent]'s illegal status limits employment opportunities and has thus far thwarted attempts to secure a home of their own"); *In re D.T.J.*, 956 F. Supp. 2d at 539 (finding 14-year-old child well-settled even though respondent and child were undocumented, child "will face substantial challenges as an undocumented immigrant" in obtaining the postsecondary education she desires, and "the possible avenues of legalizing [the child's] status [] appear to be fraught with complications").

A child may also be "well-settled," where the child and respondent had legal status at the time of the court's decision, but that status was temporary and the future status is uncertain. *See Matute-Castro*, 2016 WL 8711076, at *11 ("While Respondent's [student visa] status is not permanent, the Court accords this factor little weight in its analysis [because] Respondent and the

---

[78] The Circuit acknowledged the Ninth Circuit's view that "a child's immigration status should only be relevant to the settled analysis to the extent that there is an 'imminent threat of removal,'" but "decline[d] to impose [such] a categorical rule that the weight to be given a child's immigration status varies only in accordance with the threat of deportation." *Lozano II*, 697 F.3d at 57 n.18 (quoting *In re B. Del C.S.B.*, 559 F.3d 999, 1013–14 (9th Cir. 2009)). The court explained that "we can imagine instances where immigration status may be important even if the threat of removal is negligible." *Id.*

child currently have lawful immigration status that is not presently affecting the child's ability to adjust to his environment, his stability in that environment, and there is no evidence that he is inhibited from receiving any government benefits."); *Gwiazdowski*, 2015 WL 1514436, at *5 (finding respondent's and children's legal status a "positive factor in the 'settled' analysis" despite uncertainty over "whether [respondent] will be able to obtain legal residence in the United States when her student visa ends," [and] respondent "present[ing] no evidence of how she intends to pursue legal status upon completion of her studies").

However, if a child's and respondent's immigration status is uncertain, the child may not be well-settled where, on balance, the remaining *Lozano* factors reflect substantial instability in other areas of the child's life.  In *In re R.V.B.*, the Court noted that the respondent and child did not have legal immigration status, though residency applications were pending, and that "[w]hile there is no evidence that deportation is imminent, and indeed, may never occur, it is a threat that clouds the Child's daily living."  29 F. Supp. 3d at 257 (citing *In re Koc*, 181 F. Supp. 2d 136, 154 (E.D.N.Y. 2001)).  The court in *In re R.V.B.* concluded that "[c]onsidering all the various factors, and based on the facts that the Child has already lived in various places, has attended three different schools since coming to New York, that the Mother's employment and financial situation are unstable, and the immigration status, the Court finds that Respondent has not proven that the Child is settled in her new environment."  *Id.* (citations omitted).

Here, Respondent and K.K. currently have legal immigration status and work authorization, but it is unclear whether that will change when Respondent's work authorization expires in June 2021.  (R117.) ███████████████████████████████
██████████████████████████ (Resp't Tr. 396:2–14; 423:2–9.)  On or about December 23, 2019, Respondent filed a VAWA Application ████████████████████████████.

(Joint Stip., Dkt. 92, ¶ 32; Resp't Tr. 310:18–22, 314:3–7.) ████████████

████████████████████████████████████ ██████████

████████████████████████████████████████

████████████████████████████████ (Resp't Tr. 355:4–23, 356:3–

8.) ████████████████████████████████

████████ (Resp't Tr. 315:14–22.)

In sum, there is uncertainty surrounding Respondent and K.K.'s immigration status in the United States.  The Court finds, however, that this uncertainty has not interfered thus far with Respondent and K.K.'s stability, nor does it present an urgent or imminent threat to that stability.

██████████████████████████████████ Respondent currently has authorization to work legally in the United States.  Respondent and K.K.'s current immigration status has not prevented them from moving into their own apartment or prevented K.K. from attending school, an aftercare program, summer camp, or, importantly, obtaining health insurance or healthcare.  *See generally Matute-Castro*, 2016 WL 8711076; *cf. Broca*, 2013 WL 867276, at *8.  Moreover, K.K. is only 10 years old—many years from seeking government benefits that may be difficult to obtain or unavailable to an individual without legal immigration status.  *Cf. In re D.T.J.*, 956 F. Supp. 2d at 539. ████████████████████

████████████████████████████████████

████████████████ While the uncertainty of Respondent and K.K.'s future immigration status may not support a finding the K.K. is well-settled, it does not foreclose or undermine such a finding under these facts.  *See Matute-Castro*, 2016 WL 8711076, at *11; *Gwiazdowski*, 2015 WL 1514436, at *5.

C.      Balancing the *Lozano* Factors

Balancing the *Lozano* factors, the Court is persuaded that Respondent has demonstrated by a preponderance of the evidence that K.K. is "well-settled" in her new environment.  In contrast to *In re R.V.B.*, where the court found that nearly all of the factors, including immigration status, weighed against a finding that the child was settled, for the reasons explained above, the Court has concluded that K.K.'s age, the stability of her residence in Flatbush, Brooklyn, her consistent attendance, improvements, and happiness at P.S. ▆ (the only school she has attended), her participation in ▆▆▆▆▆ Church services and other extracurricular activities, and her relationships with friends and caring adults in New York, all support a finding that K.K. is well-settled in her new environment.

The Court further finds that this defense, standing alone, is sufficient to defeat the Verified Petitioner and prevent K.K.'s return to Trinidad under the Hague Convention.  *See, e.g.*, *Taveras ex rel. L.A.H.*, 604 F. App'x at 57 (affirming district court's decision to deny the petition based solely on the well-settled defense and to permit the child to remain in New York); *Lozano II*, 697 F.3d at 58 (same); *Matute-Castro*, 2016 WL 8711076, at *7–13 (denying the petition and permitting the child to remain in New York based solely on the well-settled defense).

III.   The "Grave Risk" Defense

Another defense to the Convention's presumption of repatriation exists where "repatriation would create a grave risk of physical or psychological harm to the child."  *Blondin IV*, 238 F.3d at 157 (citing, *inter alia*, Hague Convention art. 13(b)); *accord Souratgar*, 720 F.3d at 102.  This grave risk of physical or psychological harm to the child must be established by "clear and

convincing evidence."[79]  *Souratgar*, 720 F.3d at 103.  "Subsidiary facts [however] may be proven by a preponderance of the evidence."  *Id.*  That is, "there may be twenty facts, each proved by a preponderance of the evidence, that in the aggregate create clear and convincing evidence."  *Valles Rubio*, 2019 WL 5189011, at *21 (internal quotation marks and citation omitted).

In addressing the nature of risk that qualifies under this defense, the Second Circuit has explained,

> at one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation.  The former do not constitute a grave risk of harm under Article 13(b); the latter do.

*Blondin*, 238 F.3d at 162.  The Circuit expounded that "a grave risk of harm from repatriation arises . . . in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection."  *Souratgar*, 720 F.3d at 103 (emphasis in original) (internal quotations and citation omitted).  Further, the "potential harm to the child must be severe, and the level of risk and danger required to trigger this exception has consistently been held to be very high.  The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize."  *Id.* at 103 (internal quotations, alterations, and citations omitted).  Finally, this "exception is to be interpreted narrowly, lest it swallow the rule."  *Id.* (internal quotation marks and citation omitted).

---

[79] "To meet the clear and convincing evidence standard, the evidence presented must 'place in the ultimate factfinder an abiding conviction that the truth of the factual contentions is highly probable.'"  *Valles Rubio*, 2019 WL 5189011, at *16 n.16 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 314 (1984)).

## A.      Petitioner's Use and Threats of Physical Harm Against K.K. and J.M.

A "grave risk" of harm from abuse may be established where the "petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question," although the Circuit has been "careful to note that '[s]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk.'" *Ermini*, 758 F.3d at 164–65 (quoting *Souratgar*, 720 F.3d at 104–05); *see also Grano v. Martin*, 821 F. App'x 26, 28 (2d Cir. 2020) (summary order).

### 1.      Petitioner's Use and Threatened Use of Corporal Punishment

The Court has already found by a preponderance that Petitioner regularly, and as recently as April 2019, used or threatened to use corporal punishment against K.K., including with a belt. This conduct amounted to more than "sporadic" incidents of physical discipline against K.K.  *See Ermini*, 758 F.3d at 165.[80]  In addition to the physical pain K.K. experienced, she also experienced the fear of her father's threats to get a belt, both because of the punishment she received and because of punishment she saw Petitioner inflict on J.M., using a belt and an open hand.

---

[80] The Court has considered Respondent's use of corporal punishment on K.K. and J.M. as well, which included hitting them with a belt, leaving marks that lasted a few hours, and in J.M.'s case, leaving "a little blood on his skin."  (Resp't Tr. 147:9–23, 163:24–164:6, 668:3–19.) However, the Court credits Respondent's testimony that she stopped using the belt a few years ago, choosing instead to discipline the children by taking away their possessions for a time— testimony corroborated by J.M.  (Resp't Tr. 147:14–23; ██████████████████████  Given that Respondent stopped hitting K.K. and J.M. at least three years ago and given the close relationship she and the children currently share, the Court does not find that the fears K.K. expressed about physical harm or threats of harm stem from Respondent's use of corporal punishment against K.K. or J.M. in the past.  Moreover, the Court notes that Ms. Krasner testified that, during their sessions, K.K. never mentioned that Respondent hit her with a belt, prompting Ms. Krasner to wonder if K.K. even remembered that this happened.  (Krasner Tr. 1108:14–1109:7 (noting that Respondent herself reported to Ms. Krasner that she used corporal punishment early in the children's lives).)

Respondent saw K.K. look "frightened" and "set up to cry" when this happened.  (Resp't Tr. 145:23–24, 146:13–19.)  The apparent intensity with which Petitioner hit J.M. is evidenced by ███████ testimony that ██████ Petitioner ████████████████████████████████████ ████████████ left marks ████████████████. (J.M. Tr. 980:12–19, 981:14–18, 1038:14–20; Resp't Tr. 143:17–23, 145:2–5.)

Based on this evidence, the Court concludes that Petitioner's use of corporal punishment on both K.K. and J.M. (in K.K.'s presence) undoubtedly "inspired fear" in K.K.[81]  *Ermini*, 758 F.3d 164.

### 2.   Petitioner's Dangerous Driving

The Court has also found by a preponderance that on a number of occasions Petitioner drove recklessly while Respondent, J.M., and K.K. were in the car, placing them all at risk of physical harm, inspiring fear, and, on two occasions, resulting in physical harm.  The most serious of these incidents include the following[82]: (1) in 2008, Petitioner got into an accident during which Respondent hit her head, J.M. hit is foot and hand, and they sought medical treatment at Port of Spain General Hospital (Resp't Tr. 101:22–104:8); (2) around Christmas 2013, Petitioner got into an accident while arguing with Respondent on the phone and driving angrily; as a result of the

---

[81] The Court also notes evidence that K.K. was upset by Petitioner's disparate treatment of J.M., which included depriving him of affection, food, and attention.  (Resp't Tr. 97:13–98:5███ ████████████████.)  While certainly troubling, the Court does not find this fact relevant to the grave risk analysis, which is focused on a very high level of risk and danger.  Likewise, Petitioner's repeated failures to pick K.K. and J.M. up from daycare on time, leaving them hungry and in dirty school clothes (Resp't Tr. 155:22–158:10██████████████████████), while disconcerting, are not sufficiently serious to support application of the grave risk defense.

[82] The Court also notes that Petitioner admitted that from the time he started his relationship with Respondent in 2007 to April 2019, he was in five car accidents, three or four of which involved Respondent, J.M., or K.K. in the car with him.  (Pet'r Tr. 2111:23–2112:7.)  However, the Court cannot conclude whether any of these other accidents were caused by Petitioner's angry, dangerous driving.

accident, K.K. hit her head on the back of the seat, and J.M. flew through the middle seats, hitting

his foot and head, and requiring an x-ray; neither child was wearing a seatbelt (Pet'r Tr. 1698:1–

1699:9, 2028:16–20, 2029:11–15; ███████████████████ Resp't Tr. 104:9–105:4); and (3)

on several occasions, Petitioner became so enraged at Respondent or J.M. that he pulled over to

the side of the road, and in K.K.'s presence, kicked Respondent or J.M. out of the car  (Pet'r Tr.

2036:8–2037:3, 2037:21–2038:3, 2061:10–13, 1707:9–1709:4, 1710:10–16; Resp't Tr. 109:15–

111:24, 114:16–115:4 (describing how K.K. "had on her face like she wanted to cry"), 117:2–25;

███████████████████████████).  The evidence also established that Petitioner and

Respondent argued multiple times a week, including in the car, and often in front of K.K. and J.M.

(Resp't  Tr.  99:20–101:25; ██████████████████████████████████

██████████████████████████ Krasner Tr. 1240:1–11; 1243:2–7 ████████████

████████████████████.)[83]

## B.    Petitioner's Sexual and Physical Abuse of Respondent in K.K.'s Presence

Further, though not dispositive in these fact-intensive cases, "[e]vidence of prior spousal

abuse, though not directed at the child, can support the grave risk of harm defense, . . . as could a

showing of the child's exposure to such abuse."  *Souratgar*, 720 F.3d 96, 104 (internal quotations,

citations, and alterations omitted); *Mohácsi*, 346 F. Supp. 3d at 322 ("Although the grave risk of

psychological harm to [the child] from witnessing the abuse of his mother is enough to establish

the applicability of the defense, [expert] testimony regarding the potential for physical abuse of

---

[83] To the extent Petitioner tries to minimize the potential harm to K.K. from observing her parents arguing (Pet'r's Br., Dkt. 122, at 73–74), the Court notes Dr. Tronick's testimony that the literature suggests that "witnessing abuse of someone else and something like emotional abuse can be more problematic for a child than the child actually being physically abused" (Tronick Tr. 915:16–24).  And while Dr. Tronick explained that he is "sort of neutral" on that conclusion, what is clear is that "these kinds of adverse events are really having similar impact on the child's physiology and brain development."  (Tronick Tr. 915:24–916:5.)

[the child] further supports this conclusion."). Further, "courts have recognized [that] exposing children to inappropriate sexual concepts at a young age can constitute psychological abuse." *Id.* at 320 (finding evidence that "Petitioner has threatened to show [the child] sexually explicit images of Respondent" supported finding of grave risk of harm).

The parties agree that they had sex in their bedroom while K.K. was there, that they would attempt to use pillows to block K.K.'s view, but that K.K. would sometimes wake up, and that Petitioner would try to get K.K. to go back to sleep. (Pet'r Tr. 1684:12–17, 1686:8–14, 2044:6–12, 2044:22–2045:22; Resp't Tr. 84:13–24, 85:5–86:13.) As discussed above, the Court has further found, by a preponderance, that, contrary to Petitioner's testimony, those sexual encounters were frequently not consensual. While Petitioner forced Respondent to have sex several times between 2010, when Respondent became pregnant with K.K., and 2016, the frequency of forced sex and attempted forced sex increased in 2016, when Petitioner began staying out late and coming home drunk approximately three times a week. (Resp't Tr. 78:17–85:13 (describing, *inter alia*, Petitioner forcing Respondent to perform oral sex on him and have sexual intercourse), 665:10–667:12, 736:20–737:21; Pet'r Tr. 2095:20–2096:23 (admitting that in the later years of the parties' relationship, he went to the casino and drank every weekend, typically from 9:00 or 10:00 p.m. to as late as 3:00 a.m.).) As a corollary to its finding that Petitioner forced Respondent to have sex on numerous occasions with K.K. in the room, the Court finds, by a preponderance, that Petitioner knowingly exposed K.K. to repeated instances of "inappropriate sexual concepts." *See Mohácsi*, 346 F. Supp. 3d at 320.

Finally, the Court credits Respondent's version of the physical altercation between the parties when Petitioner was texting another woman at 2:00 a.m., and believes Respondent's testimony that when she tried to grab Petitioner's phone he pushed her into the wall, then the

parties hit a glass table causing it to break, and K.K. and J.M. got out of bed and witnessed the fight.  (Resp't Tr. 89:1–90:19.)  The Court found Petitioner's version of events—that he traveled from the living room, to the dining room, to the kitchen with Respondent on his back, never yelling or raising his voice, and that the children never woke up—to be highly improbable.  (Pet'r Tr. 1633:9–1635:6, 2098:22–2099:20.)   The Court also notes J.M.'s testimony about ██████████ ████████████████████████████████████████████████.  (J.M. Tr. 972:20–975:21.)  Though it is not clear from J.M.'s testimony whether K.K. was present during all of these incidents, the Court infers that, given K.K.'s young age, if Petitioner, Respondent, and J.M. were together, K.K. was with them.

In sum, the Court concludes that on the record presented, Petitioner's repeated instances of forced and attempted forced, and to a lesser extent, physical abuse of Respondent, in K.K.'s presence support a grave risk of harm defense.[84]

### C.    Future Abuse and Psychological Trauma as to K.K. are Highly Probable

Courts have also found a "grave risk" sufficient to overcome the presumption of repatriation where returning the child to their country of habitual residence will "severely damage [the child's] psychological and emotional state," including triggering the child's post-traumatic stress disorder.   *See Porretti*, 2019 WL 5587151, at *10 (relying on expert testimony that "returning the children to Mexico would be a 'catastrophic adjustment' and would subject them to a grave risk of psychological harm"); *Valles Rubio*, 2019 WL 5189011, at *22 (explaining that

---

[84] In reaching this conclusion, the Court has considered the fact that if K.K. is returned to Trinidad to live with Petitioner, she will have her own bedroom, thus potentially lessening the risk that she will be subjected to the same type of "inappropriate sexual concepts," *Mohácsi*, 346 F. Supp. 3d at 320, as before.  However, this change certainly does not foreclose the possibility that Petitioner will again engage in other inappropriate sexual conduct in front of K.K.—given his history of doing so repeatedly in the past.  Nor does it lessen the trauma that will be triggered simply by K.K. being returned to Trinidad and in her father's custody, as discussed below.

"repatriation would not be appropriate if it would unavoidably trigger recurrence of a child's traumatic stress disorder"); *In re D.T.J.*, 956 F. Supp. 2d 523, 547 (S.D.N.Y. 2013) (finding that repatriation would be deeply traumatic for the child where expert "credibly opined" that returning the child to "proximity of [her] relationship [with her father] . . . would lead to a . . . severe downturn in her psychological functioning" and would be "emotionally severely harmful to her"); *Blondin III*, 78 F. Supp. 2d at 295 (concluding based upon the evidence and uncontested expert testimony that "*[a]ny* return of [the children] to France, the site of their father's sustained, violent abuse, including even a temporary one-to-three month return in the custody of their mother, would trigger this post-traumatic stress disorder"), *aff'd Blondin IV*, 238 F.3d at 163 ("A 'grave risk of psychological harm,' even construed narrowly, undoubtedly encompasses an 'almost certain[ ]' recurrence of traumatic stress disorder."). Credible expert testimony is an important factor in such a finding. *See, e.g.*, *In re D.T.J.*, 956 F. Supp. 2d at 547–48; *Blondin III*, 78 F. Supp. 2d at 290–92, 295.

### 1.    Strong Possibility of Physical Harm if K.K. is Returned to Trinidad

As an initial matter, based on the evidence presented, the Court believes that if K.K. repatriates to Trinidad there is a strong possibility she will face further physical harm by Petitioner. During the evidentiary hearing, Petitioner either denied (falsely, the Court finds) engaging in the more egregious bad acts, *e.g.*, the forced sex, or showed no contrition, even for his *admitted* bad acts—*e.g.*, he blamed Respondent for making for him hit K.K with a belt and expressed no remorse; he expressed no regret for beating J.M. with a belt many times or for being too stern with him; he minimized the harm of angrily kicking Respondent out of the car and making her walk to work (claiming that it was sunny out and not too far a distance); he qualified his demonstrably fast and reckless driving by referring to the speed limit and blaming the other drivers; and he deflected

regarding the his overall failure to assist Respondent in obtaining immigration status in Trinidad, including the impact that his lateness to appointments had on her application.  Further, there is no evidence that Respondent has acknowledged or addressed his anger or volatile temper, which seems to be at the heart of many of the abusive and dangerous behaviors that present a grave risk to K.K.  The Court's assessment that K.K. will face further harm by Petitioner is also supported by Dr. Tronick's opinion, based on epidemiologic literature, of the likelihood that perpetrators of abuse toward women and children will re-engage in the same or similar behaviors.[85]  (Tronick Tr. 928:1–23, 937:20–938:20.)

Any further physical harm to K.K. would also negatively impact her development.  As Dr. Tronick explained, maltreatment, adverse parenting experiences, and traumatic events affect a child's behavior, social-emotional development, cognitive development, and the physiological processes that allow the child to cope with stress.  (Tronick. Tr. 897:21–898:2).  Moreover, adverse parenting events are *synergistic*, meaning that when two adverse events come together, such as witnessing the abuse of a sibling and being physically hit or shamed, the effect is greater than simply the effect of one plus the effect of the other, and *cumulative*, meaning that the more adverse events a child experiences, the more the child's development is compromised.  (Tronick Tr. 899:6–901:1, 926:14–24.)[86]

---

[85] Dr. Tronick also noted that his report explained that adolescents are eight or nine times more likely to be revictimized when they are brought back into the environment in which they were victimized in the first place, and that a child who has experienced one particular form of maltreatment is "very highly likely" to experience other kinds of abuse.  (Tronick Tr. 937:20–938:2.)

[86] Of note is the statistic that four or more adverse events before age eighteen, which may range from experiencing physical abuse to witnessing violence to being shamed by a parent, predicts problematic outcomes for a child including physical disease, mental health disorders, and mortality.  (Tronick Tr. 926:25–927:25.)

2.      Triggering of Psychological and Emotional Trauma for K.K.

At the evidentiary hearing, Dr. Tronick opined that returning a child to an environment in which the child has experienced traumatic events "would not only trigger the effects [] of whatever had happened prior to the child, but very likely those effects would be . . . perhaps even more severe because the child would come into the situation already being vulnerable to the effects that they had experienced before and the effects that would likely continue." (Tronick Tr. 898:6–13.) In other words, "for a child coming back into a situation with the person who's a perpetrator but also the house, the things that are around that bring back the memories of prior events, are likely to trigger . . . the kinds of compromises, disruptions, behavioral and psychological effects that were engendered" by the maltreatment in the first place. (Tronick Tr. 941:1–6.) The Court finds Dr. Tronick's opinion, which was materially undisputed,[87] about the harms that result from a child's exposure to adverse events,[88] and the risks associated with returning a child to the environment in which those adverse events occurred, to be relevant, well-founded, and convincing. *Nimely*, 414 F.3d at 396 ("[A]s *Daubert* explained, Rule 702 governs the district court's responsibility to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable'" (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993))).

---

[87] Petitioner did not present any expert testimony or evidence at the hearing to challenge the science or the literature upon which Dr. Tronick's opinions were based.  Rather, Petitioner merely highlights in his post-hearing brief the fact that Dr. Tronick did not form any opinions about what actually took place in this case—which Dr. Tronick readily acknowledged during his testimony—and that it is up to the Court to determine whether the allegations against Petitioner are real or accurate.  (Pet'r's Reply, Dkt. 127 at 57–60; Tronick Tr. 896:17–25, 950:20–951:11.)

[88] Dr. Tronick described the kind of maltreatment, adverse experiences, or trauma covered by his opinion as including a child witnessing the abuse of a parent, witnessing forceful or even unforceful sexual activity, witnessing the physical abuse of a sibling, emotional or verbal abuse of a child, and practices such as shaming a child.  (*See* Tronick Tr. 894:17–25.)

113

Indeed, Dr. Tronick's assessment in the abstract has been borne out in K.K.'s own experience and current psychological status, as determined by Ms. Krasner, who opined that K.K. "was exposed to multiple traumas during her time living in Trinidad, which resulted in symptomology that she is still experiencing and a diagnosis of post-traumatic stress disorder." (Krasner Tr. 1085:4–11.)   Ms. Krasner testified that K.K. "is demonstrating high levels of posttraumatic stress disorder even now," many months after having left Trinidad.  (Krasner Tr. 1125:2–4.)  Ms. Krasner opined that K.K. would be at great risk of further symptomatology if she was returned to Trinidad because all of the traumas she experienced occurred there, many in connection with Petitioner and some at school, so there is the possibility of re-traumatization just by being back in the place where these traumas occurred, in addition to the possibility that these traumas could occur again.  (Krasner Tr. 1124:19–1125:10.)  Ms. Krasner also opined that based on K.K.'s score of 6 out of 10 on the PEARLS ACEs, which measures adverse childhood experiences, K.K. is already at a pretty high risk of developing health related issues later in life. (Krasner Tr. 1091:8–1092:22.)  The Court finds Ms. Krasner's opinions, which were based on her evaluation of K.K., conversations with collateral witnesses, and administering of multiple objective tests that assess trauma and symptomatology, are relevant, reliable, and well-supported. *See Daubert,* 509 U.S. at 589; *Nimely*, 414 F.3d at 396.

Petitioner's attempts to chip away at the credibility of Ms. Krasner's findings by arguing that she is an inexperienced forensic evaluator[89] and a biased advocate who failed to accurately represent K.K.'s reports from their sessions, and that she failed to determine whether there were

---

[89] As the Court previously explained, this argument is a distraction, since Ms. Krasner did not purport to conduct a forensic evaluation, nor has Petitioner demonstrated that one is required to be reliable or credible.

other causes for K.K.'s PTSD symptomatology.  (Pet'r's Reply, Dkt. 127 at 42–57.)  The Court rejects these arguments.

First, Petitioner misconstrues Ms. Krasner's testimony in portraying her as biased.  Ms. Krasner testified that she considers all of her work advocacy in that she's "advocating for the rights and well-being of children and families, period."  (Krasner Tr. 1076:17–18, 1139:21–1140:11.)  However, the Court does not find that this statement amounts to, or reflects, Ms. Krasner prejudging or reaching a conclusion before evaluating all of the evidence.  Indeed, the Court assumes that the duty of every health care professional is to advocate for their patients or clients, but that advocacy does not mean manipulating the clinical data or opinions to justify a pre-ordained outcome.  Moreover, Ms. Krasner was forthcoming about the limitations of her conclusions, noting, for example, that she could not be sure of the extent of the impact on K.K. of witnessing "parents stuff" and of being bathed by Petitioner behind closed doors because, although K.K. reported feeling uncomfortable, she was not able to give much detail.[90]  (Krasner Tr. 1098:15–1099:18.)  Based on Ms. Krasner's work and testimony in this matter, the Court does not find her to be biased, overreaching, nor fixed on a particular outcome with respect to her evaluation of K.K.[91]

---

[90] The Court notes that Ms. Krasner testified, "it was clear that [these events] really impacted [K.K.], but I wasn't able to get further detail because those would be very hard for a child to talk about, especially with someone they just met. So those are possible additional traumas that we just don't have further information [about] at this time." (Krasner Tr. 1099:10–18.)

[91] The Court rejects Petitioner's argument that ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████ (Pet'r's Reply, Dkt. 127 at 50.)  Ms. Krasner did not dispute this report by K.K., but testified that K.K.'s statements that her father drove fast when he was angry and that it scared her were more important to her evaluation of K.K. than the circumstances of a particular accident.  (Krasner Tr. 1264:24–1265:24.)  The Court finds Ms. Krasner's explanation and focus on K.K.'s reaction, as opposed to the particular circumstances of this accident, to be reasonable and not indicative of bias or over-reaching.  Similarly, the Court rejects

Second, the Court rejects Petitioner's argument that Ms. Krasner's opinion as to the cause of K.K.'s trauma is unreliable because she failed to perform a "differential diagnosis" to rule out obvious alternative causes and to confirm the actual cause of K.K.'s PTSD.  (Pet'r's Reply, Dkt. 127, at 43.).   While Ms. Krasner may not have offered a "differential diagnosis" per se, *i.e.,* "a patient-specific process of elimination that medical practitioners use to identify the 'most likely' cause of a set of signs and symptoms from a list of possible causes," *Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 254 (2d Cir. 2005), she did "address obvious alternative causes and provide[d] a reasonable explanation for dismissing" them, making her opinion sufficiently reliable to the Court, *Tardif v. City of New York*, 344 F. Supp. 3d 579, 601–02 (S.D.N.Y. 2018) (noting that "the absence of a differential diagnosis is not always fatal to an expert's causation opinion," where there are, *inter alia*, "other sufficient indicia of reliability" (internal citation omitted)).[92]  Here, Ms.

_____

Petitioner's argument that Ms. Krasner's assessment of K.K.'s school performance was biased because she did not review all of K.K.'s school records.  (Pet'r's Reply, Dkt. 127, at 53–54.)  When the Court pressed Ms. Krasner on her assessment of K.K.'s school records, Ms. Krasner explained that her evaluation was focused on K.K.'s report that she was having difficulty with concentration and homework, not on her academic performance, so while records showing that K.K. performed below standard were consistent with K.K.'s reports about her current functioning, they were not determinative to her evaluation.  (Krasner Tr. 1261:14–1264:1.)   The Court likewise finds Ms. Krasner's explanation and focus on K.K.'s functioning, rather than her report cards, to be reasonable and not indicative of bias or over-reaching.

[92]  The cases cited by Petitioner—none of which arise under the Hague Convention or involve children diagnosed with PTSD—are inapposite because, unlike Ms. Krasner, none of the experts in these cases addressed obvious alternative causes for those plaintiffs' conditions.  *See*, *e.g.*, *El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714, at *6–7 (S.D.N.Y. Aug. 2, 2019) (holding that expert's "conclusion that Defendants caused Plaintiff's depression and anxiety is [] unreliable because, among other reasons, *he failed to address obvious alternative causes*" and "testified that [postpartum depression] likely could have contributed to [plaintiff's] depression; [but] provided no explanation why he then concluded that Defendants' treatment of Plaintiff, rather than postpartum depression, was the cause of her developing depression in the first instance") (emphasis added)); *Tardif*, 344 F. Supp. 3d at 601 (precluding expert from testifying as to the cause for plaintiff's PTSD where expert *failed to offer any basis* for his conclusion that defendant's conduct, not the many other traumatic experiences in plaintiff's life, were the source of her injuries) (emphasis added)); *Munafo v. Metro. Transp. Auth.*, No. 00-CV-0134 (ERK), 2003 WL 21799913, at *19 (E.D.N.Y. Jan. 22, 2003) (precluding expert from offering causation opinion

Krasner testified that she considered and eliminated other possible causes for K.K.'s symptomatology, including K.K.'s travel to the United States, her separation from Petitioner and his family in Trinidad, her multiple moves since arriving in the United States, and Respondent's experience of domestic violence by Blocker (to which K.K. was not exposed).  (Krasner Tr. 1152:22–1153:10, 1252:5–1253:19.)  Ms. Krasner explained that her observations and evaluations of K.K. revealed "no information" indicating that these other events negatively affected K.K., in fact K.K. did not mention any of her extended family members in Trinidad and spoke very positively about her experiences in New York, including her school, teachers, and new friends. (Krasner Tr. 1125:16–22, 1131:19–24, 1132:5–21, 1152:22–1153:10, 1252:5–1253:19.)   The Court finds that the reliability of Ms. Krasner's opinion is bolstered by the numerous collateral interviews she conducted with individuals in Trinidad and New York, the multiple standardized tests she administered to assess K.K.'s symptomatology (which yielded consistent results), and by the report that on multiple occasions during all three sessions K.K. became visibly upset when Ms. Krasner brought up the idea of her returning to Trinidad.  (Krasner Tr. 1081:3–1082:5, 1086:4–1092:8, 1125:11–15.)  In sum, the Court credits Ms. Krasner's opinion, reached with a "reasonable degree of certainty," that K.K.'s symptomatology and PTSD diagnosis are the result of traumatic events she experienced in Trinidad, including the parties arguing, Petitioner yelling at Respondent and driving fast, Petitioner hitting K.K. with a belt, Petitioner hitting J.M. with a belt in K.K.'s presence, and Petitioner failing to pick K.K. and J.M. up at daycare until very late so that they were hungry and in dirty clothes, as well as bullying and corporal punishment in school, as opposed

---

where expert "candidly admitted that he *made no attempt to perform a differential diagnosis*" to determine the cause of depression and "*utterly failed to investigate or even inquire* as to how [other recent significant events and emotional traumas] may have contributed to [plaintiff's] depression").

to other potential causes suggested by Petitioner.  (Krasner Tr. 1085:4–11, 1085:20–22, 1097:6–1098:14.)  *Compare Lozano I*, 809 F. Supp. 2d at 224 (finding it impossible to determine that the child's trauma was caused by anything petitioner did to the child where expert  "testified that the child clearly showed signs of trauma when they first met, [but] was unable to pinpoint the source of that trauma"), *with Reyes Olguin*, 2005 WL 67094, at *7 (rejecting petitioner's argument that the child's PTSD may have been caused by his separation from petitioner or experiences escaping to the United States, where expert "ruled out any other source for the PTSD except for [petitioner's] violent behavior").

Third, the Court finds that Ms. Krasner was unquestionably qualified to testify as an expert to evaluate K.K.'s psychological state and the impact of trauma upon her.  Although Ms. Krasner testified to her very limited experience conducting forensic evaluations in the context of litigation (Krasner 1076:20–1077:9), a dominant theme of Petitioner's challenge to her expert testimony,[93] through her work, Ms. Krasner frequently assesses for PTSD, and has screened and diagnosed hundreds of children for trauma, (Krasner Tr. 1064:11–1065:12).  Moreover, for the last twelve or so years, Ms. Krasner has been using the standardized assessments she used to evaluate K.K.; she estimates that she has administered the UCLA Test approximately 100 times, the CPSS and THQ test more than 200 times, and PEARLS ACEs approximately 50 times.  (Krasner Tr. 1069:22–1070:25.)  Further, Defendant's own expert, Dr. Safran, admitted that Ms. Krasner has the necessary training and experience to diagnosis PTSD, and testified that Ms. Krasner "developed very good rapport with K.K." and "did a very good job" questioning K.K. about what had happened

---

[93] As before, the Court considers this issue to be a red herring since (1) Ms. Krasner was neither offered nor qualified to testify as a forensic evaluator; she was qualified as an expert in psychotherapy and the diagnosis of childhood trauma (Krasner Tr. 1079:16–24); and (2) the Court does not find that a "forensic" examination is the only reliable or acceptable form of expert evidence regarding the impact of trauma on K.K. and her psychological status.

in her parents' bedroom. (Safran Tr. 1883:4–1884:2, 1932:7–22.) The Court finds unconvincing, and frankly petty, Dr. Safran's criticisms of discrete aspects of Ms. Krasner's report using APA Guidelines that Dr. Safran admitted are neither mandatory nor enforceable, are non-exhaustive, may not apply to every professional situation, and are not intended to take precedence over the judgment of psychologists. (Safran Tr. 1909:21–1910:15.) Likewise, the Court finds unconvincing Dr. Safran's criticisms of Ms. Krasner's interview technique based on an interview protocol that Dr. Safran admitted is but one of a number of interview protocols, and that was published by a training organization, not a licensing body for psychologists and social workers. (Safran Tr. 1933:19–1934:25, 1935:8–1936:14.)

Thus, based on the opinions of Dr. Tronick and Ms. Krasner, the Court finds by a preponderance that returning K.K. to the same environment where she experienced so much trauma, *i.e.*, in Trinidad and living with Petitioner, in itself, places her at serious risk of re-traumatization, which could result in significant adverse consequences to her development.

### 3.   Harm Caused by Separating K.K. from Respondent

The Court is also acutely concerned about the prospect of further psychological and developmental harm that may result from K.K.'s separation from Respondent and J.M. Dr. Tronick explained that a "secure attachment" relationship is central to a child's development; this refers to a secure, safe relationship with one person who protects the child and helps the child deal with stressful events. (Tronic Tr. 902:3–18; 908:25–909:5.) Dr. Tronick opined that if a child is separated from the parent to whom they have that secure attachment, this separation alone can be traumatic to a child and can trigger other previous problems the child may have experienced. (Tronick Tr. 898:14–19.) Conversely, the maltreating parent, to whom the child has an insecure attachment, triggers fear and worry in the child that "something is going to happen," a response

that may be lessened, but not overcome by the presence of the secure attachment parent.  (Tronick Tr. 929:2–931:6.)  For example, where there is fighting or abuse between parents, the child is aware that the secure attachment parent "has been unable to fully buffer the child from the abuse or maltreatment."  (Tronick Tr. 929:2–931:6.)  Consistent with the foundation laid by Dr. Tronick's testimony, Ms. Krasner described K.K.'s relationships with her mother and brother as "protective factors," which can mitigate the effects of trauma and minimize the level of symptomatology, which for K.K. is still high, but would be much higher if Respondent and J.M. were not present.  (Krasner Tr. 1128:13–1129:1.)  In particular, Ms. Krasner noted that K.K. raised concerns about who her potential caretaker would be in Trinidad, asking several times, "If my Mommy's not with me, who's going to take care of me[?]"  (Krasner Tr. 1126:24–1127:2.)  Furthermore, K.K.'s separation from Respondent and J.M. seems inevitable given that Petitioner has already obtained an interim order of sole custody from the Trinidad Family Court that he intends to enforce (P011, Pet'r Tr. 1994:9–11), and that neither Respondent nor J.M. have, or can likely obtain, legal immigration status in Trinidad; indeed, it is unclear if either would be permitted to enter or remain there for any length of time.  (Resp't Tr. 236:6–10, 585:5–7.)

Thus, based on Dr. Tronick's and Ms. Krasner's testimony, the Court finds by a preponderance that potentially devastating psychological harm would result to K.K. were she to be separated from Respondent and J.M. pending a custody determination.

*     *     *

In sum, based on the expert testimony of both Dr. Tronick and Ms. Krasner, as well as the Court's own assessment of Petitioner's likelihood to continue engaging in abusive, threatening, and fear inspiring conduct toward K.K.—the very traumas that Ms. Krasner opined resulted in K.K.'s current symptomatology and PTSD diagnosis—the Court concludes that returning K.K. to

Trinidad would be severely psychologically damaging and triggering to her current symptomatology and PTSD diagnosis. *See Porretti*, 2019 WL 5587151, at *10; *In re D.T.J.*, 956 F. Supp. 2d at 547; *Blondin III*, 78 F. Supp. 2d at 290–92. This conclusion is underscored by the reality that K.K.'s return to Trinidad will result in the trauma of K.K. being separated from Respondent and J.M.—the two people whose stable and protective relationships foster K.K.'s development and mitigate the effects of her trauma. *See Ermini*, 758 F.3d at 167 (affirming district court's determination of grave risk, including its consideration of the impact of separating siblings, noting "[c]ourts in this Circuit have frequently declined to separate siblings, finding that the sibling relationship should be protected even if only one of the children can properly raise an affirmative defense under the Hague Convention"); *Elyashiv*, 353 F. Supp. 2d at 409–10 (finding grave risk based on psychological harm where expert testified about the child's great fear "of being separated from her siblings and mother"). The Court also finds that there is a risk, though difficult to quantify, that if K.K. were returned to Trinidad to live with Petitioner, she would suffer physical harm from him, such as the use of corporal punishment. Considering this evidence together, and mindful that the grave risk defense demands severe harm, the Court finds, by clear and convincing evidence, that the repatriation of K.K. to Trinidad to live with her father will create a grave risk of physical and/or psychological harm to her. As with the well-settled defense, the grave-risk defense provides a separate and sufficient ground upon which to prevent K.K.'s return to Trinidad.

### D.    Ameliorative Measures

The Court's analysis does not end upon a finding of grave risk of harm. District courts, in exercising their "considerable discretion under the [Hague] Convention," must "take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a

child's repatriation."[94] *Sadda II*, 930 F.3d at 539 (internal quotation and citations omitted); *accord Blondin II*, 189 F.3d at 248; *Davies v. Davies*, No. 16-CV-6542 (VB), 2017 WL 361556, at *20 (S.D.N.Y. Jan. 25, 2017) ("The Court must examine 'the range of remedies that might allow both the return of the child[ ] to [his] home country and [his] protection from harm, pending a custody award in due course by a [court in the country of the child's habitual residence] with proper jurisdiction.'" (citation omitted)), *aff'd*, 717 F. App'x 43 (2d Cir. 2017) (summary order). Such measures are "generally disfavored" if they are unenforceable, "particularly where there is reason to question whether the petitioning parent will comply . . . and there are no other 'sufficient guarantees of performance.'" *Saada II*, 930 F.3d at 540. Further, "[a] court may decline to repatriate a child . . . where it finds that there are *no* ameliorative measures that could be put in place that would significantly mitigate the grave risk to the child." *Mohácsi*, 346 F. Supp. 3d at 322 (emphasis added).

Applying these standards, the Court finds that there are no measures that will ameliorate the grave risk of psychological and/or physical harm to K.K. if she is repatriated to Trinidad to live with her father. First, the Court is not convinced that Petitioner's preparations for K.K.'s

---

[94] While the Second Circuit requires an assessment of ameliorative measures upon a finding of grave risk, not all Circuits agree about the importance or necessity of such an assessment. *Compare Saada v. Golan* (*Sadda II*), 930 F.3d 533, 539 (2d Cir. 2019) (requiring consideration of ameliorative measures and citing *Blondin II*, 189 F.3d at 248), *and In re Application of Adan*, 437 F.3d 381, 395 (3d Cir. 2006) (same), *with Baran v. Beaty*, 526 F.3d 1340, 1349–52 (11th Cir. 2008) (affirming district court's denial of petition without considering evidence on possible ameliorative measures), *Van de Sande v. Van de Sande*, 431 F.3d 567, 571–72 (7th Cir. 2005) (explaining that ameliorative measures or "undertakings" need not be given extensive consideration upon a finding of grave risk and citing with approval State Department guidance that "if the requested . . . court is presented with unequivocal evidence that return would cause the child a 'grave risk' of physical or psychological harm, . . . then it would seem less appropriate for the court to enter extensive undertakings than to deny the return request. The development of extensive undertakings in such a context could embroil the court in the merits of the underlying custody issues and would tend to dilute the force of the Article 13(b) exception."), *Danaipour v. McLarey*, 286 F.3d 1, 25 (1st Cir. 2002) (same).

return to his sole custody will diminish this risk of harm.  For example, Petitioner has made no apparent plans or arrangements for K.K.'s education.  While he testified that he could choose to have K.K. attend her old school (where, the Court notes, K.K. had been bullied and subjected to corporal punishment), he also noted that children often go to the school near their homes. Petitioner's brother also suggested that if school is being conducted remotely at the time of K.K.'s return, she could attend school with his daughter from their home, which is in a different part of Trinidad, approximately 20 minutes away from Petitioner's current residence.  The upshot, however, is that despite seeking K.K.'s immediate return to Trinidad, Petitioner has made no arrangements, to date, for where K.K. will attend school.  Second, because Petitioner lives alone, works full-time, and sometimes travels overnight for work, he would have to arrange for K.K. to regularly stay with his family members, with whom K.K. has had almost no relationship.  While the Court does not doubt the good intentions of Petitioner's family members, Petitioner has failed to demonstrate that he is capable of providing K.K. a stable and protective environment that will ameliorate the inevitable traumatization (or re-traumatization) that K.K. will suffer upon being returned to Trinidad and her father, and separated from her mother and J.M.

Tellingly, Petitioner did not mention any arrangements to ensure that K.K. has access to therapeutic services upon her return to Trinidad, nor any steps he might take to assist Respondent and J.M.'s return to Trinidad, pending a custody determination.  *See Reyes Olguin*, 2005 WL 67094, at *12 (noting that petitioner "has made no representations regarding any actions that he could take to mitigate the risk to the children" and "has provided no evidence that he has taken steps to address his own abusive behavior"); *cf. Blondin III*, 78 F. Supp. 2d at 289 (noting petitioner's promise not to enforce a sole custody order, and offer to pay for airfare and a three-week hotel stay for Respondent and children, while Respondent applies for government housing,

financial support, and other social services).  The Court has no confidence in Petitioner's ability or willingness to make such arrangements for a number of reasons: Petitioner has made clear his intention to enforce the sole custody order; he never assisted Respondent or J.M. in obtaining immigration status in Trinidad, and even threatened to get Respondent and J.M. deported if Respondent moved out with the children; arranging for therapeutic services would require Petitioner to acknowledge how his own abusive behavior has traumatized his daughter; and Petitioner has failed to seek therapeutic services for himself and J.M. in the past, even though his sister, who is a social worker, recommended that he do so.

The Court is also not convinced, based on the evidence presented at the evidentiary hearing, that the Trinidadian Family Court can and will impose and enforce ameliorative measures to mitigate the risk of harm to K.K.  Petitioner argues that the Family Court's handling of the parties' divorce and Petitioner's interim custody petition demonstrate "the seriousness with which it will deal with all issues before it" and that he "has every incentive to adhere to any orders entered to protect K.K.'s safety."  (Pet'r's Br., Dkt. 122, at 79.)  However, the record contains nothing that demonstrates that Trinidadian courts in fact "have effective procedures and resources to meaningfully address allegations of child abuse."  *Valles Rubio*, 2019 WL 5189011, at *24; *cf. id.* (finding that "the record demonstrates that Ecuadorian courts appear to have effective procedures and resources to meaningfully address allegations of child abuse" based on evidence of prior family court proceedings between the parties that involved allegations of abuse, and noting that the Ecuadorian Family Court systems appears to have provided family therapy to the parties in the past).

The Family Court proceedings in Trinidad to date have not touched on issues of abuse. The current Family Court order grants sole interim custody to Petitioner, without apparent

consideration of the circumstances that may have led Respondent to remove K.K. from Trinidad. Nor does the Family Court order require any party, *e.g.*, Petitioner or K.K., to receive therapeutic services. (*See* P011.) Moreover, Petitioner has not proffered any expert testimony or other evidence to show that procedures and protections are available in the Trinidadian legal system to mitigate the risk of harm to K.K.[95] *See Davies*, 2017 WL 361556, at *18 (considering testimony from four expert witnesses on the legal system in French St. Martin and protections available to victims of domestic violence); *Saada v. Golan* (*Saada I*), No. 18-CV-5292 (AMD) (LB), 2019 WL 1317868, at *13 (E.D.N.Y. Mar. 22, 2019) (considering testimony of two experts on the Italian legal system's approach and capacity to handle cases of domestic violence, including the availability of orders for supervised visitation during the pendency of custody proceedings and appointments of psychologists to evaluate parent-child relationships and allegations of abuse), *aff'd in relevant part, vacated in part, remanded,* 930 F.3d 533 (2d Cir. 2019); *Blondin III*, 78 F. Supp. 2d 283, 288 (S.D.N.Y. 2000) (considering the testimony of an expert on French and international family law about French custody proceedings and the social and legal support services available to respondent and the children if returned to France). While Petitioner's expert, Dr. Moore, testified that the Family Court can order therapy for children and adolescents, and has done so in child abuse cases, Dr. Moore's testimony goes beyond the scope of the expertise for which she was qualified, *i.e.*, the availability of social and health care services for children in Trinidad who have experienced trauma. She was not qualified, and does not have the necessary background, to testify about the powers and authority of Trinidadian courts. But, even accepting

---

[95] Petitioner informed the Court that he did "not anticipate the need to retain an expert opinion on Trinidadian law." (Oct. 5, 2020 Letter, Dkt. 76.) Though the Court permitted Petitioner to present provisions of Trinidadian law in support of his arguments (10/8/2020 Minute Order), Petitioner did not present nor rely on any provision of Trinidadian law in making his arguments regarding ameliorative measures (nor any other arguments).

Dr. Moore's testimony as some evidence of legal protections for children at risk of abuse or trauma in Trinidad, it is still deficient, because it speaks only to the *possibility* of court-ordered therapy and does not establish what, if any, ameliorative measures can or will, in fact, be implemented to mitigate the risk of harm *to K.K. Compare Mohácsi*, 346 F. Supp. 3d at 322 (rejecting petitioner's generalized arguments that Hungary "provides ample protection for children and adults from domestic violence and other abuse" and "has a fully competent legal system that can and does litigate domestic disputes and offers protections for abused children" as sufficient evidence of ameliorative measures); *Reyes Olguin*, 2005 WL 67094, at *11 ("Even if there were some protective measures that in the abstract could mitigate the risk of harm to the children, no evidence has been presented that such measures would be available in this case."), *with Saada v. Golan* (*Saada IV*), No. 20-1544, 2020 WL 6303397, at *1–2 (2d Cir. Oct. 28, 2020) (affirming district court's determination that ameliorative measures were sufficient where an enforceable Italian court order required, among other things, supervised visits for petitioner and psychological counseling for the child). Significantly, Dr. Moore does not know the requirements or restrictions on receiving any of the services she identified in Trinidad. (Moore Tr. 1561:25–1562:6, 1578:2–14, 1586:14–1588:10.) Hence, there is no evidence that a Trinidadian court could or would order any of these or other services for K.K.

Furthermore, Dr. Moore provided no testimony about the quality or appropriateness of any of the services she identified to treating K.K. As Dr. Tronick explained, a child recovering from abuse or witnessing the abuse of a parent or sibling, will require, *inter alia*, professional treatment with "sophisticated and experienced" practitioners who have experience and knowledge of child development, a deep knowledge of child psychopathology, and a wide range of experience with a variety of therapeutic techniques. (Tronick Tr. 941:20–942:19.) There is no evidence that any of

126

the agencies or organizations identified by Dr. Moore can provide this level of services or meet

this standard. *See Reyes Olguin*, 2005 WL 67094, at *5, 11 (finding that nothing in a three-page

"social work report" suggests that an organization provides essential services for a child with

PTSD, and that there was no evidence that the private doctors contacted by petitioner had any

experience treating PTSD). Therefore, the Court has no basis to conclude that the Trinidadian

Family Court system has the capability to implement measures that will adequately or effectively

mitigate the risk of harm to K.K. The only thing that is certain is that, to date, no enforceable court

order implementing ameliorative measures for K.K. has been obtained. *Cf. Saada IV*, 2020 WL

6303397, at *2.[96]

Petitioner has failed to demonstrate that actual ameliorative measures exist or could be

enforced. Even if such measures were established, the Court notes that it would consider the

efficacy of those measures if, as appears likely, Respondent and J.M. cannot or do not return to

Trinidad[97] and Petitioner has sole custody of K.K., at least initially and potentially indefinitely.

---

[96] The Court recognizes that one could argue that no such court order can or should be obtained until K.K. returns to Trinidad and manifests the need for services. However, the Court, having determined that K.K. faces a grave risk of trauma and other harm if she is returned to Trinidad to live with her father, has an obligation, and the Petitioner a burden, to ensure that ameliorative measures are in place now. *See Saada v. Golan* (*Saada III*), No. 18-CV-5292 (AMD) (SMG), 2020 WL 2128867, at *2, 2 n.3 (E.D.N.Y. May 5, 2020) (noting that the Second Circuit has "impl[ied]" that the burden on ameliorative measures is part of respondent's grave risk claim, but has not clearly assigned the burden, and "[l]ogically . . . the burden would appear to fall on the petitioner" to rebut a finding of grave risk of harm (quoting *Valles Rubio*, 2019 WL 5189011, at *23)); *see also Simcox v. Simcox*, 511 F.3d 594, 606 (6th Cir. 2007) ("[T]he petitioner proffering the undertaking bears the burden of proof."); *Danaipour*, 286 F.3d at 15 ("[T]he proponent of the undertaking bore the burden of showing" its adequacy). For the reasons already stated, Petitioner has failed to demonstrate that there are any measures, much less adequate measures, in place to mitigate the risk of harm to K.K. Further, as will be explained, Respondent has demonstrated through the uncontroverted opinions of Dr. Tronick and Ms. Krasner that no ameliorative measures could mitigate the psychological harm to K.K. of repatriation to the place of her trauma.

[97] The Court's understanding is that ███████████████████████████████████ ███████████████████████████████████ which means that Respondent's ability to enter or remain in Trinidad is unclear. (Resp't Tr. 236:6–10, 391:5–18, 585:5–7.) What appears more certain,

*See Valles Rubio*, 813 F. App'x at 622 ("[W]here repatriation would return a child to the sole physical custody of their abuser, a district court does not properly weigh the safety of the child if it fails to examine the full range of ameliorative measures, including those that are enforceable when the respondent parent has chosen not to return."); *Blondin II*, 189 F.3d at 249 (finding "merit in the district court's reasons for avoiding a remedy that would effectively transfer the children directly into [their abuser]'s custody" and remanding with instructions to consider whether other custody arrangements would provide adequate protection).  Given K.K.'s PTSD diagnosis and high levels of symptomatology, the Court is skeptical of the efficacy of any ameliorative measure, so long as K.K. is separated from her "protective factors," Respondent and J.M., whose presence mitigates the effects of K.K.'s trauma and minimizes the level of her symptomatology.  (Krasner Tr. 1128:13–1129:1.)  Indeed, Dr. Tronick explained that the resources identified by Dr. Moore did not alter his opinion about the risks of returning a child to the place the child experienced trauma because repatriation would necessarily involve the duel triggering effects of separation from the secure attachment relationship, for some or all of the time, and return to the care of the maltreating parent, where there was a high likelihood of revictimization.  (Tronick Tr. 944:17–946:1.)  Moreover, Dr. Tronick explained that even under the Court's hypothetical (*i.e.*, K.K. returns to Trinidad with Respondent, but the parties are separated so as not to expose K.K. to forced sex or other abuse), Dr. Tronick would still find both supervised and unsupervised visits with Petitioner problematic because K.K. "[is] old enough to be aware of what the situation is and that the father is still present and that there's this contentious court battle going on, so she's afraid

---

however, is that Respondent cannot help J.M. get a student permit, which is required to attend school in Trinidad, because she is not a resident.  (Resp't Tr. 129:2–16, 131:16–132:19, 133:9–20.)

about possibly ending up with him and being separated from her mother." (Tronick Tr. 957:1–958:3.)

The Court's concerns about the psychological harms of K.K.'s separation from Respondent and J.M., and return to the sole custody of Petitioner, are not alleviated by possible arrangements to place K.K. in the temporary custody of other family members in Trinidad.  Petitioner testified that he has gathered the support of family members to assist upon K.K.'s return.  However, neither Christian Francis nor Helen Francis-Baptiste saw K.K. with any frequency prior to her leaving Trinidad in April 2019, and neither has spoken with K.K. since her arrival in the United States 20 months ago.  (Francis Tr. 1393:3–1394:3, 1400:9–1402:10; Francis-Baptiste 1445:2–14, 1446:19–21.)  Consequently, Ms. Krasner, who interviewed Christian Francis and Helen Francis-Baptiste, as well as K.K.'s grandmother, did not believe that these family members would be "protective factors" for K.K. because they have had and still have such limited contact and connection with K.K.  On this point, Ms. Krasner noted that K.K. did not mention any of these relatives during her interviews.  (Krasner Tr. 1129:5–18.)

Finally, and of critical significance to the Court, is the issue of whether *all* ameliorative measures would ultimately be futile because K.K's mere return to Trinidad—the site of her trauma—will be psychologically damaging.  When the Court asked Dr. Tronick whether returning a child to the place of their alleged victimization would in and of itself be detrimental, he explained,

> Going back to where she had these experiences . . . let's say it was the same home that she was in, or even if it wasn't, there is a good possibility that there would be situations --- being on the road, going by a school, meeting other people --- that would trigger some of the memories of what's going on.

> So, even if she wasn't seeing the father [] that trigger wouldn't be there, but, at the same time . . . she certainly might be anxious about running into the father, running into other people who would have known the father.  So, there certainly would be the stress of going back.

(Tronick Tr. 958:4–18.)  Ms. Krasner likewise testified "it's concerning to think of putting [K.K.] back in an environment where she experienced such traumas.  There could be the possibility of re[-]traumatization just by an association of being in the place [the traumas] occurred."  (Krasner Tr. 1124:19–1125:10.)  Ms. Krasner also noted that on multiple occasions during all three sessions, when she brought up the idea of returning to Trinidad, K.K. became visibly upset, shook her head, and said "I don't want to go back. I do not want to go back. I want to say here."  (Krasner Tr. 1125:11–15.)  In particular, Ms. Krasner identified potential "triggers" for K.K.'s trauma in Trinidad, including K.K. returning to the school where she was bullied and subjected to corporal punishment (as contemplated, the Court notes, by Petitioner), and returning to an "environment"[98] where her father used corporal punishment, where there is the possibility of her father becoming angry and driving fast, and where she may face controlling rules under threat of violence about not getting her clothes dirty.  (Krasner Tr. 1126:5–23.)  Further, Dr. Moore's opinion about the availability of services did not alter Ms. Krasner's conclusion that K.K. would be at risk of greater symptomatology upon repatriation because "even if there are services available, [K.K is] still going to be subjected to the areas and people that were involved in the trauma that she was exposed to prior."  (Krasner Tr. 1130:1–1131:18.)  In sum, Ms. Krasner testified: "as a professional working in this field for almost 20 years, I'm very, very concerned at the thought of returning a child to an environment where she experienced so much trauma and had so many resultant symptomatology that's arisen."  (Krasner Tr. 1135:7–11.)  The Court cannot disregard this compelling expert opinion.

---

[98] Based on Ms. Krasner's overall testimony, the Court infers that her reference to "environment" meant Trinidad as a whole and not specifically to any of the residences where K.K. lived with her family in Trinidad.  (*See* Krasner Tr. 1124:19–1126:23.)

130

Based on the credible, reliable, and uncontroverted testimony that returning K.K. to Trinidad—the place where she experienced the traumatic events that have resulted in her PTSD and high levels of symptomatology nearly two years later (Krasner Tr. 1085:4–11, 1125:2–4)— would be severely traumatizing, the Court is convinced that repatriation itself will be unavoidably triggering for K.K.  As a result, the Court finds that the evidence presented on ameliorative measures is not only inadequate, but "essentially inapposite," because no interim custody arrangement or therapeutic services can change the fact that returning to Trinidad is *per se* harmful to K.K.'s psychological status.  *See Blondin IV*, 238 F.3d at 161 (concluding that testimony about government services and arrangements that could be facilitated by French authorities "is essentially inapposite, as it does not purport to cast doubt on the Court's finding that *even with all of these arrangements in place,* the children face an almost certain recurrence of traumatic stress disorder on returning to France because they associate France with their father's abuse and the trauma they suffered as a result"); *id* at 162 ("[D]ue to the particular circumstances presented here, [the French authorities] cannot provide the necessary protection because doing so would require them to fulfill the impossible task of ensuring that a return to France would not trigger a recurrence of traumatic stress disorder in the children."); *Porretti*, 2019 WL 5587151, at *10 (concluding that the grave risk of psychological harm associated with repatriation could not be ameliorated by Mexican court intervention where expert testified that the children would not be able to repatriate "without the baggage of catastrophic stress and unhappiness and just poor quality of life, psychologically"); *Davies*, 2017 WL 361556, at *21 ("Finally, the Court has concluded . . . that [the child] would be severely traumatized if he were returned to St. Martin—the place where the abuse occurred—regardless of whether he resided with Mr. Davies full-time, part-time, or not at all. There are no measures that could mitigate that trauma, other than permitting [the child] to

remain in the United States."); *In re D.T.J.*, 956 F. Supp. 2d at 548 (holding that no ameliorative measures exist where the "return to Hungary itself and proximity to [petitioner] himself present a grave psychological risk to [the child]," and explaining that "[e]ven were a Hungarian court to direct that [petitioner] have no unsupervised conduct with [the child], [the child] could, and in the Court's perception would, still reasonably fear lawless, violent, and abusive behavior by him"); *Reyes Olguin*, 2005 WL 67094, at *11–12 (crediting expert testimony that "regardless of what arrangements might be made to safeguard [the child], he would be exposed to severe psychological harm if returned to Mexico because the repatriation in and of itself would trigger a relapse or exacerbation of the PTSD" and finding that no ameliorative measures could mitigate the grave risk); *Elyashiv*, 353 F. Supp. 2d at 409 ("In light of the sole, unimpeached and uncontroverted testimony of [the expert] that the *mere* return of the children to Israel would trigger their post-traumatic stress disorders, as well as [the child's] suicidal ideations, the issue of whether there would be any living arrangements in Israel is irrelevant; for the same reason, there was no need for the Court to have reached out to the Israeli authorities for their input.").  Thus, while the Court understands that it may have the authority to direct one or both of the parties to apply to courts in Trinidad for "any available relief that might ameliorate the grave risk of harm to the child" in order to "ascertain the types of protections actually available[,]" *Saada II*, 930 F.3d at 541–42,[99] it

---

[99] The Court notes that the facts here are quite different from the facts in *Saada* where the child was not himself the target of petitioner's violence (though he was exposed to much of petitioner's abuse of respondent), was not diagnosed with PTSD, and where the expert who evaluated the child did not conclude that the child's developmental delays were caused by his exposure to domestic violence.  *See Saada I*, 2019 WL 1317868, at *1–12, 12 n.33, 18 n.37; *see also Saada III*, 2020 WL 2128867, at *6 ("There is insufficient evidence that repatriation would cause [the child] grave psychological harm[.]")

declines to do so here because of the clear and convincing evidence that merely returning K.K. to Trinidad will cause her severe psychological trauma.

## IV.    Petitioner's Remaining Arguments

Finally, the Court has considered and rejects Petitioner's arguments that despite any finding that the "well-settled" and "grave risk" defenses having been established, the Court should nevertheless exercise its discretion to repatriate K.K. in light of K.K.'s interest in returning to Trinidad, K.K.'s need for contact with the Petitioner, Petitioner's interest in exercising custody, the need to discourage inequitable conduct (such as concealment), and the need to deter international abductions generally.   (Pet'r's Br., Dkt. 122, at 44–53.)   As the evidence demonstrates, any attempt by Respondent to conceal K.K.'s whereabouts was short-lived, and at no point after K.K. left Trinidad on April 5, 2019 did Respondent prevent or obstruct Petitioner's contact with K.K.  The Court does not doubt Petitioner's love for his daughter and his sincere wish to be reunited with her in Trinidad.  However, the Court finds that uprooting K.K. from her well-settled life in New York, away from the people who make her feel the most protected and cared for, and sending her back to the environment where she was traumatized and will be re-traumatized, does not serve the Convention's goal of "protect[ing] children internationally from the *harmful* effects of their wrongful removal or retention."  *Ermini*, 758 F.3d at 160 (emphasis added).  While repatriation might serve the goal of general deterrence, the Court finds that under the circumstances of this case, general deterrence would not be served by K.K.'s repatriation and is largely inapplicable here.  Indeed, it would run contrary to the Convention's purpose to dissuade a parent from removing his or her child from a dangerous situation where the other parent can and has shown a willingness to improperly use the laws of the habitual residence country to maintain control over the child and to perpetuate the dangerous situation.

## CONCLUSION

For the foregoing reasons, the Court finds that Respondent has proven by a preponderance of the evidence that K.K. is well-settled in New York, and by clear and convincing evidence that K.K. would face a grave risk of harm, which no ameliorative measure could mitigate, if she were returned to Trinidad and Tobago pending a custody determination.  The Verified Petition is denied.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: February 5, 2021
Brooklyn, New York