UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CHRISTOPHER SEAN FRANCIS, acting on
behalf of infant child, K.K.S.F.,

                  Petitioner,

- against -

SHELLON ROBERTA CULLEY,

                Respondent.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
20-CV-3326 (PKC) (SJB)

PAMELA K. CHEN, United States District Judge:

On April 6, 2021, Petitioner filed a motion under Local Civil Rule ("Local Rule") 6.3 and

Federal Rules of Civil Procedure ("Rule") 59(a) and (e), 60(b)(1), (2), (3) and/or (6), and 52(b),

seeking reconsideration of the Court's February 5, 2021 findings and relief from the March 23,

2021 judgment (the "Motion"). (Petitioner's Memorandum of Law in Support of Motion for Relief

("Mem."), Dkt. 156, at 3–4, 7–12.) Petitioner also requests an indicative ruling pursuant to Rule

62.1. (*Id.* at 3, 12–13.) For the reasons stated below, the Court denies the Motion and the request

for an indicative ruling.

## BACKGROUND[1]

### I.    Procedural History

On July 23, 2020, Petitioner commenced this action seeking return of his daughter K.K. to

Trinidad and Tobago ("Trinidad") by filing a verified petition pursuant to the Hague Convention

on the Civil Aspects of International Child Abduction, as implemented by the International Child

---

[1] The Court assumes familiarity with the extensive history and facts of this case, which are set forth in detail in the February 5, 2021 Memorandum and Order. (*See* M&O, Dkt. 133, at 2–75.) Here, the Court recites only the procedural history and factual findings relevant to the issues raised in the Motion.

Abduction Remedies Act, 42 U.S.C. § 9001 *et seq.* (*See generally* Verified Petition for Warrant in Lieu of Habeas Corpus and Petition for the Return of Child to Petitioner ("Verified Petition"), Dkt. 1.)  After Respondent conceded Petitioner's *prima facie* case (10/08/2020 Minute Order), the Court conducted a ten-day evidentiary hearing via video, during which it heard from 16 witnesses, including Petitioner, Respondent, and five experts, and admitted more than 100 exhibits into evidence (the "Hearing").  The Hearing took place between October 15 and October 30, 2020.

On February 5, 2021, the Court issued a 134-page Memorandum & Order ("M&O") denying the Verified Petition[2] based on the Court's finding that Respondent had proved both her well-settled and grave-risk-of-harm defenses.  (M&O, Dkt. 133, at 81–134.)  On March 3, 2021, Petitioner filed a timely notice of appeal.  (Dkt. 137.)  On March 23, 2021, judgment was entered against Petitioner (the "Judgment").  (Dkt. 149.)

On April 6, 2021, Petitioner filed the Motion "based on newly discovered evidence concerning recent criminal charges brought against Respondent's United States husband Bruce Blocker."  (*See* Mem., Dkt. 156, at 3–4)  In particular, Petitioner asks the Court to: (1) reverse, alter or amend the Judgment under Local Rule 6.3 and Rule 59(e); (2) reconsider the Judgment pursuant to Local Rule 6.3 and Rules 60(b)(1), (2), (3), and/or (6); or (3) reopen the evidentiary hearing pursuant to Local Rule 6.3 and Rules 59(a) and (e) to amend or add to the Court's findings of fact under Rule 52(b).  (*Id.* at 3–4, 7–12.)[3]

---

[2] The Court initially issued the M&O for parties' eyes only and instructed the parties to confer and submit joint proposed redactions.  (*See* Dkt. 133; 2/5/2021 Docket Order.)  On March 3, 2021, the Court issued a public, reacted version of the M&O.  (*See* Dkt. 139; 3/3/2021 Docket Order.)

[3] The Motion also requests an indicative ruling under Rule 62.1 stating that the Court would grant the Motion if the Court of Appeals remands for that purpose, or that the Motion raises a substantial issue.  (Mem., Dkt. 156, at 12–13.)  Because the parties have since stipulated to

On April 30, 2021, the Court granted Petitioner's letter motion for discovery (*see* Dkt. 158), made in connection with the Motion, and issued Orders subpoenaing documents sought by Petitioner from the (1) New York State Department of Corrections and Community Supervision ("DOCCS") (Dkt. 162), (2) Kings County District Attorney's Office ("KCDA") (Dkt. 162-1), and (3) New York City Police Department ("NYPD") (Dkt. 162-2).  The agencies produced documents to the Court, which the Court then reviewed *in camera* and released to the parties.  (5/13/2021, 5/25/2021, 6/16/2021 Docket Orders.)

Respondent opposed Petitioner's motion.  (Respondent's Opposition to Petitioner's Motion for Relief, Dkt. 163.)  Petitioner filed a reply.  (Petitioner's Reply Memorandum of Law in Further Support of Motion for Relief ("Reply"), Dkt. 170.)  Respondent filed a sur-reply.  (Respondent's Sur-Reply to Petitioner's Motion for Relief ("Sur-Reply"), Dkt. 174.)

## II.    Newly Discovered Evidence

The "newly discovered evidence" that forms the basis for the Motion stems from an assault by Respondent's spouse Bruce Blocker.[4]  On December 31, 2020, at approximately 10:00 p.m., Blocker viciously attacked Respondent by slashing her face with a glass bottle shard and strangling her until she lost consciousness.  (*See* Dkt. 154-1 (sworn statement by arresting officer).)[5]

---

withdrawing the appeal (*see* Dkt. 176), the Court considers Petitioner's request for an indicative ruling moot.

[4] Respondent and Blocker ██████████████████ and continued their relationship until October 2019.  (*See* M&O, Dkt. 133, at 37, 44.)  Following three domestic violence incidents in and around October 2019, Respondent obtained a two-year Order of Protection against Blocker on December 11, 2019.  (*Id.* at 44–47 (describing incidents of physical violence on September 29 and October 1, 2019, and an incident of verbal harassment on October 10, 2019).)

[5] Local Rule 6.3 states that "[n]o affidavits shall be filed by any party unless directed by the Court." *Available at* https://img.nyed.uscourts.gov/files/local_rules/localrules.pdf.  Although Petitioner affixed an affidavit with exhibits to the Motion without direction or permission to do so

On January 8, 2021, Blocker was indicted by a Kings County grand jury on nine counts, including attempted murder, assault, stalking, criminal contempt, and criminal possession of a weapon.  (Dkt. 154-3 (Indictment, Supreme Court of the State of New York, County of Kings).)  Count Four, which charges Blocker with "stalking in the first degree [PL 120.60(1)]"[6] states:

> The Defendant, Bruce Blocker, on, about, and between August 1, 2020 and December 31, 2020, in the County of Kings, with intent to harass, annoy, or alarm a specific person, namely: Shellon Culley, intentionally engaged in a course of conduct directed at S[h]ellon Culley which would likely cause Shellon Culley to reasonably fear physical injury or serious physical injury, the commission of a sex offense against, or the kidnapping, unlawful imprisonment, or death of Shellon Culley or a member of Shellon Culley's immediate family, and, in the course and furtherance thereof, intentionally or recklessly caused physical injury to Shellon Culley.

(*Id.* at ECF[7] 3.)

---

(*see* Dkt. 154), the Court has nevertheless considered the affidavits and exhibits provided by both parties in support of their briefs.

[6] New York Penal Law § 120.60(1) states in relevant part:

> A person is guilty of stalking in the first degree when he or she commits the crime of stalking in the third degree as defined in subdivision three of section 120.50 . . . and, in the course and furtherance thereof, he or she: (1) intentionally or recklessly causes physical injury to the victim of such crime.

N.Y. Penal Law § 120.60.  Penal Law § 120.50 states in relevant part:

> A person is guilty of stalking in the third degree when he or she: . . . (3) With intent to harass, annoy or alarm a specific person, intentionally engages in a course of conduct directed at such person which is likely to cause such person to reasonably fear physical injury or serious physical injury, the commission of a sex offense against, or the kidnapping, unlawful imprisonment or death of such person or a member of such person's immediate family[.]

N.Y. Penal Law § 120.50.  Although Count Four quotes the relevant New York Penal Law provisions, it does not, as Petitioner seems to argue, describe specific acts or occurrences that gave rise to the stalking charge against Blocker.

[7] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

Petitioner contends that the conduct giving rise to the allegation in Count Four that "between August 1, 2020 and December 31, 2020, . . . [Blocker] intentionally engaged in a course of conduct directed at" Respondent both validates his argument at the Hearing that Blocker posed a risk of harm to Respondent and K.K. and undermines Respondent's testimony that she had no contact with Blocker after June 2020.  (*See* Mem., Dkt. 156, at 3.)  Petitioner thus argues that the subpoenaed documents from the DOCCS, KCDA, and NYPD related to Blocker's post-release supervision from June 2020 to April 2021, the December 31, 2020 incident, and the pending criminal case against Blocker constitute "new evidence" that warrant reconsideration of the Court's denial of the Verified Petition and/or reopening the case for further evidentiary proceedings.  (*See generally* Dkts. 162, 162-1, 162-2.)

The documents that were produced in response to the subpoenas and attached to Petitioner's Reply reveal, in relevant part, that in and around the time of the Hearing, Respondent ██████████████████████████████████████████████████████████████

██ :

- ████████████████████████████████████████████
  ██ ██ ██ ██ ███ ██ ██ ██ ██ ██ ██
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████ (Dkt. 171-1 (DOCCS Parolee Chrono Report), at ECF 24.)

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████ (*Id.* at ECF 23.)

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████ (*Id.* at ECF 19–20.)

Additionally, ███████████████████████████████████████████████████

████████████████████████████████████████████████ (*see id.* at ECF 18 (noting that

████████████████████████████)), ██████████████████████████████ (Dkt. 171-

6, at ECF 2–3 (letter from Securus Technologies Monitoring Solutions analyst) (capitalization in

original)).

While these documents do not shed light on the basis for the stalking charge,[8] Respondent

submitted a sworn affidavit with her opposition brief that reveals an intentional course of conduct

by Blocker toward Respondent between his release from prison in June 2020 and the Hearing in

October 2020.  (*See generally* Affidavit of Shellon Roberta Culley ("Culley Aff."), Dkt. 164.)

Specifically, Respondent states:

> Between August 2020 and the court hearing in October 2020, I was aware that
> Bruce Blocker tried to call me a number of times even though I had blocked his
> phone number.  I always receive many calls from phone numbers with no caller ID
> or numbers I do not recognize to my cell phone, and I often answer these calls
> because salon clients often call from these sorts of numbers.  A number of times,
> when I answered calls from unknown numbers or numbers with no caller ID during
> this period of time, I recognized Mr. Blocker's voice on the other end.
>
> Whenever this happened during this time, I told Mr. Blocker to stop calling me and
> I would hang up the phone, or I hung up without saying anything to him.  We did
> not have conversations.  Between August and the hearing, Mr. Blocker sometimes

---

[8] In his initial letter motion for discovery in connection with the Motion, Petitioner
"reserve[d] the right to seek *in camera* production of Respondent's grand jury testimony should
that be the only form in which the [KCDA] can identify the substance of Blocker's conduct
encompassed by the Fourth Count in the Indictment."  (Dkt. 158, at 2.)  In response to Petitioner's
subpoena, the KCDA produced ████████████████████████████████████████████
██████████████████ (Dkt. 171-5, at ECF 3–4), ██████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████ (*id.* at ECF 1).  To date, Petitioner has not
requested Respondent's grand jury testimony.  The Court views this testimony as unnecessary
because, for the reasons explained herein, none of the arguments raised in Petitioner's motion,
including with respect to Blocker's dangerousness and Respondent's credibility, would change the
Court's prior findings or Judgment.

called my phone from numbers I did not recognize or numbers with no caller ID multiple times a week.

(Culley Aff., Dkt. 164, ¶¶ 2–3.)  Thus, the "newly discovered evidence" upon which Petitioner now seeks relief consists of Blocker's calls to Respondent from August through October 2020, and the revelation that Respondent never mentioned or disclosed these calls to the Court or Petitioner during or in connection with the Hearing, ██████████.[9]  (*See* Reply, Dkt. 170, at 1–3 (characterizing the newly discovered evidence as Blocker's "course of conduct from August 2020 through the October 2020 hearing" and Respondent's failure to report "Blocker's multiple violations of the order of protection that prohibited him from contacting her" to the Court ██████ ██████.)

## DISCUSSION

## I.   The "Newly Discovered Evidence" Does Not Change The Court's Findings

The Court finds that the newly discovered evidence does not change its prior findings of fact or assessment of Respondent's credibility, nor does it change the Court's conclusion that Respondent has proven her grave-risk-of-harm and well-settled affirmative defenses.

### A.   Respondent's Credibility

The Court's determination that Respondent testified credibly at the Hearing is not undermined by the apparent, but reconcilable, discrepancy between Respondent's testimony that

---

[9] Petitioner does not argue that Blocker's December 31, 2020 attack on Respondent and January 8, 2021 indictment, both of which occurred after the conclusion of the Hearing, but approximately one month before the Court issued the M&O, constitute "newly discovered evidence."  (*See* Reply, Dkt. 170, at 10 n.7 (noting that the events of December 31, 2020 "could not have been discovered at the time of the hearing, [but] those facts echo what the newly discovered evidence proves"); Sur-Reply, Dkt. 174, at 1 ("[Petitioner] does not cite any case law countering Respondent's position that events occurring after an evidentiary hearing cannot be 'newly discovered evidence.'").  As discussed *infra*, however, even construing the attack and indictment as newly discovered evidence, the Court does not find that either affects the Court's prior denial of the Verified Petition.

her final "contact" with Blocker was in June 2020 (Respondent ("Resp't") Transcript ("Tr.") 233:20–23), and her subsequent disclosure that Blocker called her numerous times a week from unknown or no-caller-ID phone numbers between August and October 2020 (Culley Aff., Dkt. 164, ¶¶ 2–3).

During the Hearing, Respondent was asked on direct examination whether Blocker had "contacted" her since the Order of Protection has been in place, and she answered, "Yes . . . [w]hen he came out [of prison] in 2020 June . . . [h]e ask me for his stuff," including certain documents such as "his social and birth certificate." (Resp't Tr. 232:19–233:9.) Then, Respondent was asked (again on direct): "And since that one interaction where Mr. Blocker requested his belongings back, has he had any other contact with you since the Order of Protection has been in effect?" (*Id.* 233:20–22.) Respondent answered: "No." (*Id.* 233:23.) Petitioner did not cross-examine Respondent on this testimony, other than to confirm that Blocker contacted Respondent in June 2020 to "get his stuff." (*Id.* 550:12–17; *see also id.* 565:14–566:11.) Respondent now explains that during the Hearing she assumed "contact" referred to interactions like the June 2020 conversation with Blocker that was substantive and lasted several minutes, and that it "never occurred to [her] that the calls where [she] either hung up or told [Blocker] not to call again were 'contacts.'" (Culley Aff., Dkt. 164, ¶¶ 4–6.)

Given the ambiguity of the word "contact," and that it was never defined by her counsel during Respondent's examination, the Court finds Respondent's explanation to be both reasonable and understandable.[10]   Moreover, this explanation is consistent with ███████████████

---

[10] The Court finds that this conclusion is also supported by Dr. Chitra Raghavan's explanation of Respondent's "concrete" response style (Raghavan Tr. 801:6–804:24 (explaining that Respondent had more difficulty answering abstract questions without clear facts and context)), as well as the Court's own observations of Respondent during the Hearing.

███████████████████████████████████████████████████ (Dkt. 171-1, at ECF 24) and that ██████████████████████████████ (*id.* at ECF 23; *see also id.* at ECF 19–20 (noting that █████████████████████████████████████ ██████████████████████████████ )).  That Respondent gave the same answers ████████████ as during her hearing testimony—despite her incentive to disclose to ██████ ███████ any perceived harassment by Blocker—corroborates her explanation about her understanding of the term "contact."  The Court concludes that Respondent indeed believed that "contact" referred to a conversation of some substance and length, however brief, not merely calls from unknown or no-caller-ID numbers that Respondent either immediately hung up or hung up after telling Blocker to stop calling.

The Court rejects Petitioner's argument that Respondent strategically lied to ███████████, her experts, *and* the Court about Blocker's calls to establish her affirmative defenses and defeat the Verified Petition.  (*See* Reply, Dkt. 170, at 10–14; *id* at 14 ("The newly discovered evidence that [Respondent] lied to the Court to serve her needs on a material issue calls into question all of [Respondent]'s testimony.").)  Although the Court previously recognized that "Respondent has been willing in the past to lie when it served her needs, especially when those perceived needs involved, as here, protecting or advancing her or her children's safety and happiness" (M&O, Dkt. 133, at 30), the Court does not find that Respondent lied to ████████ or provided false testimony to the Court when she stated that her last "contact" with Blocker was in June 2020.  Were that the case, what strategic advantage would Respondent gain from revealing the June 2020 "contact" with Blocker (just a few months before the Hearing) or his other more threatening and direct conduct toward Respondent, but not the other calls?  Based on its observations of Respondent and its review of the voluminous evidence introduced during these lengthy proceedings, the Court does

not find Respondent to be sufficiently sophisticated with respect to the potential legal significance of these incrementally different forms of contact with Blocker, as to have purposely withheld them in order to improve her defense.  Rather, it appears to the Court that Respondent provided truthful answers based on her reasonable belief that "contact" did not include the non-substantive, quickly-terminated calls that she received from Blocker between August and October 2020.

Therefore, the Court's previous, thoroughly considered finding that Respondent testified credibly at the Hearing (*see* M&O, Dkt. 133, at 28–33) is not undermined or altered by the newly discovered evidence.

### B.      The Grave Risk Defense

The newly discovered evidence also does not change the Court's prior findings or conclusion on the grave risk of harm that K.K. faces if she is returned to Trinidad pending a custody determination.  The grave risk defense must be established through clear and convincing evidence that "repatriation would create a grave risk of physical or psychological harm to the child." *Blondin v. Dubois*, 238 F.3d 153, 157 (2d Cir. 2001) (footnote and citations omitted).  The Court's inquiry is focused on the conduct of the petitioning parent and circumstances in the country to which the child would be returned—not on the circumstances of the child's life in their new environment.  *See id.* at 162 (explaining that "situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation" constitute a grave risk of harm); *Ermini v. Vittori*, 758 F.3d 153, 164–65 (2d Cir. 2014) ("A 'grave risk' of harm from abuse [may be] established where the 'petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question'" (citation omitted)).  Thus, to the extent Petitioner argues that the Court's findings on grave risk should be altered because *Blocker* poses a grave risk of harm to K.K. *in Brooklyn, New York*, this argument is contrary to law.

The only potential relevance of the newly discovered evidence to the Court's grave risk analysis is the extent to which it undermines Petitioner's credibility.  However, for the reasons explained above, the Court rejects Petitioner's argument that its findings "were infected by the apparent false testimony proffered by Respondent" and should be "eliminate[d]."  (*See* Mem., Dkt. 156, at 20; Reply, Dkt. 170, at 14.)  The Court again finds that Respondent did not offer "false testimony" at the Hearing regarding her "contacts" with Blocker and the Court's previous determination that Respondent is credible still stands—including its conclusion that "the false statements Respondent made in government forms and a Trinidadian court [cannot] diminish the credibility of her compelling testimony during the hearing describing the forced sex to which she was subjected by Petitioner," often in K.K.'s presence.  (M&O, Dkt. 133, at 33.)  Moreover, even if there were reason to now doubt Respondent's credibility, the Court's grave risk findings were predicated on more than just Respondent's testimony.  The Court also considered the testimony and credibility of Petitioner, Petitioner's siblings Helen Francis-Baptiste and Christian Francis, and K.K.'s brother J.M., as well as of Respondent's experts, Pamela Krasner, LCSW, and Dr. Edward Tronick.  (*See* M&O, Dkt. 133, at 5–36, 106–121.)  Based on its assessment of *all* of the competent evidence, the Court concluded that Respondent had met her burden on the grave risk defense.

Relatedly, the Court rejects Petitioner's argument that the expert opinions of Dr. Raghavan, Ms. Krasner, and Dr. Tronick are "not reliable or helpful" to the grave risk analysis because Respondent allegedly "withheld information about Blocker's stalking [of] her from August 1, 2020 onward."  (Mem., Dkt. 156, at 21.)  First, Dr. Raghavan's opinion did not inform the Court's grave risk analysis, except for the very limited finding that it tended "*to corroborate* Respondent's *already credible and compelling testimony* that Petitioner regularly forced or attempted to force

her to have sex in K.K.'s presence." (M&O, Dkt. 133, at 32 n.34 (emphasis added).) In other words, even without Dr. Raghavan's opinion, the Court would have found that Petitioner regularly forced or attempted to force Respondent to have sex in K.K.'s presence. Second, Ms. Krasner explained that her evaluation of K.K. was not impacted by Respondent's experience of domestic violence by Blocker because K.K. was not exposed to that abuse, K.K. never mentioned Blocker during the evaluation, J.M. never mentioned Blocker, and they never lived with Blocker. (*Id.* at 64.) Whether Ms. Krasner knew about Blocker's calls to Respondent is of no consequence because the fact remains that K.K. did not bring Blocker up during four-and-a-half hours of interviews over three days. (*Id.* at 58–60.) Thus, the newly discovered evidence is irrelevant to, and does not impact, the Court's conclusion that Ms. Krasner offered a credible and reliable opinion that K.K. was exposed to multiple traumas *in Trinidad*, resulting in a diagnosis of PTSD and persistent symptomatology, and that K.K. would be at risk of re-traumatization just by returning to Trinidad. (*Id.* at 114–19.) Third, as Dr. Tronick's opinion was based on his review of research and literature, he did not form any opinions about what happened in this case and opined only as to hypotheticals presented by the Court.[11] (*Id.* at 65–68, 112–13, 128–30.) The newly discovered evidence is plainly irrelevant to, and in no way impacts, the Court's conclusion that Dr. Tronick offered a credible and reliable opinion, including that returning a child to the place of their alleged trauma would in and of itself be detrimental. (*Id.* at 113, 120, 129.)

---

[11] Petitioner's argument that Dr. Tronick's opinion testimony is "fatally flawed by the sheer fact that it relies on the opinions rendered by Dr. Raghavan and Ms. Krasner, which are both the product of Respondent's withholding of information about the ongoing threat Blocker posed to Respondent and K.K." (Mem., Dkt. 156, at 23) misconstrues the record and is false. As the Court previously noted, "Dr. Tronick spoke with Dr. Ragavan and Ms. Krasner, though he did not form any opinions about what did or did not take place in this case." (M&O, Dkt. 133, at 65 (citing Tronick Tr. 895:13–22, 897:17–25).)

In sum, the newly discovered evidence does not impact the Court's determination that "on the record presented, Petitioner's repeated instances of forced and attempted forced [sex], and to a lesser extent, physical abuse of Respondent, in K.K.'s presence support a grave risk of harm defense." (*Id.* at 110.)  Nor does this evidence impact the Court's determination that

> based on the expert testimony of both Dr. Tronick and Ms. Krasner, as well as the Court's own assessment of Petitioner's likelihood to continue engaging in abusive, threatening, and fear inspiring conduct toward K.K . . . returning K.K. to Trinidad would be severely psychologically damaging and triggering to her current symptomatology and PTSD diagnosis.

(*Id.* at 120–21.)  The Court will not reconsider or alter its conclusion that Respondent proved by clear and convincing evidence that K.K. would face a grave risk of harm if she were returned to Trinidad pending a custody determination.

### C.      The Well-Settled Defense

Further, the newly discovered evidence does not alter the Court's findings or conclusion on the well-settled defense.  "Settled" means that a child has "has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment." *See Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).  In making a well-settled determination, a court may consider "any factor relevant to a child's connection to [her] living arrangement," which "should generally include" the following:

> (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent.

*Id.* at 56–57 (alteration in original) (collecting cases).  The Court applied this standard in its well-settled analysis and found that

> K.K.'s age, the stability of her residence in Flatbush, Brooklyn, her consistent
> attendance, improvements, and happiness at P.S. ▓ (the only school she has
> attended), her participation in ▓▓▓▓▓▓▓▓▓▓ Church services and other
> extracurricular activities, and her relationships with friends and caring adults in
> New York, all support a finding that K.K. is well-settled in her new environment.

(M&O, Dkt. 133, at 104.)  The newly discovered evidence does not undermine these findings, all

of which hold true despite Blocker's calls to Respondent between August and October 2020.

Moreover, these findings were not based on Respondent's testimony alone, but also on testimony

from J.M., Patrice Carter-Carmichael, and Elaine Heron, as well as non-testimonial evidence, such

as K.K.'s school records, photos, and videos.  (*See generally id.* at 81–100.)  Thus, even if the

Court were to reconsider Respondent's credibility (which it does not), these findings would still

be amply supported by the record.

In making its well-settled determination, the Court also considered and dismissed

Petitioner's argument that there was a "genuine risk of additional domestic violence" by Blocker

that precluded "a finding that K.K. is secure in Flatbush, Brooklyn." (Petitioner's Post-Trial Brief

("Pet'r's Br."), Dkt. 122, ¶¶ 77–119; *see also id.* at 57–58, 61–64.)  First, the Court found that

Blocker did not undermine the stability of K.K.'s residence in her new environment.  Although in

May 2019, Respondent, K.K., and J.M. spent one night with Blocker at a shelter when they were

seeking to qualify for an apartment, and in October 2019, Respondent, K.K., and J.M. spent one

night in a domestic violence shelter after Blocker assaulted Respondent, the Court found that "the

two nights out of over 20 months that Respondent and her children spent in shelters . . . provide

no basis for finding any instability in K.K.'s new environment."  (M&O, Dkt. 133, at 86–87.)

Second, the Court specifically rejected Petitioner's argument that "Respondent endangered K.K.'s

physical and emotional safety once she decided to make Bruce Blocker the foundation of her new

life in the United States" (Pet'r's Br., Dkt. 122, at 61) and made the following findings:

While the Court does not underestimate the seriousness of the threat that Blocker posed to the safety of Respondent and her children during the time that Blocker and Respondent were involved, there is no evidence that Blocker ever harmed either K.K. or J.M., that K.K. or J.M. ever witnessed Blocker's mistreatment of Respondent, that Respondent had reason to think Blocker posed a danger to K.K., J.M., or herself, or that Blocker continues to pose a risk of harm to Respondent or her children. During Respondent's relationship with Blocker, K.K. and J.M. both interacted with Blocker on a nearly daily basis, but without incident; in fact, Blocker helped K.K. with homework and shared meals with her, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Blocker was alone with K.K. on only one occasion, when he picked her up from school and walked her to Respondent's salon 10 or 15 minutes away; this was before the two incidents in which Blocker assaulted Respondent. K.K. was not present during the two assaults by Blocker, but was in ▮▮▮▮▮▮▮ the salon when Blocker verbally harassed Respondent at work. Following these assaults, Respondent filed [Domestic Incident Reports] with the NYPD, asked the NYPD to contact K.K.'s school to prohibit Blocker from picking K.K. up, and on December 11, 2019, obtained an Order of Protection against Blocker that remains in effect until December 10, 2021. Although Blocker has contacted Respondent twice since the Order of Protection has been in effect, most recently in June 2020, neither she nor her children have seen Blocker in over a year, despite the fact that Blocker has been out of custody for nearly six months.

In the absence of any concrete evidence that Blocker endangered K.K., that K.K. was exposed to Blocker's violent acts toward Respondent, or that Blocker presents an actual threat to K.K.'s future safety, the Court is unwilling to speculate that such a threat exists. Nor does the Court conclude that Respondent's relationship with Blocker undermines the stability of K.K.'s life since she began living in Flatbush, Brooklyn in April 2019.

(M&O, Dkt. 133, at 87–88 (record citations omitted).)

The newly discovered evidence does not, as Petitioner argues, "constitute[] 'concrete evidence' that Blocker posed a threat from August 2020 onward." (Reply, Dkt. 170, at 8.) Although Blocker called Respondent between August and October 2020, there is still no evidence that Blocker ever harmed K.K. or that K.K. ever witnessed Blocker mistreat Respondent. (M&O, Dkt. 133, at 87.) Moreover, at the time of the Hearing, K.K. had not seen or spoken to Blocker since before he assaulted Respondent in October 2019. (Culley Aff., Dkt. 164, ¶ 8; *see also* M&O, Dkt. 133, at 88 ("[N]either [Respondent] nor her children have seen Blocker in over a year, despite the fact that Blocker has been out of custody for nearly six months." (record citations omitted)).)

The Court does not question the seriousness of Blocker's calls in violation of Respondent's Order of Protection *as a matter of state criminal law*.  However, the Court understands why Respondent may not have reported those calls *as a matter of safety*, particularly because Blocker did not threaten Respondent over the phone or come to her home or workplace.  (*See* Culley Aff., Dkt. 164, ¶¶ 7–8; Resp't Tr. 232:12–18; *see also* Curtis[12] Tr. 2285:5–2287:9 (explaining considerations around reporting order of protection violations, and noting that society "expect[s] [survivors of domestic violence] to do what we think is best [] not really understanding that [] what we think is best is not often the safest for them"); Sur-Reply, Dkt. 174, at 4 (citing, *inter alia*, Jessica R. Goodkind et al., *A Contextual Analysis of Battered Women's Safety Planning*, 10 Violence Against Women 514, 527 (2004), *available at* https://vaw.msu.edu/wp-content/uploads/2013/10/Safety-planning-article.pdf (empirical data on "battered women's strategies to protect themselves and their children" found that "women engage in numerous and diverse risk-reduction and safety-planning strategies" and that "there is no simple answer or 'best' strategy to respond to intimate partner violence").)  Respondent is under no legal obligation to report violations of her Order of Protection.  There is no evidence that Respondent endangered K.K. by not reporting Blocker's non-threatening calls.

Further, the Court rejects Petitioner's argument that it was "fundamentally unfair" to exclude certain evidence of Blocker's "escalating domestic violence" toward other women more than a decade ago.  (Mem., Dkt. 156, at 16–18.)  During the Hearing, the Court *did admit*, over

---

[12] Respondent called Maureen Curtis, Vice President of criminal justice programs at Safe Horizon, the largest victim services agency in the country, to testify about, among other things, how victims of domestic violence typically obtain copies of orders of protection and respond to violations of those orders.  (Curtis Tr. 2269:7–2272:18, 2276:17–2287:12.)  Ms. Curtis was not qualified as an expert but spoke from her more than 30 years of experience working with victims of domestic violence.

Respondent's objection, testimony and documentary evidence regarding Blocker's criminal history. (*See* Tr. 2140:20–2141:2 (overruling Respondent's objection to evidence regarding Blocker's prior crimes); William Tr. 2144:2–16 (testimony of DOCCS parole revocation specialist regarding Blocker's classification as someone with a "high probability" to reoffend), *id.* 2179:14–21 (explaining that Blocker "has a history of violating the orders of protection[,] [s]o for the victim's safety he has a GPS placed on him"); P238 at DOCCS_0000114–116 (DOCCS Violation of Release Report describing Blocker's criminal history and noting his "extensive history of domestic violence").) The Court considered Blocker's "substantial criminal history," including a 2010 incident in which he violated an order of protection by violently assaulting the mother of his three-year old son in his son's presence (M&O, Dkt. 133, at 46), and that Blocker was given a GPS monitor when he was released on parole in June 2020 because of his history of domestic violence and violations of orders of protection (*id.* at 47 n.44).[13] Nevertheless, the Court concluded that Blocker's criminal history alone did not demonstrate that he posed a specific threat to K.K.'s security and stability in Brooklyn, New York. (M&O, Dkt. 133, at 88.) Any additional evidence that the Court may have excluded regarding Blocker's prior acts of domestic violence and

---

[13] The Court rejects Petitioner's argument that ███████████████████████████ ████████████████ because of Respondent's "lie" about Blocker's contacts and that "[h]ad [Respondent] told the truth about Blocker, ██████████████ would have prevented Blocker's attack of [Respondent]." (Reply, Dkt. 170, at 11; *see also id.* ("[Respondent]'s lie may have defeated the Petition, but it almost cost [Respondent] her life.").) First, as previously explained, the Court does not find that Respondent lied to ██████████ or the Court by failing to explain ██████████ Second, ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ (*See* Dkt. 171-1, at 18–19.) In other words, Respondent's ████████████████████████████ ████████████████████████████████████████████████████. Third, it should go without saying: Respondent is not to blame for Blocker's violence against her.

violations of orders of protection involving other women more than a decade ago, would not change the Court's conclusion.

Finally, any risk of harm Blocker posed to K.K.'s safety and stability is but one of several considerations in the "fact-specific multi-factor" well-settled analysis, under which no single factor is dispositive. *See Broca v. Giron*, 530 F. App'x 46, 47 (2d Cir. 2013) (summary order) (quoting *Lozano*, 697 F.3d at 57). The newly discovered evidence of Blocker's calls does not alter the Court's ultimate determination that on balance, and considering all competent evidence in the record, Respondent demonstrated by a preponderance of the evidence that K.K. is well-settled in her new environment.

## II.     Petitioner's Requests For Relief Are Denied

Petitioner's requests for reconsideration are governed by the strict standard of Local Rule 6.3, which is "intended to 'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" *Coventry Cap. US LLC v. EEA Life Settlements Inc.*, 439 F. Supp. 3d 169, 175 (S.D.N.Y. 2020) (quoting *SEC v. Ashbury Cap. Partners, L.P.*, No. 00-CV-7898 (RCC), 2001 WL 604044, at *1 (S.D.N.Y. May 31, 2001)). Whether to grant or deny such requests is in "the sound discretion of the district court." *Id.* (quoting *Aczel v. Labonia*, 584 F.3d 52, 61 (2d Cir. 2009)); *accord Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 594 (S.D.N.Y. 2011). Petitioner does not meet the heavy burden for relief under Local Rule 6.3 or any of the Rules upon which he relies, as addressed below.

### A.     Rule 59(e)

In general, a Rule 59(e) motion to alter or amend a judgment will be "denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *In re*

*Zyprexa Prods. Liab. Litig.*, 653 F. Supp. 2d 181, 182 (E.D.N.Y. 2009) (alteration omitted) (quoting *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).  "A court may grant a Rule 59(e) motion only when the [movant] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2d Cir. 2020) (internal quotation marks omitted) (quoting *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013)).

Petitioner argues that relief is warranted under Rule 59(e) because the newly discovered evidence "demonstrates that Blocker presented a threat to Respondent and K.K" and reveals that the Court's grave risk determination was "improperly founded on Respondent's false testimony, as well as the opinions of Respondent's experts—from whom Respondent appears to have withheld information about Blocker's stalking [of] her from August 1[,] 2020 onward."  (Mem., Dkt. 156, at 7.)  Petitioner also argues that the Court "improperly shifted the burden to Petitioner to prove that ameliorative measures were available in Trinidad."  (*Id.* at 7 n.5.)

> To prevail on a "newly discovered evidence" claim, the movant must demonstrate that
>
> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*Metzler Inv. Gmbh*, 970 F.3d at 146–47 (quoting *United States v. Int'l Brotherhood of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001)).  Even assuming that Petitioner was "justifiably ignorant" of Blocker's calls to Respondent at the time of the Hearing, the Court will not grant relief under Rule 59(e) because, for all of the reasons explained above, Blocker's calls to Respondent between August and October 2020 are not "of such importance" that they "probably would have changed

19

the outcome" of the Court's determination that Respondent testified credibly at the Hearing, that K.K. is well-settled in Flatbush, Brooklyn, and that returning K.K. to Trinidad will create a grave risk of physical and/or psychological harm.

Although Petitioner's "newly discovered evidence" claim focuses on Blocker's calls to Respondent between August and October 2020, evidence associated with the December 31, 2020 attack and Blocker's January 8, 2021 indictment could arguably be construed as newly discovered as well.  While these events occurred more than two months after the Hearing concluded on October 30, 2020, this was still during the pendency of a dispositive proceeding, *i.e.*, prior to the Court's denial of the Verified Petition on February 5, 2021 and entry of judgment on March 23, 2021.  *See Saada v. Golan*, No. 18-CV-5292 (AMD) (RML), 2021 WL 1176372, at *4 (E.D.N.Y. Mar. 29, 2021) (finding that a November 2019 investigation that "existed at the time that [the court] was considering [its] May 5, 2020 order" constitutes "facts that existed at the time of trial or other dispositive proceeding");[14] *Kurzweil v. Philip Morris Cos., Inc.*, No. 94-CV-2373 (MBM), 1997 WL 167043, at *4 (S.D.N.Y. Apr. 9, 1997) (finding that reports published after briefing was complete in December 1994, but one month before the Court's September 1995 Order, constituted "new evidence [that] existed at the time of the [court's] decision"); *see also NYC Med. Prac., P.C. v. Shokrian*, No. 19-CV-162 (ARR) (RML), 2020 WL 1853203, at *3 (E.D.N.Y. Jan. 31, 2020) ("Newly *discovered* evidence must have existed at the time that the underlying motion was adjudicated[.]").  The Court does not minimize the seriousness of the attack and indictment, but

---

[14] "Whether relief is sought under Rule 59(e) or Rule 60(b)(2), courts apply the same strict standard, and decisions under either are authoritative."  *Mavl Cap., Inc. v. Marine Transp. Logistics, Inc.*, No. 13-CV-7110 (PKC) (RLM), 2018 WL 1474175, at *6 (E.D.N.Y. Mar. 26, 2018) (citing, *inter alia*, *Becnel v. Deutsche Bank AG*, 838 F. Supp. 2d 168, 171 (S.D.N.Y. 2011)), *aff'd*, 771 F. App'x 56 (2d Cir. 2019) (summary order)).

does not conclude that these events, nor any of the related evidence cited by Petitioner, would have changed the Courts findings or the Judgment.

First, ██████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ (*See* Dkt. 171-4.) ████████████

██████████████████████████████████████████████████

████████████████████████████████████████ (*Id.*) ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ (Dkt. 171-3, at ECF 7.) ████████████████████████

████████████████████████████████ (*Id.* at ECF 10 (████████████

████████████████████████████████████████████████████),

ECF 14 ██████████████████████████████████████████), ECF 15

(████████████████████████████████████████), ECF 16 (████████████

████████████████████████████████.) ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ While Blocker's

shocking act of violence momentarily interrupted life for Respondent and her children, it does not undermine K.K.'s overall stability and security in Brooklyn, New York since April 2019.[15] Second, although the attack may have made the Court's determination that Blocker does not continue to pose a risk of harm to Respondent or her children a closer call, Blocker's continued

---

[15] In fact, ████████████████████████████ following the attack have arguably strengthened her connections to her community and further support the Court's well-settled determination.

incarceration[16] and the probability he will receive a substantial prison term if convicted of the assault mean that he likely will be incapacitated from causing harm for the foreseeable future.[17] Third, the attack, no matter how serious, does not alter the Court's key well-settled findings. (*See* M&O, Dkt. 133, at 81–104.)  "In order to prevail on a motion for relief from a judgment on the grounds of newly discovered evidence, a party must [] establish [among other things] that 'the evidence [is] admissible and of such importance that it probably would have changed the outcome.'"  *See Marhone v. Cassel*, No. 16-CV-4733 (NSR), 2021 WL 142278, at *3 (S.D.N.Y. Jan. 14, 2021) (quoting *Metzler Inv. Gmbh*, 970 F.3d at 147).  Even assuming that evidence related to the attack and indictment qualifies as newly discovered and admissible, the Court still finds, as

---

[16] Blocker is currently in custody on $500,000 bond, which he has not paid.  *See* WebCriminal, NEW YORK STATE UNIFIED COURT SYSTEM, https://iapps.courts.state.ny.us/webcrim_attorney/AttorneyWelcome (last visited July 16, 2021). His trial is scheduled to begin on July 26, 2021.  *Id.*  As discussed *infra* at footnote 17, the evidence of Blocker's guilt is considerable, consisting not only of Respondent's testimony, but also that of ██████████████████████████████████████████████████████████████████████.

[17] The Court rejects Petitioner's argument that the Court "can[not] safely predict the outcome of th[e] criminal trial especially given that [Respondent] has now made the prosecutor's job that much more difficult" with her testimony that Blocker never threatened or contacted her after June 2020 and her "multiple false statements under oath" at the Hearing.  (Reply, Dkt. 170, at 9–10.) ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ (Dkt. 171-3, at ECF 2–3; *see also* Dkt. 171-1, at ECF 7 (noting that ██████████████ ███████████████████████████); Dkt. 171-5, at ECF 3 (noting that ████████ ██████████).)  In light of this and other incriminating evidence, it does not appear that Respondent's testimony (and credibility) is the lynchpin of the prosecution's case.  While the Court may not be able to predict the outcome of Blocker's trial, it is reasonable to assume, given his significant criminal history and that he was charged with six felonies and three misdemeanors, that he faces an uphill battle in avoiding a lengthy sentence if convicted.  *See* WebCriminal, NEW YORK STATE UNIFIED COURT SYSTEM, https://iapps.courts.state.ny.us/webcrim_attorney/AttorneyWelcome (last visited July 16, 2021); *see* N.Y. Penal Law §§ 110.05, 125.25(1), 120.60(1), and 70.00 (maximum penalties for attempted murder in the second degree (a class B felony) and stalking in the first degree (a class D felony), respectively, are 25 years and 7 years).

discussed above, that Petitioner has not established that it "probably would have" changed the Court's determination that K.K. is well-settled.  For this reason, Petitioner is not entitled to relief under Rule 59(e) based on newly discovered evidence.

Petitioner also is not entitled to relief under Rule 59(e) because the Court did not "improperly shift[] the burden to Petitioner to prove that ameliorative measures were available in Trinidad."  (Mem., Dkt. 156, at 7 n.5; *see id.* at 24–25.)  Petitioner does not point to controlling decisions overlooked by the Court or any other clear error.  In fact, the Court previously acknowledged, as Petitioner now argues, that "the Second Circuit has 'impl[ied]' that the burden on ameliorative measures is part of respondent's grave risk claim."  (*See* M&O, Dkt. 133, at 127 n.96.)  But the Court also noted, which Petitioner now omits, that the Second Circuit has not explicitly assigned the burden to one party or the other, and that other courts have observed that "[l]ogically . . . the burden would appear to fall on the petitioner" to rebut a finding of grave risk of harm.  (*Id.* (collecting cases.))  On consideration of evidence presented by both parties, including testimony by Petitioner's expert Dr. Karen Moore (M&O, Dkt. 133, at 68–71, 125–130), the Court found that Petitioner had "failed to demonstrate that there are any measures, much less adequate measures, in place [in Trinidad] to mitigate the risk of harm to K.K," but more decisively, that Respondent had "demonstrated through the uncontroverted opinions of Dr. Tronick and Ms. Krasner that no ameliorative measures could mitigate the psychological harm to K.K. of repatriation to the place of her trauma" (*id.* at 127 n.96).  Regardless of where the burden rests, "the [court's] focus [should be] on measures that 'make possible the safe return of [the] child to the home country.'"  *Saada v. Golan*, No. 18-CV-5292 (AMD) (SMG), 2020 WL 2128867, at *2 (E.D.N.Y. May 5, 2020) (quoting *Blondin*, 238 F.3d at 153 n.11).  Here, the Court considered the possibility of such measures, but ultimately concluded that none exist, because merely returning

K.K. to Trinidad would be harmful to her psychological wellbeing.  (*See* M&O, Dkt. 133, at 131–33.)

In sum, Petitioner has not identified any new evidence, clear error, or manifest injustice that merits altering or amending the Judgment.  Petitioner's challenge to the Court's credibility, well-settled, grave risk, and ameliorative measures determinations is an impermissible attempt to "relitigate[e] old issues" or "otherwise tak[e] a second bite at the apple."  *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012), *as amended* (July 13, 2012) (internal quotation marks and citation omitted).  "Reconsideration of a decision pursuant to Rule 59(e) is an 'extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.'"  *Johnson v. ThyssenKrupp Elevator Corp.*, No. 19-CV-3009 (AMD) (RLM), 2019 WL 6217267, at *1 (E.D.N.Y. Nov. 15, 2019) (quoting *Johnson v. New York City*, No. 10-CV-5359 (PKC) (JLC), 2011 WL 2471030, at *1 (S.D.N.Y. June 21, 2011)).  Petitioner has not demonstrated that he is entitled to such extraordinary relief here.[18]

### B.     Rule 60(b)(1), (2), (3), and/or (6)

Rule 60(b) lists various reasons a court "may relieve a party or its legal representative from a final judgment, order, or proceeding."  Fed. R. Civ. P. 60(b)(1)–(6).  Much like a Rule 59(e) motion, a Rule 60 motion "is generally not favored and is properly granted only upon a showing

---

[18] Although Petitioner makes passing references to Rule 59(a) (*see* Dkt. 153; Mem., Dkt. 156, at 4), he does not make any arguments in support of a motion for new trial (*see* Mem., Dkt. 156, at 7–9 (addressing only Rule 59(e)).)  Further, Petitioner did not address Rule 59(a) or otherwise clarify his position with respect to a motion for new trial in his Reply brief.  (*See generally* Reply, Dkt. 170.)  To the extent Petitioner asks the Court to reopen the Hearing to receive additional evidence on Respondent's failure to disclose Blocker's calls, Blocker's dangerousness, and/or ameliorative measures (Mem., Dkt. 156, at 3, 17, 25), the Court denies that request for all of the reasons stated herein, including that additional evidence on these issues would not alter the Court's determination that Respondent testified credibly at the Hearing, that K.K. is well-settled in Flatbush, Brooklyn, and that no ameliorative measures could mitigate the grave risk of psychological harm K.K. would face by returning to Trinidad pending a custody determination.

of exceptional circumstances." *Teamsters*, 247 F.3d at 391; *accord Paddington Partners v. Bouchard*, 34 F.3d 1132, 1142 (2d Cir. 1994). Likewise, a Rule 60 motion should not be used to "relitigate matters settled by the original judgment." *Mavl Cap.*, 2018 WL 1474175, at *5 (quoting *Donovan v. Sovereign Sec. Ltd.*, 726 F.2d 55, 60 (2d Cir. 1984)).

        1.    <u>Rule 60(b)(1)</u>

Rule 60(b)(1) provides relief for "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). "Under this provision, a district court may correct its own mistakes that are 'of a substantive legal nature,' and 'its own mistake[s] of fact.'" *Castro v. Bank of N.Y. Mellon*, --- F. App'x ---, 2021 WL 1207904, at *2 (2d Cir. Mar. 31, 2021) (summary order) (alteration in original) (first quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 670 (2d Cir. 1977), and then quoting *Gey Assocs. Gen. P'ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 35 (2d Cir. 2003)).

Petitioner argues that the Court was "incorrect in its determination" that Blocker did not pose an ongoing threat to Respondent and K.K. because the Court relied on Respondent's "apparent false testimony" and the opinions of experts with whom Respondent was not forthright about the "persistent threat posed by Blocker." (Mem., Dkt. 156, at 10–11.) Petitioner does not point to a mistake of fact by the Court, but rather, highlights his own disagreement with the Court's considered determination that the record was devoid of "concrete evidence" that Blocker endangered K.K., that K.K. was exposed to Blocker's violent acts toward Respondent, or that Blocker presented an actual threat to K.K.'s future safety. As discussed above, the fact that Blocker attempted to speak to Respondent between August and October 2020 and then physically attacked her in December 2020 does not alter the Court's finding that there is no concrete evidence that Blocker has or will harm K.K. Rule 60(b)(1) "will not provide a movant an additional opportunity to make arguments or attempt to win a point already 'carefully analyzed and justifiably

disposed.'" *Isabella v. Podlofsky*, No. 08-CV-1510 (TCP) (ETB), 2010 WL 11632635, at *4 (E.D.N.Y. Jan. 26, 2010) (quoting *In re Carlton Concrete Corp.*, No. 08-CV-242 (JFB), 2008 WL 4443233, at *5 (E.D.N.Y. Sept. 26, 2008)).   Moreover, even if the Court's determination on this issue could be viewed as a mistake of fact (in light of the newly discovered evidence), this mistake would be insufficient to change the Court's conclusion that K.K. is well-settled in Flatbush, Brooklyn.  *Samuels v. United States*, No. 12-CV-7362 (RJS), 2017 WL 6624849, at *1 (S.D.N.Y. Oct. 11, 2017) (explaining that a mistake of fact must be a "material mistake that changed the outcome of the [c]ourt's judgment" to serve as a basis for relief under Rule 60(b)(1) (quoting *Matura v. United States*, 189 F.R.D. 86, 89 (S.D.N.Y. 1999))).   As explained above, the Court's well-settled determination was based on its balancing of several factors, none of which was dispositive.  In sum, Petitioner has not identified exceptional circumstances warranting relief under Rule 60(b)(1).

## 2. Rule 60(b)(2)

Rule 60(b)(2) provides relief in the face of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2).  "Whether relief is sought under Rule 59(e) or Rule 60(b)(2), courts apply the same strict standard for determining what qualifies as 'newly discovered evidence.'"  *Grand River Enters. Six Nations, Ltd. v. King*, No. 02-CV-5068 (JFK), 2012 WL 263100, at *2 (S.D.N.Y. Jan. 30, 2012) (quoting *Becnel*, 838 F. Supp. 2d at 171); *accord Mavl Cap.*, 2018 WL 1474175, at *6. As the Court already explained in its analysis rejecting Petitioner's request for relief under Rule 59(e), Petitioner has not demonstrated that the newly discovered evidence probably would have changed the outcome of the Court's conclusions.   Therefore, Petitioner's request for relief under Rule 60(b)(2) is also denied.

3.      Rule 60(b)(3)

Rule 60(b)(3) provides relief where there is "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3).  This provision is ordinarily "invoked 'where material information has been withheld or incorrect or perjured evidence has been intentionally supplied.'" *Mavl Cap.*, 2018 WL 1474175, at *8 (quoting *In re Emergency Beacon Corp.*, 666 F.2d 754, 759 (2d Cir. 1981)).  A party seeking relief under Rule 60(b)(3) "must produce 'clear and convincing evidence' of fraud or misconduct causing material misrepresentations." *Id.* (quoting *Fleming v. N.Y. Univ.*, 865 F.2d 478, 484 (2d Cir. 1989)).  To prevail, the movant "must show that the conduct complained of prevented the moving party from fully and fairly presenting his case." *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 176 (2d Cir. 2004) (citation omitted).

As discussed, the Court does not find that Respondent testified falsely—no less, fraudulently—when she denied further "contact" with Blocker after June 2020.  Additionally, Blocker's calls to Respondent between August and October 2020 do not amount to "material information" that would have changed the Court's conclusions.  Petitioner falls far short of demonstrating by clear and convincing evidence that Respondent perpetrated fraud or engaged in misconduct by failing to disclose Blocker's calls to her.  As importantly, Petitioner has not shown how the omission of this information during the Hearing prevented him from "fully and fairly presenting his case." *Id.*  Petitioner's request for relief under Rule 60(b)(3) is denied.

4.      Rule 60(b)(6)

Rule 60(b)(6) provides relief for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6).  "[I]f Rules 60(b)(1) through (5) do not apply, and if extraordinary circumstances are present or the failure to grant relief would work an extreme hardship on the movant," then a party may seek relief under Rule 60(b)(6). *ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 109

(2d Cir. 2012) (citation omitted); *accord United Airlines, Inc. v. Brien*, 588 F.3d 158, 175 (2d Cir. 2009).  Here, Petitioner's reasons for seeking relief fall within at least one of the "more specific clauses" of Rule 60(b), although he failed to carry his burden under those clauses; thus, he is "disqualif[ied] [] from obtaining relief under Rule 60(b)(6)."  *See Castro*, 2021 WL 1207904, at *3.  In any event, the Court finds that Petitioner has not demonstrated any other basis for the Court to grant relief from the Judgment.  Thus, Petitioner's request for relief under Rule 60(b)(6) is denied.

## III.   Rule 52(b)

Under Rule 52(b), a court "may amend its findings—or make additional findings—and may amend the judgment accordingly," Fed. R. Civ. P. 52(b), in order "to correct manifest errors of law or fact at trial, or, in some limited situations, in the face of newly discovered evidence," *Endo Pharms. Inc. v. Amneal Pharms., LLC*, No. 12-CV-8060 (TPG), 2016 WL 1732751, at *1 (S.D.N.Y. Apr. 29, 2016) (internal citations omitted).  Requests for relief under Rule 52(b) are evaluated under the "same standard" as requests for relief under Rule 59(e).  *Id.*; *see also Tiffany & Co. v. Costco Wholesale Corp.*, No. 13-CV-1041 (LTS) (DCF), 2019 WL 120765, at *4 n.2 (S.D.N.Y. Jan. 7, 2019) ("A Rule 52(b) motion is evaluated under a similar reconsideration standard as a Rule 59(e) motion and should be 'denied unless the moving party can point to controlling decisions or data that the court overlooked.'" (citations omitted)).  For all of the reasons stated above, the Court finds that Petitioner has not pointed to any error of fact or law, or any new evidence, that would materially alter the Court's findings.  Petitioner's request for relief under Rule 52(b) is denied.

\*     \*     \*

Having found that Petitioner has failed to meet his burden to show that he entitled to relief under Rules 59(e), 60(b)(1), (2), (3), and (6), and 52(b), the Court denies the Motion in its entirety.

The Court also denies Petitioner's request to reopen the evidentiary hearing, finding no need or basis to do so, given the Court's determination that this evidence will not change the Court's prior denial of the Verified Petition.

## IV.    Rule 62.1

Finally, Petitioner asks the Court for an indicative ruling under Rule 62.1.  (Mem., Dkt. 156, at 3.)  Rule 62.1 provides that

> [i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 62.1; *see also LFoundry Rousset, SAS v. Atmel Corp.*, 690 F. App'x 748, 750 (2d Cir. 2017) (summary order) ("A motion brought pursuant to [Rule] 62.1 is a procedural device that allows a district court to inform the parties and [the court of appeals] how it would rule on the merits of certain motions after an appeal has been filed and the district court has been divested of jurisdiction.").

The parties have stipulated to withdrawing the appeal.  (Dkt. 176.)  Therefore, Petitioner's request for an indicative ruling under Rule 62.1 is moot.  In any event, the Court's resolution and denial of Petitioner's Motion in its entirety render his request for an indicative ruling unnecessary, and that request therefore is denied.

## CONCLUSION

Petitioner's motion for relief under Rule 59(a) and (e), Rule 60(b)(1), (2), (3) and/or (6), and Rule 52(b) is denied.  Petitioner's request for an indicative ruling under Rule 62.1 is denied as moot.  The March 23, 2021 Judgment stands.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: July 20, 2021
      Brooklyn, New York